# Exhibit D

**In The Matter Of:**

*Desmond, et al. v.*
*Narconon, et al.*

---

*Louis Adolph Casal, M.D.*
*March 21, 2012*

---

*Q&A Reporting Services, Inc.*
*Certified Court Reporters*
*2165 Fairhaven Circle, NE*
*Atlanta, GA  30305*
*404.233.3300  ** JFischer@QAReporting.com*

Original File casal.txt

Min-U-Script® with Word Index



| Desmond, et al. v.<br>Narconon, et al. | Louis Adolph Casal, M.D.<br>March 21, 2012 |
|---|---|

---

**Page 3**

IN THE STATE COURT OF DEKALB COUNTY
STATE OF GEORGIA

PATRICK C. DESMOND AND MARY )
C. DESMOND, INDIVIDUALLY, AND)
MARY C. DESMOND, AS )
ADMINISTRATRIX OF THE ESTATE )
OF PATRICK C. DESMOND, )
            Plaintiffs, )
                              ) CIVIL ACTION FILE
      vs.                     ) NO. 10A28641-2
NARCONON OF GEORGIA, INC., )
DELGADO DEVELOPMENT, INC., )
SOVEREIGN PLACE, LLC, )
SOVEREIGN PLACE APARTMENT )
MANAGEMENT, INC., LISA )
CAROLINA ROBBINS, M.D., THE )
ROBBINS GROUP, INC., AND )
NARCONON INTERNATIONAL, )
            Defendants. )

        Video deposition of LOUIS ADOLPH CASAL, M.D.,
taken on behalf of the Plaintiffs, pursuant to
the stipulations contained herein, before
Jo Tomoff Fischer, RMR, CCR No. B-924, at 880
West Peachtree Street, Atlanta, Georgia, on
March 21, 2012, commencing at the hour of 11:05
a.m.

            Q&A REPORTING SERVICES, INC.
                Certified Court Reporters
                2165 Fairhaven Circle, NE
                    Atlanta, GA  30305
        404.233.3300  **  (Fax) 404.233.1530

1  ALSO PRESENT:  GABRIELLE ESQUIVEL, Legal Technology
2                 Services, 770-554-1633

---

**Page 2**

1  APPEARANCES OF COUNSEL

2        ON BEHALF OF THE PLAINTIFFS:

3            JEFFREY R. HARRIS, ESQ.
             Harris Penn Lowry DelCampo, LLP
4            400 Colony Square, Suite 900
             1201 Peachtree Street, NE
5            Atlanta, GA  30361
             (404) 961-7650
6

7

8        ON BEHALF OF THE DEFENDANTS NARCONON OF GEORGIA
9            and NARCONON INTERNATIONAL:

10           BARBARA A. MARSCHALK, ESQ.
             Drew, Eckl & Farnham, LLP
11           880 West Peachtree Street
             P.O. Box 7600
12           Atlanta, GA  30357
             (404) 885-1400
13

14

15       ON BEHALF OF THE DEFENDANT DELGADO DEVELOPMENT:

16           SEAN L. HYNES, ESQ.
             Downey & Cleveland, LLP
17           288 Washington Avenue
             Marietta, GA  30060
18           (770) 422-3233

19

20

21       ON BEHALF OF THE DEFENDANTS LISA CAROLINA ROBBINS,
22           M.D. and THE ROBBINS GROUP, INC.:

23           ROBERT G. TANNER, ESQ.
             Weinberg, Wheeler, Hudgins, Gunn & Dial, LLC
24           Suite 2400
             3344 Peachtree Road
             Atlanta, GA  30326
25           (404) 876-2700

---

**Page 4**

1                INDEX TO EXAMINATION

2

3  By Mr. Harris. . . . . . . . . . . . . . .6

4

5

6

7

8                INDEX TO EXHIBITS

9  PLAINTIFFS'
       EXHIBIT         DESCRIPTION            PAGE
10
11     1      Defendant Narconon's First
              Supplemental Objections and
12            Responses to Plaintiffs' First
              Interrogatories                    7
13
       2      Casal Handwritten Notes           17
14
       3      PubMed: "The Narconon Drug
15            Education Curriculum for High
              School Students..."                26
16
       4      NIDA Abstract:  Treatment Approaches
17            for Drug Addiction                 61
18     5      12-12-11 Letter from R. Franklin
              to K. Whitlock                    131
19
       6      Narconon Urgent Directive         154
20

21

22

23

24

25

---

Desmond, et al. v.
Narconon, et al. 13-cv-02217-SCJ Document 1-2 Filed 07/02/13 Page 3 of 73 Louis Adolph Casal, M.D.
March 21, 2012

Page 5

1    (THE FOLLOWING TRANSCRIPT CONTAINS QUOTED
     MATERIAL; SUCH MATERIAL IS REPRODUCED AS
2    READ OR SPOKEN.)

3

4

5                    - - -

6

7    (IN THE FOLLOWING TRANSCRIPT, A DASH [ -- ]
     IS USED TO INDICATE AN UNINTENTIONAL OR
8    PURPOSEFUL INTERRUPTION OF A SENTENCE;
     AN ELLIPSIS [...] IS USED TO INDICATE
9    HALTING SPEECH OR AN UNFINISHED
     SENTENCE IN DIALOGUE, OR AN OMISSION
10   OF WORD(S) WHEN READING WRITTEN
     MATERIAL.)
11

12

13                   - - -

14

15   (Thereupon, the court reporter disclosed that she was
     there on behalf of Q & A Reporting Services, Inc.
16   in compliance with Article 10.B of the Rules and
     Regulations of the Board of Court Reporting of the
17   Judicial Council of Georgia and O.C.G.A. 15-14-37(a)
     and (b), the court reporter discloses that she was
18   retained by Jeffrey R. Harris, Esq., to take down
     the proceedings.  Q & A Reporting Services, Inc.
19   will charge the attorneys the usual and customary
     rate for the transcript, and will be paid by the
20   attorneys upon their receipt of the transcript.)

21

22

23

24

25                   - - -

Page 6

1        THE VIDEOGRAPHER: We're now on video
2    record on March 21st, 2012. The time is
3    approximately 11:05 a.m. This is tape
4    number 1.
5        MR. HARRIS: All right. This will be
6    the deposition of Dr. Adolph Casal, taken for
7    all purposes allowed by the Georgia Civil
8    Practice Act. The deposition is taken in
9    accordance with the Georgia Civil Practice
10   Act and also in accordance with the court's
11   standing order regarding discovery issues.
12       Jo, if you would swear the witness,
13   please.
14       (Thereupon, the witness was sworn.)
15       MS. MARSCHALK: Jeff -- Jeff, if we
16   could just have an agreement that Dr. Casal
17   has the right to read and sign.
18       MR. HARRIS: Fine.
19       MS. MARSCHALK: Thank you.
20       LOUIS ADOLPH CASAL, M.D.,
21   having been first duly sworn, was examined and
22   testified as follows:
23              EXAMINATION
24   BY MR. HARRIS:
25       Q.  Doctor, if you would state your full name for

Page 7

1    the record?
2        A.  Louis Adolph Casal, M.D.
3        Q.  Casal. I'm sorry, I mispronounced it there at
4    the beginning.
5        A.  It's same -- it's all the same to me.
6        Q.  All right. It's my understanding that you've
7    been designated as an expert witness in this case; is
8    that correct?
9        A.  Yes.
10       Q.  And you understand that the purpose of the
11   deposition here today is for me to have an opportunity
12   on behalf of the plaintiffs to learn and to understand
13   the basis for the opinions that you intend to give; do
14   you understand that?
15       A.  Yes.
16       Q.  Okay. And -- and in connection with that,
17   I've been provided with a outline or an expert
18   disclosure of your opinions. And I'm going to go ahead
19   and mark that as Exhibit 1 to the deposition.
20       (Thereupon, marked for identification
21   purposes, Plaintiffs' Exhibit No. 1.)
22   BY MR. HARRIS:
23       Q.  Have you seen this before, Doctor?
24       A.  Yes.
25       Q.  Okay. Attached to the disclosure there is

Page 8

1    a -- a CV, which I believe is Exhibit A?
2        A.  Yes.
3        Q.  Is that the most current CV that you have,
4    sir?
5        A.  Yes.
6        Q.  All right. And any -- any additions at all,
7    of any kind, that you've put on there since you provided
8    that CV to your counsel?
9        A.  I have not updated this CV since January 26,
10   but there's a lot of things that I have done or do that
11   I've not bothered to add to my CV.
12       Q.  Understood. There's just not another draft
13   floating around --
14       A.  No.
15       Q.  -- that you have updated?
16       A.  No, sir.
17       Q.  Okay. Fair enough. Have you ever been
18   deposed before?
19       A.  Yes.
20       Q.  How many times?
21       A.  At least one time. One time in a -- in a
22   situation similar to this, and one time when an attorney
23   just came and asked me questions without recording it.
24       Q.  Okay. We'll dig into that in a little bit
25   more detail. But to your recollection only one other

Case 2:14-cv-00283-GMN-NJK   Document 1-6   Filed 02/24/14   Page 5 of 67

Louis Adolph Casal, M.D.
March 21, 2012
Desmond, et al. v.
Narconon, et al. 1:13-cv-02217-SCJ   Document 1-2   Filed 07/02/13   Page 4 of 73

Page 9

1  deposition?
2      A.  It's -- to the best of my recollection right
3  now, uh-huh (affirmative).
4      Q.  Do you remember what the case was --
5      A.  Sure. --
6      Q.  -- called?
7      A.  -- Sure.
8      Q.  What's the name of it?
9      A.  I don't remember the name, but I remember that
10  it was approximately ten years ago, and I -- I'd seen
11  a -- a child in a hospital who had been injured in a car
12  crash. And Mr. Adams, the attorney, was preparing a
13  life plan for the young man.
14      Q.  Got you.
15      A.  And he asked me my expert psychiatric opinion
16  about what the going-forward psychotherapeutic needs for
17  the child would be.
18      Q.  Do you remember what court that was in, by
19  chance?
20      A.  I have no rec -- I -- I don't think I ever
21  knew. But the accident occurred in Gwi -- I'm thinking
22  it was Gwinnett County, because there was a county
23  attorney there as well.
24      Q.  Was it a situation where you were retained to
25  testify, or you were just a fact witness who had treated

Page 10

1  the child?
2      A.  I think I was just a fact witness, and I
3  gave -- I -- although I was retained, I mean, they did,
4  you know, ask me to come and I agreed, and... That was
5  a one-time thing.
6      Q.  All right. And other than that deposition
7  that you told me about, has there ever been a
8  circumstance where you've given a deposition or been
9  retained to provide consulting in a medical legal
10  matter?
11      A.  Yes. Sure.
12      Q.  Tell me about that.
13      A.  Oh, a handful of years ago, Mr. Clay Ratterree
14  in Savannah, Georgia asked me to give my opinion about
15  this young -- this child who had fallen off a balcony.
16  He wanted me to give my opinion about to what degree
17  were her current behavioral abnormalities likely to be
18  related to her fall from the balcony. So I reviewed
19  charts and had a meeting with him. But I never
20  testified.
21      Q.  Do you remember what the name of that case
22  was?
23      A.  I don't have the foggiest recollection.
24      Q.  How long ago?
25      A.  It would be pretty close to 2004, I believe.

Page 11

1      Q.  Okay. I used to work for Clay; I was just
2  curious. Long ago. Any other cases? That you -- that
3  you were retained as -- to do consulting work in a
4  medical legal matter?
5      A.  Actually, I remember another one. Two years
6  later, they asked me to review some charts on a case of
7  a child who was in a car crash. They asked me my
8  opinion and -- and talked over the phone with the
9  lawyer--I think it was a friend of Dr. -- of
10  Mr. Ratterree's--and that was the end of it.
11      Q.  So Clay must think highly of you.
12      A.  He told me he did.
13      Q.  Good, good.
14      A.  Yeah.
15      Q.  Any others that you can recall?
16      A.  I have been to court before.
17      Q.  Tell me about that.
18      A.  Maybe two years ago, in Cobb County, there was
19  a situation where a child, in our opinion, was being
20  mistreated by his mother. And the Department of Family
21  and Children Services asked -- and the county attorney,
22  or one of the attorneys serving for the county, asked if
23  I wouldn't mind coming in and talking to the judge a
24  little bit about what my concerns were.
25      Q.  Was it a criminal case, or a deprivation case?

Page 12

1      A.  Deprivation. Yeah. Deprivation.
2      Q.  All right. So the case that you -- that Clay
3  retained you on about someone falling off the balcony,
4  do you remember -- I'm sorry, I may have asked you this,
5  but do you remember the name of that case?
6      A.  No. In -- in the stream of thought it might
7  hit me someday, but I -- no, sir, I don't think it's
8  anywhere near my brain.
9      Q.  Do you keep a testimony list?
10      A.  I don't do this often enough that I've ever
11  thought it was necessary, but I -- I might going
12  forward, but, no, sir.
13      Q.  All right. And then the -- the chart review,
14  which I think is a friend of Clay's, I think you
15  said, --
16      A.  Uh-huh (affirmative).
17      Q.  -- do you remember the name of that case?
18      A.  It's a boy. No, nothing's hitting me.
19      Q.  All right. Those four; I think you -- you've
20  given me four. Any other cases that you've testified
21  either by deposition, in trial, or been retained, in a
22  le -- medical legal case?
23      A.  Six months ago I was in the Gwinnett County
24  courthouse because of -- I -- I'd seen a patient and
25  there was some custody dispute, and somehow I -- they --

Louis Adolph Casal, M.D.
March 21, 2012

**Page 13**

1  they asked me if -- if I would give my opinion. And
2  they actually didn't need it, so I was happy to say
3  good-bye and come back home. So...
4  Q.   Who retained you in that case?
5  A.   I don't -- I don't know any of the names, but
6  the father's attorney was the one that called me and --
7  and wanted me there. It was Gwinnett County, and I -- I
8  did not enter -- I did not speak to the judge, I don't
9  think I entered -- I didn't testify or anything. I was
10  just there in case they needed me, and then they
11  released me and that was the end of it. And I haven't
12  heard from them in six months.
13  Q.   All right. And that was, as you said, a
14  custody case?
15  A.   Yes, sir. Sure was. Uh-huh (affirmative).
16  Q.   Any other come to mind?
17       Not custody cases, but -- you understand my
18  question? Any other cases where you've been retained to
19  testify or given an opinion in medical legal --
20  A.   I think that's probably it.
21  Q.   All right. How did you first get involved in
22  this case?
23  A.   I received a voice mail at my desk from Kate
24  Whitlock.
25  Q.   And what was the voice mail?

**Page 14**

1  A.   Oh. "Please call me; I am looking for a
2  doctor to help me on this case."
3  Q.   Did you know Ms. Whitlock?
4  A.   No, sir.
5  Q.   Have you ever done any work for the Drew Eckl
6  firm?
7  A.   No.
8  Q.   Ever done any work for Ms. Marschalk or
9  Mr. Miller?
10  A.   No.
11  Q.   What -- what did -- I assume you called her
12  back?
13  A.   Yes.
14  Q.   And tell me about that conversation; what did
15  she ask you to do?
16  A.   She described that she needed some help with a
17  substance abuse program. And she was -- I think her
18  first question was, "Do you know anybody that could help
19  me?" I did not feel the need to volunteer my own
20  services, 'cause I'm very clinically busy, and quite
21  happy doing what I do, so I gave her the names of
22  Dr. Erly, who is a -- a recognized expert in -- in
23  Atlanta, and also Dr. Michael Vaughn, who is a friend of
24  mine, who I talk to regularly at Peachford, and -- and
25  may have given her a few other names, but those are the

**Page 15**

1  other -- only two names that I remember giving her. And.
2  I said I'd be, you know -- you know, "I think those
3  would be two good people for you."
4       I mentioned it to Dr. Vaughn the next day; he
5  said he was just too busy right now to be involved in --
6  in a case. So when Ms. Whitlock called me back, she
7  said, "Well, Dr. Casal, I'd really like you to help me,"
8  and I thought it over and I called her back and I said,
9  "Sure. I'll -- I'll see what I can do."
10  Q.   And why did you recommend Drs. Erly and
11  Vaughn? What specifically about their academic or
12  professional credentials --
13  A.   Oh.
14  Q.   -- did you find --
15  A.   I respect their opinions when it comes to
16  psychiatric and substance abuse issues. I -- I do.
17  Q.   All right. So did you have further
18  conversations or discussions with Ms. Whig --
19  Ms. Whitlock about what she needed you to do?
20  A.   Yes, sir. She provided me some materials, and
21  asked me to start reviewing them.
22  Q.   Did she tell you anything about the case?
23  A.   I had a conversation with her, and I'll check
24  and see if I wrote any notes about any conversations I
25  had with her. If you'd like me to.

**Page 16**

1  Q.   Yes, sure; and, by the way, if you need to
2  look at anything --
3  A.   Yeah.
4  Q.   -- in your file --
5  A.   Great.
6  Q.   -- to answer these questions, feel free --
7  A.   Great.
8  Q.   -- to do that. Make it easier.
9  A.   I don't think I took any notes when I spoke to
10  Ms. Whitlock. But I think -- basically she -- you know,
11  I -- I'm not sure who told me what, but I remember in
12  the introductory part of the -- of the -- of the --
13  these are my own notes. I think she told me that, you
14  know, Mr. Desmond was a young man who was in treatment
15  and had -- had died. And she wanted to know what --
16  actually, I do remember quite distinctly now, she wanted
17  me to develop an independent opinion of what I truly
18  felt about Narconon.
19  Q.   Okay. That was -- that was your --
20  A.   That was --
21  Q.   -- assignment?
22  A.   That was really the -- that was really a very
23  good question, so when she asked that question, I was,
24  "Oh, I can -- I can do that." So I thought it was a
25  very refreshing question; I could put some effort into

March 21, 2012

**Page 17**

1  doing that.
2    Q.  So your recollection, then, is that the first
3  thing that -- or, sort of the first area of expertise
4  that she wanted you to develop was to develop an
5  independent view of Narconon?
6    A.  Yeah.  Yeah.  I mean -- Mr. Harris, I got the
7  clear impression that she may or may not want to use my
8  testimony.  She wanted me to develop an independent
9  opinion.
10        (Thereupon, marked for identification
11        purposes, Plaintiffs' Exhibit No. 2.)
12  BY MR. HARRIS:
13    Q.  Let me show you what's been marked as
14  Plaintiffs' Exhibit 2.  It's a -- it's a copy of notes
15  that --
16    A.  Uh-huh (affirmative).
17    Q.  -- Ms. Marschalk provided me.
18    A.  Yep.
19    Q.  Is it complete, does it have everything that
20  you have in --
21    A.  I'll --
22    Q.  -- your book right there?
23    A.  I'll be happy to...
24    Q.  If you don't mind, just --
25    A.  Yeah.

**Page 18**

1    Q.  -- make sure.
2    A.  You got it.  Why don't I...
3    Q.  And we can do this later; I just -- when
4  you're referring to specific pages of your notes, --
5    A.  Maybe I should have numbered them.
6    Q.  -- I'd like to be -- yeah, well, it's not
7  the --
8    A.  Why don't I have a pen, and I'll number my
9  pages, and I'll check off and see if I've got --
10    MS. MARSCHALK: They're out of order.
11    THE WITNESS: 1, 2, 3, 4, 5, --
12    MS. MARSCHALK: Can I unstaple them?
13    THE WITNESS: -- 6, --
14    MR. HARRIS: Okay.
15    MS. MARSCHALK: Can I unstaple them?
16    MR. HARRIS: Sure.
17    THE WITNESS: -- 7, 8, 9, 10, 11, 12.
18  Looks like there's 12 pages, and why don't
19  I -- you have --
20    MS. MARSCHALK: That's 1.
21    THE WITNESS: -- the one with my log of
22  hours spent, right there is number 1.  Do you
23  have -- Page 2 is my log of hours spent
24  working.  Do you have Patrick Desmond
25  summary?  Yep, that's number 3.  Number 4 is

**Page 19**

1    ASAM level.  Number 5 is deposition, Mary
2  Desmond, October 5.
3    MS. MARSCHALK: I've got this backwards.
4  This is easier than I thought.
5    THE WITNESS: Number 6 is two sentences
6  on Brad Taylor.  Number 7 is blank, 'cause it
7  has just this form on it.
8  BY MR. HARRIS:
9    Q.  What is that form?
10    MS. MARSCHALK: I -- I didn't copy it;
11  it's my letter enclosing the disk.
12  BY MR. HARRIS:
13    Q.  Of what?
14    MS. MARSCHALK: Some document.
15  BY MR. HARRIS:
16    Q.  All right.  We'll get to that in a minute.
17    A.  I think it has all the books.
18    Q.  Okay.  Just let me just make sure I've got all
19  your notes first, before we start worrying about what
20  documents you looked at.
21    A.  Got you.  All right.  Number 8 is Dr. Roy,
22  born... Okay, number 9 is Roy Kennison, he owns the
23  program; number 10 is Dr. Robbins; number 11 is Major
24  Patrick Desmond; number 12 is books of Narconon.
25    MS. MARSCHALK: Which you just did.

**Page 20**

1    THE WITNESS: Oh, I -- okay.  Sorry.  So
2  here's a page that -- I'm actively using this
3  book, Mr. Harris.
4  BY MR. HARRIS:
5    Q.  Okay.
6    A.  So --
7    Q.  And that -- that last page, then, you're --
8    A.  It just --
9    Q.  -- telling me I don't have?  That's --
10    A.  It doesn't appear --
11    Q.  -- Page 12?
12    A.  Yes, sir.  It just lists all the chapters of
13  the -- the eight -- actually, the eight books --
14    Q.  Okay.
15    A.  -- that they use over at Narconon.
16    MS. MARSCHALK: I'll copy it so that we
17  have a complete set of --
18    MR. HARRIS: That would be great.
19    MS. MARSCHALK: -- Exhibit No. 2.
20    THE WITNESS: Great.  So, except for
21  that last page, this is a complete list of my
22  notes there.
23  BY MR. HARRIS:
24    Q.  All right.  And -- and the -- the list, now,
25  is -- I'm a little bit baffled by it.  Let's start at

Case 2:14-cv-00283-GMN-NJK   Document 1-6   Filed 02/24/14   Page 8 of 67

March 21, 2012
Desmond, et al. v.
Narconon, et al.   2:13-cv-02217-SCJ   Document 1-2   Filed 07/02/13   Page 7 of 73

Page 21

1   the beginning of your book.
2   A. Yes, sir.
3   Q. Is it in this order? What's your first page?
4   A. "Patrick W. Desmond, died June 11, 2008."
5   Q. All right. And this is -- I guess I'm --
6   that's the first page of your book, but it has all of
7   your time, is that how you do it, you just leave that
8   pla -- page blank?
9   A. Yes -- yes, sir; and I keep adding to this
10  page.
11  Q. Got it.
12  A. Actually, not; to the second page, yeah.
13  Uh-huh (affirmative).
14  Q. All right. And so what I'm trying to
15  determine is what -- what note in your book here would
16  be the first note where you began discussing substantive
17  matters related to the case?
18  A. You know, I -- doesn't appear that I took any
19  notes of any conversations I had, Mr. Harris.
20      And I can distinctly remember not taking notes
21  with my discussions with Ms. Whitlock, because I was in
22  the intensive care unit seeing a patient, took a break,
23  walked over to a desk. I've never been -- I don't ta --
24  particularly take no -- many notes.
25  Q. I guess what I'm asking is, I don't remember

Page 22

1   seeing anything in your notes where you indicated that
2   your assignment was to perform an independent overview
3   of the Narconon program. I mean, is that true?
4   A. My -- my notes are there, Mr. Harris; I --
5   I -- my recollection is that that's the -- that's the
6   job she is asking me to do.
7   Q. Do you remember when you were first retained
8   by her?
9   A. Well, I may very well, because the first
10  time -- aha. On November the 11, 2011, on Page 1, I
11  spent 60 minutes meeting with Kate.
12  Q. Okay. All right. Well, we'll go through
13  those in a little bit, but do you know how Ms. Whitlock
14  came to -- to find you?
15  A. No, sir.
16  Q. Know if anybody recommended you?
17  A. I have -- she did not say how she found me.
18  Q. Your initial assignment, then, was to develop
19  an independent overview of the Narconon program, right?
20  A. That's my understanding.
21  Q. Anything else that you were assigned to do in
22  that initial conversation or initial discussions with
23  Ms. Whitlock?
24  A. Not that I recall. I -- my -- I'm going to
25  assume that part of my job was to determine do I think

Page 23

1   that there was something wrong there that contributed to
2   Patrick's death.
3   Q. And that's exactly what I'm trying to
4   determine; --
5   A. Yeah.
6   Q. -- it seems to me at some point your --
7   A. Oh, yeah.
8   Q. -- your opinion changed to more directly
9   dealing with the circumstances of Patrick's death as
10  opposed to just generically looking at the program?
11  A. Yes, sir. I -- I -- I think I was charged
12  with giving an -- developing my opinion of -- do I think
13  that Narconon did anything to contribute to his death.
14  I believe that -- that was something that -- that is
15  kind of an expectation of what I've been asked to do.
16  Q. All right. What did you do in order to do an
17  independent analysis or overview of the Narconon
18  program?
19  A. Okay. Read a lot of depositions. Reviewed
20  materials provided to me on the course at Narconon,
21  including the books. Scanned some of the research
22  materials. Did my own research on PubMed--articles,
23  research articles--to see if there was any scientific
24  news on Narconon. And also reviewed, you know, hospital
25  criteria, qualities of successful programs, criteria for

Page 24

1   outpatient versus non -- you know, other types of
2   treatment for people that are suffering addictions. Did
3   a lot of thinking. And hours and hours of reading
4   depositions.
5   Q. How many hours have you put into this case
6   thus far?
7   A. I would say approximately 80-ish. I
8   haven't -- I don't have a good tally right now--I'd have
9   to add some of these numbers up--but approximately 80
10  hours of total work spent.
11  Q. And you bill $600 an hour?
12  A. $500 an hour for chart review, and $600 an
13  hour for depositions and testimony.
14  Q. The articles that you looked at on PubMed --
15  well, let me back up; I think you said you did a PubMed
16  search?
17  A. Yes.
18  Q. Did you find any articles?
19  A. Yes, sir.
20  Q. Do you -- what are the names of those
21  articles?
22  A. I have it here for you, --
23  Q. Okay, --
24  A. -- if you wish.
25  Q. -- great. You have copies of those

Page 25

1  articles --
2  A. Yes, sir. In fact, --
3  Q. -- for me?
4  A. -- I don't need it back.
5     MS. MARSCHALK: We don't have copies,
6  but I can run and make copies. --
7     MR. HARRIS: Yeah, that's fine.
8     MS. MARSCHALK: -- I just got it this
9  morning.
10    THE WITNESS: Yeah, I just -- I pulled
11 it up, actually printed a copy last night in
12 case you might want it.
13 BY MR. HARRIS:
14 Q. Yes. What's the name of the article?
15 A. "The Narconon drug education curriculum for
16 high school students," colon, "a non-randomized,
17 controlled prevention trial."
18 Q. And --
19 A. March 2008.
20 Q. -- did you rely in any way, sir, on that
21 article for any of the opinions that you intend to give
22 today?
23 A. My opinion was already concluded before I
24 actually read this article.
25 Q. Well, how does that article help, hurt, --

Page 26

1  A. Oh.
2  Q. -- have any bearing on your testimony?
3  A. I think it would support my opinion that I
4  think that Narconon is a reasonable and adequate means
5  of treating addiction.
6  Q. Let's go ahead and mark that article as 3.
7     (Thereupon, marked for identification
8     purposes, Plaintiffs' Exhibit No. 3.)
9  BY MR. HARRIS:
10 Q. All right. Do you know anything about this
11 article, I mean, other than what you -- well, this,
12 first of all, is the abstract.
13 A. I know nothing more, and I looked up other
14 things that those people have -- have written. And
15 they've written a variety of psychiatric works. They
16 haven't just focused on substance abuse or just
17 Narconon. So I was trying to take a critical look about
18 who the -- who these guys were. I saw a variety of
19 other published materials by these individuals.
20 Q. Well, what you've produced here at your
21 deposition is the abstract --
22 A. Yes.
23 Q. -- of the article?
24 A. Yes. And that's all I've read.
25 Q. So you haven't read the actual --

Page 27

1  A. No, sir.
2  Q. -- article?
3  A. No, sir.
4  Q. Do you know anything about the -- the authors
5  themselves, whether or not they've done any consulting
6  work that -- with Narconon before?
7  A. Well, that's what I tried to find out, and --
8  and I don't know. I don't know who they are. So I -- I
9  would definitely be more skeptical if they'd been paid
10 to write this, or if they'd consulted with... So,
11 right, there may be some -- there may be some -- that's
12 why I looked to see what else -- what else they wrote.
13 And they've written a variety of psychiatric,
14 psychopharmacology articles. And... What was the other
15 point. Yeah, I -- I surely would be interested to know
16 if they had ever consulted with that organization and if
17 there was a connection, but --
18 Q. Why would that make you skeptical?
19 A. Well, I like peer-reviewed material, and this
20 was published in some kind of a peer-reviewed journal.
21 And if it's not published in a peer-reviewed journal, in
22 other words, if -- if my equals haven't read this
23 article and then cleared it, and said, "Okay, this meets
24 our degree of comfort that it's scientific," you know, I
25 tend not to read those articles.

Page 28

1  Q. And you found this article on your own?
2  A. Yes.
3  Q. It was not provided to you by counsel?
4  A. I found it last night doing a PubMed search.
5  Q. All right. So the sum total, then, of your
6  reliance on this article is you believe that it supports
7  certain conclusions that you have already arrived at; is
8  that fair?
9  A. It's fair; and I'd be happy to add a comment
10 to that.
11 Q. Sure.
12 A. In -- in preparing for meeting with you today,
13 I wanted to be very careful that I haven't missed any
14 glaring, you know, problems out there in the field. So
15 I was looking for scientific, critical, negative
16 articles that would tell me that there's -- there are
17 problems, systematic problems, found in Narconon, and I
18 didn't -- I didn't find anything, but I also didn't find
19 much in the peer-reviewed -- really found very little in
20 the peer-reviewed articles on Narconon. So -- but had
21 there been something negative, I would have wanted to
22 know about it.
23 Q. What search terms did you put into PubMed?
24 A. Narconon. Simply -- just Narconon.
25 Q. Did you encounter any articles written by

Case 2:14-cv-00283-GMN-NJK   Document 1-6   Filed 02/24/14   Page 10 of 67

Louis Adolph Casal, M.D.
Desmond, et al. v.   1:13-cv-02217-SCJ   Document 1-2   Filed 07/02/13   Page 9 of 73   March 21, 2012
Narconon, et al.

**Page 29**

1  authorities in California who were analyzing whether or
2  not the Narconon program in California was effective?
3      A.  PubMed search in peer-reviewed journals gave
4  me only this article, to the best of my recollection.
5  There were -- oh.  There were -- there were some
6  articles that just didn't seem to have pertinence, and
7  they were -- I actually don't remember what those were.
8      Q.  Well -- well, how did you determine they
9  didn't have pertinence?
10     A.  You know, Mr. Harris, I -- I really can't
11 remember, but they didn't -- I can really redo the
12 PubMed search right now and it would re -- it would
13 refresh my memory.  I'll try to remember right now.
14     Q.  Well, you -- you have -- you have elected to
15 pull out an abstract of an article that I think you told
16 me in your opinion supports some of your conclusions.
17     A.  Well --
18     Q.  Fair?
19     A.  Not exactly.  Not exactly.  I would -- I would
20 rephrase that to say that the article serves two purs --
21 purposes for me.  One, it is a indicator to me that, you
22 know, I did look in the published peer-reviewed
23 literature to find what's out there.  And that's all I
24 found.  And second of all, it happened to be a
25 reasonably positive article, so -- abstract, so, for

**Page 30**

1  what it's worth.  My opinions were already concluded
2  prior to bringing this, so I think this is more of an
3  indication of, you know, I think it's worthwhile looking
4  at the peer-reviewed published literature.  And...
5      Q.  What journal is this published in?
6      A.  Ah.  It's at the very top, it's...
7      Q.  Psychometrics Technologies? --
8      A.  No.
9      Q.  -- no, that's the -- that's the authors' --
10     A.  Yeah.
11     Q.  Tell me where -- I can't --
12     A.  It's -- yeah.  It's really kind of hard.
13 Substance abuse treatment something policy.  I'm not
14 sure -- when I clicked this, I -- I couldn't get a -- a
15 hit.  But it's some kind of a substance abuse policy
16 journal.
17     Q.  And how do you know it's peer-reviewed?
18     A.  Well, the -- the -- when you do PubMed, you
19 click you only want peer-reviewed journals.
20     Q.  Is that what you did?
21     A.  Uh-huh (affirmative).  Uh-huh (affirmative).
22     Q.  Okay.  Are you familiar with that journal?
23     A.  No, sir.
24     Q.  It's not one that you routinely rely on in
25 your practice?

**Page 31**

1      A.  No.  Huh-uh (negative).
2      Q.  Have you ever used it in any --
3      A.  No.
4      Q.  -- capacity --
5      A.  No.
6      Q.  -- whatsoever?
7      A.  No.
8      Q.  Let me -- by the way, she's going to yell at
9  us if we don't --
10     A.  Oh.
11     Q.  It's -- it's okay, I mean, we just do it in
12 conversation, but I need to finish my question and then
13 you can respond, so we're not talking over each other.
14         Back to that journal; so you -- have you ever
15 encountered it before?
16     A.  No.
17     Q.  Now, what I was trying to ask you is, you --
18 you clearly have pulled this abstract out, and you
19 are -- you've brought it to your deposition, and in some
20 capacity you're using it to support your opinions.  What
21 I want to know is -- and -- and I believe you said that
22 there were certain aspects of it that were positive.
23 What I want to know is, are there other articles that
24 you looked at that were negative, that you didn't bring?
25     A.  No, sir, absolutely not.  That was the only

**Page 32**

1  article I found when I hit Narconon through PubMed.
2      Q.  Okay.  And, again, just to be clear, it's not
3  an article, it's an abstract.
4      A.  Yes, sir, you're absolutely right.
5      Q.  And, now, what I was asking you -- let's put
6  PubMed aside for just a second.  Are you familiar with
7  any studies that have been done of the Narconon program
8  by various state agencies looking into that pro -- those
9  programs?
10     A.  I'm aware of none.
11     Q.  All right.  So you're not familiar with a
12 study that was done by the State of California?
13     A.  Correct.
14     Q.  And you're not familiar with a study that was
15 done by the State of Oklahoma?
16     A.  That is correct.
17     Q.  And you're not familiar with a study that was
18 done by the Canadian authorities in Quebec?
19     A.  That is correct.
20     Q.  Did you do anything other than the PubMed
21 search to try to locate studies that might in fact be
22 negative of the Narconon program?
23     A.  Other than the PubMed search...
24     Q.  Right.  Did you do a search on Google, did you
25 do a search on any other medical literature program

**Page 33**

1 or -- or web site?
2    A.  I tend to rely on articles and information
3 published in peer-reviewed journals. I don't typically
4 go to the web for non-peer-reviewed information, because
5 anyone can write anything they want.
6        Now, if -- I have heard news clips about --
7 this -- I've heard news clips about the vitamins, and
8 something about Oklahoma one time, about the vitamins
9 and the sauna. And I don't -- I don't remember hearing
10 anything about California, but when you mentioned
11 Oklahoma I remember some news clip sometime in the past
12 about something along those lines.
13    Q.  Well, but your -- you were attempted -- you
14 were attempting, as you told me, to do an objective sort
15 of --
16    A.  Yeah.
17    Q.  -- analysis of this.
18    A.  Yeah.
19    Q.  Wouldn't you want to know whether or not state
20 agencies had done an investigation into the program?
21 Isn't that something you think would be important for
22 your opinion?
23    A.  Mr. Harris, I believe I'm -- I'm -- I'm
24 already aware of that opinion.
25    Q.  Oh, okay. Well, I'm sorry, I thought you --

**Page 35**

1 Ms. Rieser?
2    A.  I had a conversation with her, I will tell
3 you, Mr. Harris... Today is Wednesday the 21st,
4 yesterday was the 20th. It was on the 19th of March.
5 That would have been this Monday.
6    Q.  Okay. What was the nature of that
7 conversation?
8    A.  I had questions -- I had -- I had questions
9 about the practical application of these techniques. I
10 had questions about who the teachers were around that
11 time, what their tenure was, what their experience was.
12 I wanted to get a personal feel about Ms. Rieser, just
13 my own personal sense of -- of, you know, the person I
14 was sitting in the room with. I wanted to look over
15 some of these personnel files, you know? Were they
16 organized. Had -- had they had training. Whatever
17 training is required by Narconon, had they had that. So
18 I had at least four -- four questions.
19    Q.  Are those questions reflected in your notes?
20    A.  No, sir. I didn't take any notes from the
21 meet -- from the meeting.
22    Q.  Why not?
23    A.  Chose not to. Deposition was two days later;
24 I thought it would be fresh.
25    Q.  Okay. So this -- you -- you did the meeting

**Page 34**

1 you weren't familiar with the Oklahoma or the California
2 studies.
3    A.  I live in Georgia. I practice in Georgia, and
4 this program is licensed in the State of Georgia. I
5 don't really have any reason to really concern myself
6 too much about what's happening in California or
7 Oklahoma.
8    Q.  Well, the abstract you brought, does it --
9 does it look specifically at the Georgia program?
10    A.  No.
11    Q.  But you're relying on a --
12    A.  No, I'm not.
13    Q.  Okay. So you're --
14    A.  My opinion was already formed before I read
15 the abstract.
16    Q.  All right. What else did you do in order
17 to -- to do this overview of the program and to have an
18 opinion about it?
19    A.  I reviewed the eight books in the program, and
20 I also had a conversation with Ms. Rieser about the
21 program.
22    Q.  Mary --
23    A.  And, of course, I met with Ms. Marschalk,
24 and...
25    Q.  When did you have a conversation with

**Page 36**

1 with Mary Rieser a couple of days ago?
2    A.  Monday.
3    Q.  And -- but you had already been disclosed as
4 an expert in the case before that; you understand that,
5 right?
6    A.  I had...
7    Q.  Yeah; the Exhibit 1, I think, that we've --
8    A.  I -- if you can repeat the question?
9    Q.  Well, you had already been disclosed as an
10 expert before you talked to Ms. Rieser?
11    A.  Yes.
12    Q.  Okay. And you were already comfortable with
13 your expert opinions before you talked to Ms. Rieser?
14    A.  Sure.
15    Q.  Because your expert disclosure had already
16 outlined all those --
17    A.  Sure.
18    Q.  -- opinions?
19    A.  Yes.
20    Q.  So what -- what is it about your expert
21 opinions, if any, that you had additional concerns about
22 or wanted additional information that drove you to want
23 to have a meeting with Ms. Rieser?
24    A.  Oh, I've -- I always -- I'm continually coming
25 up with ideas, criticisms, potential problems with any

Page 37

1   program, and -- and then questioning myself. And
2   wondering, "Well, could this be a problem, could that be
3   a problem." You know, as you lie in bed, you think,
4   "Well, could that be a problem." And so, as my opinion
5   galvanized, I -- I -- I wanted to be able to come in
6   here and tell you absolutely the truth of my opinion,
7   clearly, without any reservation. And having met with
8   her and reviewed some of those files, I feel much more
9   comfortable doing that.
10   Q.   Well, but, nevertheless, before you met with
11   her you were comfortable being disclosed as a person who
12   had the opinion that the staffing at Narconon of Georgia
13   was appropriate for an outpatient drug and alcohol
14   education and rehabilitation program?
15   A.   Yes, sir, I did.
16   Q.   So let's -- let's talk a little bit about
17   that. I believe you said you -- you wanted to ask
18   Ms. Rieser about certain personnel files.
19   A.   Uh-huh (affirmative).
20   Q.   Is that accurate?
21   A.   Yes, sir.
22   Q.   Which personnel files?
23   A.   I wanted to have a general idea of what their
24   personnel files looked like and were the people there
25   getting the training that they were supposed to.

Page 38

1   Q.   Which personnel files did you look at, Doctor?
2   A.   I looked at about seven or eight, and I didn't
3   write down their names.
4   Q.   Well, then, I mean, you understand that I'm
5   entitled to understand the basis of your opinion --
6   A.   Okay.
7   Q.   -- in this case, right?
8   A.   My opinion is, in general -- specifically,
9   are -- is Ms. Rieser requiring and providing for her
10   staff's ongoing education. And I looked in various
11   files, and sure enough there were logs, there were piles
12   of paper, and I was satisfied, because my opinion was
13   based on having been told that these things were in fact
14   the case. And I'm willing to believe that, but I was
15   very much reassured when I actually saw the files
16   myself.
17   Q.   Well, how did you pick the seven or so
18   personnel files that you looked at?
19   A.   I just grabbed a stack and started thumbing
20   through them and reading through them.
21   Q.   Well, what -- what good does that do? I mean,
22   if -- if those personnel files don't have anything to do
23   with the people who were working at the time, I mean,
24   what -- what was the purpose of doing that, I guess is
25   what I'm asking?

Page 39

1   MS. MARSCHALK: Object to form.
2   THE WITNESS: These personnel files
3   dated back quite far. And -- back to the
4   time -- 'cause these were -- these were logs
5   that went back quite far. So -- and they
6   were -- there were hours logged and training
7   done, and Ms. Rieser also gave me the -- I
8   didn't write them down, I didn't -- I don't
9   remember their names, but the main teachers
10   at the time had been there for quite a long
11   time. The young -- the least-tenured teacher
12   at the time of this -- the time in question
13   had been there for about a year and a half.
14   BY MR. HARRIS:
15   Q.   Can you identify by name any specific
16   individual whose personnel file you reviewed in
17   connection with this case?
18   A.   No.
19   Q.   And yet you're comfortable saying that the
20   staffing of Narconon of Georgia was appropriate for an
21   outpatient drug and alcohol education and rehabilitation
22   program?
23   A.   Oh, yes.
24   Q.   And you -- you -- you looked at, I think you
25   said, hours logged?

Page 40

1   A.   Uh-huh (affirmative).
2   Q.   Why were you looking at the hours that the --
3   those folks logged?
4   A.   If I was looking at a fellow physician's
5   continuing medical education, I would see the course and
6   the number of -- the number of hours. And I think I am
7   going to need some more water.
8   MS. MARSCHALK: Okay. I'll get it.
9   BY MR. HARRIS:
10   Q.   Do you need to take a break to get water?
11   A.   Not at all; I'd like to keep working.
12   Q.   Sure. And I would too.
13   MS. MARSCHALK: Let --
14   BY MR. HARRIS:
15   Q.   All right.
16   MS. MARSCHALK: Time out. Let me go get
17   him some water real quick, and then we can
18   keep going.
19   MR. HARRIS: Sure; I don't -- I'm not
20   trying to torture him. That's why I asked
21   him if he wanted to pause.
22   THE VIDEOGRAPHER: Going off video at
23   11:42 a.m.
24   (Recess at 11:42 a.m., resumed at 11:43.)
25   THE VIDEOGRAPHER: We're back on video

Case 2:14-cv-00283-GMN-NJK   Document 1-6   Filed 02/24/14   Page 13 of 67

Louis Adolph Casal, M.D.
March 21, 2012

Desmond, et al. v.
Narconon, et al.

Case 1:13-cv-02217-SCJ   Document 1-2   Filed 07/02/13   Page 12 of 73

Page 41

1    record at 11:43 a.m.
2    BY MR. HARRIS:
3        Q.  All right.  Well, let's -- let's try it this
4    way, Doctor.  Opinion number 4 in your expert disclosure
5    relates to staffing at Narconon, right?
6        A.  Yes, sir.
7        Q.  I want to know everything that you did and
8    every basis you have for your contention that the
9    staffing at Narconon of Georgia was appropriate for an
10   outpatient drug and alcohol education and rehabilitation
11   program.
12       A.  Narconon is licensed in Georgia to provide
13   that service, so a lot of the homework was done for me.
14   I had the understanding, and verified later with
15   Ms. Rieser, that the staff at the time that Mr. Patrick
16   Desmond was there had significant experience, years of
17   experience, doing the type of work.  So -- and then I
18   got to firsthand see a handful of their personnel
19   records and education and training logs.  So the fact
20   that they're licensed to do something in the State; the
21   fact that he had experienced people doing this type of
22   work, working with him; the fact that he --
23       Q.  Who's "he"?
24       A.  Mr. -- sorry.
25       Q.  Are you talking about Mary Rieser?

Page 42

1        A.  No, sir.  Mr. Patrick Desmond.
2        Q.  Oh, I got you.
3        A.  Sorry, Mr. Harris.  The fact that Mr. Patrick
4    Desmond wrote how -- how -- how much he appreciated
5    their hard work and their devotion--two people were
6    there like, quote, "every second of the day," in one of
7    his writings--made it clear to me that there were good
8    things happening there.  And that Mr. Desmond, in many
9    ways, responded quite well to the treatment they were
10   providing.
11       Q.  So you're referring to the success stories?
12       A.  I've read al -- I've read or scanned
13   everything he wrote.
14       Q.  All right.  Well, let me back up.  Now --
15   you -- you said that you were relying on Ms. Rieser to I
16   guess provide you with the files for the people who were
17   providing drug and alcohol counseling services at the
18   time of Patrick Desmond's death?
19       A.  That is true.
20       Q.  'Cause you don't know who they are?
21       A.  No, sir.
22       Q.  And you can't tell me in this deposition?
23       A.  I cannot.
24       Q.  And so you went to Ms. Rieser and you said,
25   "Okay, give me the files of the people who provided drug

Page 43

1    and alcohol counseling services to Patrick," and she
2    presumably did?
3        A.  No, sir.
4        Q.  "No, sir," what?
5        A.  I asked her who they were and what their
6    experience were -- was, and how long they'd been there.
7    And she named three people that were there at that time.
8    That was the conversation.  And I -- and -- she told me
9    who they were and how long they'd been there.
10           One of those was a recovering -- one person in
11   recovery.  She was a schoolteacher from New York.
12           An independent action of mine was to grab some
13   of the personnel files, and to look through them, and to
14   spend some time looking and saying, "Oh," you know,
15   "This looks reasonable to me."  Now, I am not a human
16   resources expert, but I was able to look at the files
17   and the logs and see that a lot of stuff is happening.
18   And it was my understanding, because Narconon allows
19   this program to use their name and their materials, that
20   they had abided by Narconon's requirements for training
21   of the teachers in the classrooms.
22           So, as far as I can remember, as far as I can
23   understand your question, I -- I think that's the sum
24   total of my efforts to -- to critique the staff.
25           But I'll add one thing.  Did I tell you -- do

Page 44

1    you know that during the course of my studying of this
2    case, I did have Mr. Patrick Desmond's student file, and
3    I read that as well.
4        Q.  I -- I understand that.
5        A.  Okay.  Great, great.
6        Q.  Is it your opinion that the individuals
7    employed by Narconon who interacted with Patrick and
8    provided him with specific drug and alcohol counseling
9    were appropriately certified in that field?
10       A.  Mr. Harris, it is my understanding that very
11   few of the Narconon staff have specific certification of
12   substance abuse counselors.  But what they're licensed
13   to do in this state is to provide this education
14   program.  And they're trained in the Narconon
15   techniques.
16       Q.  Well, have you done anything to determine
17   whether or not the contentions made by Narconon on its
18   license applications are -- are accurate?
19       A.  Mr. Harris, I do remember glancing at some
20   things that had to do with kind of non-medical issues
21   outside of my realm of expertise.  I can try to remember
22   my recollection of looking at those.  I do remember that
23   there were some questions about, "Hey, we need a
24   physician" to monitor, to oversee the detox part of
25   the -- of what they're doing.  And I think that was a

**Page 45**

1  very reasonable thing. Whether it was their idea or
2  imposed upon them, great. They've got an M.D. that...
3      Q.   That -- that wasn't my question.
4      A.   Oh.
5      Q.   You understand that -- that each year--I guess
6  it's every two years--Narconon submitted a license
7  application to the Department of Human Resources to be
8  li -- licensed as the facility -- or, to be licensed as
9  a facility in Georgia; you understand that?
10     A.   I do now.
11     Q.   Okay. Well, you -- you do now because I just
12 said it?
13     A.   Yes, sir. I didn't know that it was every two
14 years, I don't know how often, or -- but I do know that
15 they're licensed to do what they do.
16     Q.   All right. And -- and I'm just going to tell
17 you that in the license application Narconon identifies
18 certain individuals that have certain jobs.
19     A.   Okay.
20     Q.   You haven't seen any of those license
21 applications?
22     A.   Not that I remember. I -- I -- if I have,
23 I've scanned them and I -- I don't think I could comment
24 on them, 'cause I don't really -- I remember something
25 about State of Georgia, but I have no recollection and

**Page 46**

1  no opinion to give you about them, Mr. Harris.
2      Q.   Okay. And that's exactly why I'm asking you
3  that question.
4      A.   Great. Great.
5      Q.   Have you done anything to determine whether or
6  not the people that Narconon said that they had employed
7  at the facility, and the certifications that Narconon
8  contended those folks had, in fact -- that that was
9  ac -- in fact accurate? Have you done anything in that
10 regard?
11     A.   Mr. Harris, if -- if they're telling me things
12 that are untrue, then there's a problem. The program is
13 telling me that they have people trained by Narconon --
14 by -- with Narconon's techniques, to provide this -- let
15 me think about your question. I don't maybe -- maybe
16 I'm not understanding it. You're asking me do I -- oh.
17 Have I personally scrutinized whether the staff there on
18 site matches up with what they say? No, sir. I've not
19 done that.
20     Q.   Okay. And that's -- if you haven't done that,
21 then feel free to say you haven't done that, and I
22 assume you don't intend to have any opinion about
23 whether or not what Narconon contended in its State DHR
24 license applications was in fact true?
25     A.   I have no opinion about any kind of --

**Page 47**

1  correct.
2      Q.   Because, as you said, you're -- I think you're
3  basically telling me you're relying on what they're
4  telling you. And if that isn't true, then that's a
5  problem, right?
6      A.   I'm relying on -- for number 4, I'm relying on
7  all the things I've read and the experiences of Patrick
8  Desmond in the program to conclude that the staffing
9  there was appropriate to give him this program.
10     Q.   All right. But in -- I'm not trying to -- I'm
11 really not trying to torture you, but you don't have any
12 idea who the staff was that was providing treatment to
13 Patrick Desmond, other than Ms. Rieser telling you that?
14     A.   You know, I -- there may be some names in his
15 material -- you know, in his materials, but I would say
16 I don't know them off the top of my head. But we might
17 find his teachers, and certainly his ethics officer may
18 have written his name at the bottom of the ethics work
19 that Mr. Desmond had to do. So we could probably fairly
20 easily find some of those teachers, but I don't have
21 them off the top of my head.
22     Q.   And you understand that I'm here to try to get
23 your opinions so that I can understand what you intend
24 to testify about at trial?
25     A.   Oh, yes.

**Page 48**

1      Q.   And -- and that's not what I'm asking you. We
2  may be able to do these things, I certainly understand
3  that, but you haven't, right?
4      A.   I don't know who -- I don't know the names of
5  the teachers that he had.
6      Q.   So you -- you haven't taken Patrick's records
7  and said, "Okay, it says here that person A provided
8  counseling to him," and then gone and pulled that
9  specific record to determine whether or not that person
10 was certified in any way?
11     A.   Oh, no, sir. No.
12     Q.   So you don't have any idea, bottom line, then,
13 whether or not the people who Patrick interacted with,
14 who provided drug and alcohol -- alcohol counseling to
15 him, had any kind of certification at all, whatsoever?
16     A.   "Had any kind of certification at all,
17 whatsoever."
18     Q.   I mean, that's true, isn't it, Doctor?
19     A.   Well, if that's true, then someone could have
20 walked in off the street and gave -- given the course.
21 I mean, are -- are -- am I going to be led to believe
22 that this program would let a non-qualified person teach
23 the course?
24           MR. HARRIS: Move to strike as
25 unresponsive. If you could read that last

March 21, 2012

Page 49

1    question back?
2        THE WITNESS: Mr. Harris, I would love
3    to answer your question, and I will.
4    BY MR. HARRIS:
5    Q.  She's going to read it back, and let's take
6    another shot at it.
7    A.  Thanks.
8        (Thereupon, the record was read by the
9        court reporter.)
10       THE WITNESS: I have not checked
11   individual licenses on the people that taught
12   Patrick.
13   BY MR. HARRIS:
14   Q.  So you agree with what I said, then, do you
15   not, sir?  You don't know?
16   A.  That's -- I think that's an accurate
17   statement.  I don't know.
18   Q.  Now, you've mentioned several times about
19   training provided by Narconon to staff members.  It's
20   your understanding that some of the folks, at least, who
21   worked at Narconon had training that was provided by
22   Narconon itself; is that fair?
23   A.  Yes.
24   Q.  You -- you can't identify for me specific
25   individuals, as we've discussed, right?

Page 51

1    was all kinds of training in the logs.  CPR, substance
2    abuse, withdrawal symptoms.  To be one of the teachers
3    or coaches, they had to have their own training, and
4    they told me that they'd had that and they'd been
5    teaching these things for quite a number of years.
6    Q.  Right; but the people, the logs that you
7    looked at, we've already established you don't know
8    whether any of those people were working there at the
9    time that Patrick died?
10   A.  The logs went back several years.
11   Q.  Well, that's not my question.  The files that
12   you looked at, --
13   A.  Yes, sir.
14   Q.  -- you can't tell me whether or not those
15   people, who you believe had sufficient training,
16   actually worked there at the time that Patrick was
17   there?
18   A.  No; I didn't write down any of the names.
19   Q.  So the answer is -- I mean, that's true,
20   right, you can't tell me that?
21   A.  Okay.
22       MS. MARSCHALK: You know that we could
23   pull this for you pretty easily, Jeff.  I
24   mean, I've got all the personnel files.
25   BY MR. HARRIS:

Page 50

1    A.  Correct.
2    Q.  But let's talk about it generically.  What do
3    you -- do you know what kind of training these
4    individuals received by Narconon in order to teach the
5    Narconon course?
6    A.  No.
7    Q.  Well, is it your contention that -- that the
8    training that they provided is -- or, that the -- that
9    the training that these folks had was adequate?
10   A.  Is -- my opinion is that they were able to
11   teach the Narconon technologies to Narconon's
12   satisfaction.
13   Q.  All right.  Well, I'm not asking you that.
14   I'm asking you, do you know anything about that training
15   at all?
16   A.  No.  No.
17   Q.  So are you -- I think what you're telling me
18   is that Narconon was satisfied with the Narconon
19   training?
20   A.  Uh-huh (affirmative).  Yes.
21   Q.  But you don't know what that training consists
22   of?
23   A.  Aside from the -- the process that some of the
24   students had been through, the Narconon books
25   themselves, but there was -- there was several -- there

Page 52

1    Q.  Now, you've done nothing to look at the
2    Narconon training materials that they used to train
3    staff members -- well, let me strike that.
4        I think you indicated to me that you
5    understand that some of the folks who went through the
6    program ultimately become staff members in some
7    capacity.
8    A.  Yes.
9    Q.  And so there's that group of people, who
10   presumably have gone through the Narconon course.
11   A.  Uh-huh (affirmative).
12   Q.  Right?
13   A.  Yes.
14   Q.  Is it your understanding that there are other
15   levels, beyond just going through the Narconon course?
16   A.  That was my assumption.
17   Q.  All right.  What is that assumption based on?
18   A.  Good question.  I don't -- I'm not even sure
19   if I know.  What entailed the training of the people --
20   of the veterans that were there when -- that were
21   teaching these things.
22   Q.  Well --
23   A.  I don't.  I don't know that answer,
24   Mr. Harris; it's a good question.
25   Q.  All right.  Well, you're -- you're the one

Case 2:14-cv-00283-GMN-NJK  Document 1-6  Filed 02/24/14  Page 16 of 67

Louis Adolph Casal, M.D.
March 21, 2012

Desmond et al. 13-cv-02217-SCJ  Document 1-2  Filed 07/02/13  Page 15 of 73
Narconon, et al.

Page 53

1  that says it's appropriate, right?
2  A.  Oh, yes, I --
3  Q.  Okay.
4  A.  -- do believe it is.  I believe that the
5  staffing was.  The staff at Narconon was appropriate for
6  an outpatient drug and alcohol education and
7  rehabilitation center.
8  Q.  You see my confusion?  I mean, how can you say
9  that it's appropriate if you don't know what it is?
10  A.  No.  I didn't say anything about their
11  training in my statement number 4, Mr. Harris.  I didn't
12  say anything about their training.
13  Q.  Oh, I'm sorry, maybe I misun -- misunderstood
14  your entire opinion, then.  Are you just saying that
15  staffing in terms of numbers and that sort of thing is
16  appropriate?
17  A.  Oh, no.  No.  I don't have a comment about
18  staffing.  I'm -- well, my -- on number 4, my opinion is
19  that the capacity of the teachers to do what they're
20  supposed to be doing is appropriate for an outpatient
21  drug and alcohol education and rehabilitation program.
22  Q.  All right.  Let's use your word, then,
23  "capacity."  What does that mean, the "capacity" of the
24  people who are providing the training?
25  A.  Their ability to do what they're licensed to

Page 54

1  do there.  Teach these Narconon technologies.
2  Q.  And, again, you -- to what extent are you
3  relying on the fact that they were licensed?  For -- for
4  your contention that -- that it's an appropriate level
5  of training and education?
6  A.  They're licensed by the State of Georgia.  I
7  believe Ms. Kate or Mary -- I -- someone told me that
8  they were licensed in the State of Georgia.
9  Q.  All right.  But backing up for just a second,
10  are you going to contend in any way that the training
11  that the staff members had at Narconon to provide drug
12  and alcohol counseling or rehabilitation services was
13  appropriate or adequate?
14  A.  Mr. Harris, I don't know if I have studied
15  enough about their training to say that their training
16  was -- was adequate.  I -- I don't think I can really
17  comment on their training.  I'd be happy to further
18  investigate that, and --
19  Q.  So you're not going to talk about that?
20  A.  No; I -- I don't really know how they train
21  Narconon teachers.
22  Q.  Well, I thought one of your primary
23  assignments in this case was to determine sort of
24  overall whether or not the Narconon program was an
25  effective program?

Page 55

1  A.  Oh, yes, sir.
2  Q.  Okay.  And you've done that?
3  A.  Oh, yes.
4  Q.  And what's your opinion?
5  A.  Narconon is effective for some people who have
6  addictions and want recovery.
7  Q.  How many people?
8  A.  I have no comment or knowledge of -- of -- of
9  statistics of their actual success rate.
10  Q.  So your opinion is that the Narconon program
11  is effective for some people who have addictions and
12  want recovery?
13  A.  Yes, sir.
14  Q.  And that would be true for every single
15  program that's ever been done to treat people with drugs
16  and alcohol, true?
17  A.  Every single program?  Sir, I don't think I
18  can comment on every single program that's ever been
19  created.  I really don't think I can.
20  Q.  Well, can you tell me a program that in your
21  opinion is not effective for treating some people who
22  have alcohol addiction -- or, who have addictions and
23  who want recovery?
24  A.  Well, Scared Straight didn't work.
25  Q.  Okay.  All right.  Good.

Page 56

1  Didn't work for anybody?
2  A.  The research on it said it really didn't have
3  a major impact, Mr. Harris; I don't have the -- I don't
4  have the articles, but --
5  Q.  Well, I'm -- I'm using your test; "effective
6  for some people who have addictions and want recovery."
7  A.  Uh-huh (affirmative).
8  Q.  Using your test, Scared Straight would have
9  been effective for at least somebody?
10  A.  I don't have any data to support its
11  effectiveness or its non-effectiveness.  I -- Scared
12  Straight was not deemed to be a very helpful,
13  cost-effective way of helping kids stop.
14  Q.  Is -- are you familiar with the term "standard
15  of care"?
16  A.  I've heard that a time or two.
17  Q.  I'm sure you have.
18  A.  Uh-huh (affirmative).
19  Q.  Tell me what -- in your opinion, what that
20  means.
21  A.  "Standard of care" means basically what's
22  happening here in my community or in Georgia; would a
23  couple of reasonable doctors have a reasonably close to
24  same opinion as yours.  Would you be providing care here
25  that somebody in, you know, Smyrna or Riverdale or

Page 57

1  Alpharetta would be providing.
2    Q.  Is a drug program that's effective for some
3  people who have addictions and want recovery, is that
4  within the standard of care?
5    A.  Yes, sir.
6    Q.  So you believe that the standard of care
7  simply requires that a drug program be effective for
8  some people who have addictions and want recovery?
9    A.  Excellent question, but I -- I kind of lost
10  concentration for a minute, Mr. Harris.  Could -- would
11  you mind if I heard the question again?
12    Q.  Well, let's -- let's — let's look at it this
13  way.  One of your opinions here is that "Narconon of
14  Georgia provided a reasonable and appropriate outpatient
15  drug and alcohol education program, and met the
16  applicable standard of care."
17    A.  Yes, sir.
18    Q.  And I think one of my questions to you was,
19  well, what -- what do you define as effective?  And I'm
20  trying to see whether or not there's some distinction
21  between effective programs and programs that comport
22  with the standard of care.
23    A.  Effective programs and effective -- and
24  programs that meet the standard of care.  Are you
25  looking for a difference between those two?

Page 58

1    Q.  I'm looking for what your opinion is.
2    A.  Oh, okay.  Well, would you like to know some
3  of the things that I've thought about to -- to come up
4  with my opinion about Narconon's effectiveness, or --
5    Q.  Sure.
6    A.  -- the value of Narconon?  Mr. Harris, you
7  know that this work is really hard, you know, helping
8  people make the choice to change their life; to stop
9  smoking, to eat better, to exercise -- okay.  You got
10  me, right?  So addictions are -- so, anyway, it's hard
11  business.  It's hard business.  So -- let's see.
12  Where's my...
13    Q.  Well, Doctor, I -- I don't -- I'm not sure
14  what you're -- question you're responding to, but, I
15  mean, let -- let me try to ask -- were you finished?  I
16  mean, I don't want to cut you off; --
17    A.  No, sir, I --
18    Q.  -- I'm just not --
19    A.  -- thought --
20    Q.  -- sure what you're responding to.
21    A.  -- I was going to tell you what I was -- how I
22  developed some of my opinions about why I believe that
23  Narconon is an effective program.
24    Q.  Fair enough.  Then let's -- let's --
25    A.  Okay.

Page 59

1    Q.  -- pursue that, then.  But, first of all,
2  the -- the definition of an effective program is one
3  that helps some people have -- who have addictions and
4  want recovery recover; I mean, that's your term?
5    A.  Yes.  Live sober.
6    Q.  And before we move on to what reasons you have
7  for believing specifically that the Narconon program is
8  effective, I just want to know whether or not that is
9  your definition for a program that comports with the
10  standard of care.  Do you understand my question?
11    A.  Oh.  Well, yes, I do.  And I would expand my
12  idea, my belief of what the -- the standard of care is.
13    Q.  So any program that's effective for some
14  people who have addictions and want recovery that helps
15  them recover comports with the standard of care?
16    A.  I would say as long as it included some
17  reasonable elements.  And those would include things
18  that we might find in the National Institute of Drug
19  Abuse information to the community and to doctors about
20  the principles of effective treatment.
21    Q.  Well, what are the reasonable elements that
22  you believe that a program that -- like the one that
23  we're discussing should include?
24    A.  Well, when I reviewed this document here,
25  Mr. Harris, from the National Institute of Drug Abuse,

Page 60

1  the principles of -- of effective treatment, they noted
2  that "Scientific research since the mid 1970s shows that
3  treatment can help patients addicted to drugs to stop
4  using, avoid relapse, and successfully recover their
5  lives.  Based on this research, key principles have
6  emerged that should form the basis of any effective
7  treatment program."  Now, there are several bullets here
8  that I'll be happy to read -- read to you, and I can
9  kind of let you know my opinion of whether Narconon met
10  that specific standard.
11    Q.  Well, you can read to me whatever you'd like
12  to read to me, sir, but I want to know, if you have an
13  opinion as an expert witness about what reasonable
14  elements a program that provides drug and alcohol
15  rehabilitation services should contain, I would like to
16  have those.  If you're telling me that you're simply
17  going to tell me the same things out of that article,
18  that's fine, but I would prefer you just tell me what
19  your opinion is.  And then you can tell me what you're
20  relying on for that opinion.
21    A.  I think that we can do both.  And I will refer
22  to these bullet points so we can be comprehensive and
23  complete.
24    Q.  Sure.  Fine.
25      MR. HARRIS: Plaintiffs' Exhibit 4.

Case 2:14-cv-00283-GMN-NJK   Document 1-6   Filed 02/24/14   Page 18 of 67

Desmond, et al. v. 13-cv-02217-SCJ   Document 1-2   Filed 07/02/13   Page 17 of 73
Narconon, et al.
March 21, 2012

Page 61

1   BY MR. HARRIS:
2      Q.  I'm going to mark this document that you've
3   been talking about here as Plaintiffs' Exhibit 4.
4         MR. HARRIS: First of all, have I gotten
5      a copy of that?
6         MS. MARSCHALK: I don't know that this
7      was in what I received on Monday, so I don't
8      think you did.
9   BY MR. HARRIS:
10     Q.  When did --
11        MS. MARSCHALK: I don't think you did.
12        MR. HARRIS: Yeah.  I don't think I
13     have, either.
14        (Thereupon, marked for identification
15        purposes, Plaintiffs' Exhibit No. 4.)
16  BY MR. HARRIS:
17     Q.  When -- when did you pull that?
18     A.  Mr. Harris, I know I pulled it more than a
19  couple of days ago, and --
20     Q.  Well, at any rate, you pulled it after you had
21  concluded that Narconon of Georgia provided a reasonable
22  and appropriate outpatient drug and alcohol education
23  program?
24     A.  I don't know if I agree to that.  I'm not --
25  I'm not sure exactly when I pulled this, Mr. Harris.

Page 62

1   And if I failed to provide it to you, I'm really sorry
2   about that; I...
3         MS. MARSCHALK: It -- it may have been
4      that I just -- I had it and I just didn't
5      give it to Jeff.  I don't know.  I -- I
6      think -- I mean, we can have a conversation
7      about the document --
8         MR. HARRIS: I --
9         MS. MARSCHALK: -- if you want to.
10        MR. HARRIS: I'm having a conversation.
11        MS. MARSCHALK: All right.  I've seen
12     this before, and I saw it before Monday.  I
13     just don't know that -- that we considered it
14     part of his file materials.  But it
15     obviously -- it is part of his file
16     materials, and we have it now.
17  BY MR. HARRIS:
18     Q.  Well, Doctor, Plaintiffs' Exhibit 4 sounds to
19  me like it's a pretty important part of --
20     A.  I --
21     Q.  -- your file.
22     A.  I think it's pretty important, --
23     Q.  Okay.
24     A.  -- Mr. Harris, and I apologize for not making
25  sure -- I mean, I'm sorry that you don't have it ahead

Page 63

1   of time.
2      Q.  Okay.  Well, we'll -- we'll muddle through it.
3      A.  Yes, sir.  It will be quite straightforward
4   and quick.
5      Q.  Okay.  Now, I just want to be clear about
6   something.  Are you telling me what elements you think a
7   program ought to have?
8      A.  Yes, sir.
9      Q.  And -- and you're reading to me from that
10  document?
11     A.  Yes, sir.
12     Q.  Because you presumably agree with all of those
13  things in that document?
14     A.  I agree with all the things in this document.
15     Q.  Any additions?  Does that make sense?  I mean,
16  are you going to add some elements that they don't
17  require?
18     A.  I don't think so, Mr. Harris.  I don't think
19  so.
20     Q.  Okay.  So this is the -- this is the universe,
21  the sum total of the elements that you think a program
22  ought to have?
23     A.  Yes.
24     Q.  Okay. --
25     A.  Yes.

Page 64

1      Q.  -- Let's hear them.
2      A.  Well, Mr. Harris, "Addiction is a complex but
3   treatable disease that affects brain function and
4   behavior."  And Narconon does not have a strength here.
5   They don't necessarily emphasize that addiction is a
6   disease.  They think of it as a problem, so -- but they
7   are very, very good at focusing how this problem affects
8   your body and brain.  There are materials and pamphlets
9   about almost every drug that I know of that is there to
10  inform the students of the detrimental effects of the
11  drug on the body and brain.  But -- but it's my
12  understanding that they shy away from using the word
13  "disease."  So that would be a semantic criticism, but
14  not a criticism in -- in practice, of what actually
15  happens.
16     Q.  Is addiction a disease?
17     A.  Yes, it is.
18     Q.  So they're wrong?
19     A.  Semantically they are wrong.  In practice,
20  they treat it as a disease.  They provided a whole
21  treatment program that lasts months and months and
22  months to treat this problem.  They have -- they use
23  different words.
24     Q.  In your -- in your practice, do you view
25  addiction as a disease?

Page 65

1   A.  Yes, sir.
2   Q.  In all of the facilities that you work at, is
3   addiction viewed as a disease?
4   A.  Yes, sir.
5   Q.  Have you ever sent or referred a patient to
6   any alcohol rehabilitation program that did not view
7   addiction as a disease?
8   A.  No, sir.
9   Q.  All right.
10       Do you think it comports with the standard of
11  care to not view addiction as -- as a disease?
12  A.  Do I think it -- sorry.
13  Q.  If a medical doctor in your field did not view
14  addiction as a disease, do you, sir, believe that that
15  view or that approach to treating patients would comport
16  with the standard of care?
17       MS. MARSCHALK:  Object to the form.
18       THE WITNESS:  Mr. Harris, if -- to
19  answer your question, I think that's an
20  unanswerable question, because if -- if
21  you're a doctor treating a problem or
22  treating a disease, you're by definition
23  treating a problem.  Whether you choose to
24  call that problem a disease or a problem is
25  really up to you, and I'm not going to

Page 66

1   quibble over [sic] you about what you call
2   the problem.  If I see, Mr. Harris, that you
3   are treating that individual with techniques
4   that are effective, and your patient gets
5   better, then I think you've met the standard
6   of care on that one.  Because -- just because
7   you don't call it a disease but you treat the
8   problem just the same way I do, then I think
9   you -- I think you've met the standard of
10  care on that one.
11  BY MR. HARRIS:
12  Q.  So your -- your approach to the standard of
13  care, then, for the treatment of drug and alcohol abuse
14  is basically results-oriented?  If it works, it comports
15  with the standard of care?
16  A.  Well, I don't know, because I think you can
17  cure a disease by cutting the -- cut -- cure the cancer
18  by cutting the whole arm off, and I don't think that's
19  standard of care.  I think we need to make sure we can
20  try to -- try to salvage the finger before we cut the
21  whole arm off.  So -- it sure was effective in
22  eliminating the cancer on the finger, but, no, sir, I
23  don't think I would agree with that.
24  Q.  All right.  Well, then, going back to our
25  list, the -- first bullet point, then, it sounds to

Page 67

1   me like, is that -- that, at least under that document
2   that you're reading to me here, is there needs to be a
3   program or a process where addiction is at least dealt
4   with as a disease?
5   A.  Yes.  I would agree with that.
6   Q.  And so your contention is that even though
7   Narconon doesn't view addiction as a disease, they have
8   a program where they effectively at least treat it that
9   way; is that a fair summary of --
10  A.  Yes, sir.
11  Q.  -- what you're talking about?
12  A.  Yes, sir.
13  Q.  But -- but you at least disagree with their --
14  their semantic characterization of addiction not being a
15  disease?
16  A.  Yes, sir.
17  Q.  All right.  Anything else with respect to
18  point number 1?
19  A.  No, sir.
20  Q.  What's point number 2, Doctor?
21  A.  "No single treatment is appropriate for
22  everyone."
23  Q.  All right.  To what extent does the Narconon
24  treatment program vary depending upon the specific
25  individual needs of the students?

Page 68

1   A.  It's a bit of a diff -- the -- that's --
2   each -- each student has his individual treatment plan;
3   different drugs, different life problems, different
4   legal issues, different educational issues, different
5   vocational issues, so... But the point here is that
6   people who have failed this type of pro -- program A.  The
7   point that "No single treatment is appropriate for
8   everyone" indicates that "Just because you failed
9   program A, don't lose hope."  That program doesn't have
10  to fit everyone.
11  Q.  Well, let's -- let's look at the Narconon
12  program for just a second.
13  A.  Yes, sir.
14  Q.  First of all, the program, or at least a -- a
15  major component of the program, you would agree with me,
16  consists of working through eight different books, true?
17  A.  True.
18  Q.  There may be some additional training that I
19  think you've alluded to, but -- but that's the vast
20  majority of the program itself, working through these
21  eight books?
22  A.  Correct.
23  Q.  And these eight books are provided and
24  administered to every student in the same sequence,
25  meaning you start at book 1 and you go to book 8?

Page 69

1    A.  Correct.
2    Q.  And there's no variability between Narconon
3  programs throughout the country; every one of them, in
4  order to be licensed by Narconon International, you've
5  got to do it that way?
6    A.  Okay.  I'm willing to believe that.
7    Q.  Well, do you know one way or the other?
8    A.  No, sir.  I don't.  I don't -- I only know
9  about Narconon of Georgia.
10    Q.  Okay.  And if you -- if you don't complete
11  book 1, then you can't move to book 2, et cetera, right?
12    A.  That's correct.
13    Q.  And you -- you move -- you work your way
14  through the levels?
15    A.  Yes, sir.
16    Q.  And the first thing you've got to do is you've
17  got to complete the sauna program before you can even
18  start the second book, I believe it is?
19    A.  I -- Mr. Harris, I believe that you have to do
20  a little bit of just sitting in the room and TRs first,
21  before you go to sauna.
22    Q.  I think you're right.
23    A.  But something along those lines, yes, sir.
24    Q.  But -- but my point is simply that you --
25  there's a sequence where sauna's at --

Page 70

1    A.  Yes.
2    Q.  -- basically at the beginning?
3    A.  Yes, sir.  Uh-huh (affirmative).
4    Q.  And then you graduate from sauna?
5    A.  Yes.
6    Q.  And there are certain doses of vitamins that
7  are -- that are prescribed, fair?
8    A.  Yes, sir.
9    Q.  And those vitamins are delineated very
10  specifically in the -- in the Narconon materials?
11    A.  Yes, sir.
12    Q.  There's no deviation between students
13  regarding how that process works, is there, sir?
14    A.  I agree with what you've said.  I think
15  there's very little variation from -- on what you've
16  said.  I think the variation...
17    Q.  I wasn't cutting you off.
18    A.  Oh.  No.  I think the variation would include
19  in the time it took, the individual teacher's approach
20  of how he or she was teaching the stuff -- I'm making an
21  assumption there; I've never been in a classroom.  So --
22    Q.  And we're going to talk about that assumption
23  for a second. --
24    A.  Uh-huh (affirmative).
25    Q.  -- Do you know whether or not the teachers are

Page 71

1  allowed in any way to deviate from the specific text of
2  the books?
3    A.  You know, that's a good point, Mr. Harris,
4  because I think that, in reading these books and
5  scanning a lot of them, they're pretty specific.
6  They're pretty specific in the way the -- the -- the
7  twins and the coach and the teacher are supposed to kind
8  of do these things.  So...
9    Q.  Have you -- have you reviewed the depositions
10  of any of the students who have been deposed in this
11  case?
12    A.  I believe all of them, Mr. Harris.
13    Q.  And all of those students, you would agree
14  with me, Doctor, basically say that -- that the way that
15  the program works is, you work through the books
16  yourself, and that the teachers or the counselors who
17  are there don't really add or elaborate anything to the
18  text?
19    A.  Now, I -- I had -- I did not glean, from a
20  fair -- fairly careful review of these depositions --
21  and I can name you the ones I read.  I don't actually
22  remember that statement, Mr. Harris, but I would be
23  willing to believe what you've said; it seems
24  reasonable.
25    Q.  Well, let me ask you this; did you find any

Page 72

1  evidence to the contrary?  Did -- can you point me to
2  anything in the record or anything that you rely on
3  that -- that suggests that when these instructors are
4  going through these books, --
5    A.  Uh-huh (affirmative).
6    Q.  -- that they're expounding upon them,
7  interpreting them, --
8    A.  Huh-uh (negative).
9    Q.  -- elaborating, et cetera?
10    A.  No, sir.  Not during the books.  But only
11  maybe in the ethics meeting and the side -- outside, you
12  know, conversations, 'cause they -- they're living
13  together, and -- and they're coaching each other.  They
14  have like counseling sessions and they talk and --
15  especially when they've messed up.  And -- and, you
16  know, they have to do a writing or another book when
17  they've done the alcohol, and they have to write a --
18  or, when they've relapsed or made a mistake, and they
19  have to do some writing and some talking with their
20  ethics person, so...
21    But, Mr. Harris, I believe that, if we're
22  talking about bullet number 2, I think we might be
23  getting a little bit off track, because the point of
24  number 2 in my understanding is that "No single
25  treatment is appropriate for everyone" means that "Just

**Page 73**

1  because you failed 12-Step program, don't lose hope."
2  You know, "Not every single treatment is appropriate for
3  you -- for everyone; maybe you should try a different
4  program." There should be variability, there should be
5  choices, different ideas.
6      Q.  Is that -- is that what Narconon believes?
7          Is there any document that you can point me to
8  where Narconon says, "Hey, if this program, if this
9  Non -- Narconon program doesn't work, you need to feel
10 free to try some other program"?
11     A.  Mr. Harris, I don't know one way or the other
12 if Narconon has ever said that. But in my experience in
13 20 years treating substance abuse addicted people, all
14 of my friends that have programs think that their
15 program is the best.
16     Q.  Well, let's look at it this way, then.  You --
17 if -- if Narconon's contention is that the other
18 programs don't work and that you shouldn't do any other
19 program except Narconon, you would disagree with that
20 contention?
21         MS. MARSCHALK: Object to form.
22         THE WITNESS:  I agree with you; if
23     Narconon says that their way is the only way,
24     then that would be a -- that would be a
25     tall -- that would be a -- that would be a

**Page 74**

1      hard statement to agree with, Mr. Harris.
2  BY MR. HARRIS:
3      Q.  Okay.  Fair enough.  All right.  So anything
4  else on 2?  I understand your contention, which is
5  basically flexibility and --
6      A.  Yeah, flexibility, "Hey, don't lose hope,
7  there's another program, there's a diff -- there's --
8  there are other options."  For example, if people don't
9  like 12-Step, you know, Dr. Albert Ellison in New York
10 developed a non-spiritual way to do the steps.  So there
11 are -- there are other options.  So that's my thought
12 there, to the best of my understanding, of what this
13 document means.
14     Q.  By the way, did you ask Ms. Rieser about that?
15 Did you say, "Hey --"  --
16     A.  No, sir.
17     Q.  Okay.
18     A.  "Treatment needs to be readily available."
19     Q.  What does that mean?
20     A.  That is more of a -- in my opinion, that is
21 more of an advertisement out to the world to say, "These
22 programs need to be affordable, and readily available,
23 and insurances need to pay for them," so... I think
24 that in -- I think that -- the main problem with
25 treating addiction today, Mr. Harris, is that -- oh, 20

**Page 75**

1  problems, but one of the big problems is that people
2  can't afford it.  So I think this is more of a -- a jab
3  to administration to say, "Hey, we need to find
4  affordable ways, and we need to have funding," so...
5      Q.  Is the Narconon program, in your opinion, an
6  affordable and accessible program?
7      A.  Mr. Harris, I believe it is, and I believe it
8  costs less than many of my peers' programs.
9      Q.  How much does it cost?
10     A.  I'll have to refer to some notes, but --
11     Q.  Sure.  Do you have notes that tell you that?
12     A.  Only the notes that you have.  But what I do
13 remember is that it does cost less than Breakthrough
14 Recovery, which costs $18,300 for three months.
15     Q.  Does that include a residential component?
16     A.  It does.  And my understanding at the time is
17 that Narconon was less than that.  And if I'm wrong, I
18 stand corrected.
19     Q.  But, as you sit here in your deposition today,
20 you can't -- you can't tell me how much it costs?
21     A.  Narconon?
22     Q.  Yeah.
23     A.  I don't remember.  I do remember, though, when
24 I was understanding where it fit, that it was less than
25 Breakthrough Recovery Outreach in Chamblee Dunwoody.

**Page 76**

1      Q.  All right.  So what you did was, at some point
2  you knew what the amount was that they charged, --
3      A.  Yes, sir.
4      Q.  -- and you sort of looked around and said,
5  "Okay, is this cheaper or more expensive --" --
6      A.  Yes.
7      Q.  -- than comparable programs?
8      A.  Yes, sir.
9      Q.  Did you compare it to a residential program
10 when you did that?
11     A.  Breakthrough Outreach Recovery is -- provides
12 residence support.  Let me get a quick drink.
13         THE VIDEOGRAPHER: Jeff.
14         THE WITNESS:  Break -- most of the
15     programs in Georgia are fairly identical in
16     their structure to Narconon, in that they
17     provide outpatient with residence support.
18     So they're called -- I'm sorry, I'm sorry.
19     They're called residential because --
20     "residential" has a specific meaning in -- in
21     medicine, but people throw the word
22     "residential" out there without really
23     understanding that it has a specific meaning.
24 BY MR. HARRIS:
25     Q.  I understand.  We'll -- believe me, we'll get

Page 77

1    into that --
2        A. Uh-huh (affirmative).
3        Q. -- in a little bit more detail.
4        A. Uh-huh (affirmative).
5        Q. We got to change tapes here, so maybe let's
6    take a quick break.
7        A. Good time for some water.
8        Q. Looks like you might need some water?
9        A. I might -- maybe I'll get two cups.
10           MS. MARSCHALK: Unhook.
11           THE VIDEOGRAPHER: Going off video
12    record at 12:26 p.m.
13           (Recess at 12:26, resumed at 12:37.)
14           THE VIDEOGRAPHER: We're back on video
15    record at 12:37 p.m.; this is tape number 2.
16    BY MR. HARRIS:
17        Q. Okay, Doctor, you're -- you're giving me the
18    list of -- of elements that you believe an effective
19    drug and alcohol treatment program should provide.
20        A. Uh-huh (affirmative).
21        Q. I believe number 3 was that it be readily
22    available, and you -- I don't mean to put words in your
23    mouth, but it's -- basically that it be financially
24    accessible?
25        A. That is really the critical thing.

Page 78

1        Q. Fair enough.
2        A. Yeah.
3        Q. And anything else about that one that's --
4        A. No, sir.
5        Q. -- we need to talk about?
6           What's number 4?
7        A. "Effective treatment attends to multiple needs
8    of the individual, not just his or her drug abuse."
9    Which means you -- you can't just talk about drug abuse
10    all day; you got to talk about how you're handling
11    relationships, how you're handling responsibility,
12    occupational issues, how are you going to support
13    yourself. And your physical health. And your
14    psychiatric health. You know, if you're suffering from
15    severe depression, or anxiety, are you doing anything to
16    help cope better. So...
17        Q. Are most -- most folks who suffer from
18    addictions, do they suffer from other mental disorders
19    or diseases?
20        A. My opinion, based on my experience, is yes,
21    but I cannot give you the actual number. My guess would
22    be that at least 50 percent of people that are addicted
23    suffer from anxiety or depression or posttraumatic
24    stress disorder.
25        Q. And that's called something, and I -- I can't

Page 79

1    remember what it is.
2        A. Comorbidity.
3        Q. That's it, thank you.
4        A. Yes, sir.
5        Q. All right. So what does the Narconon program
6    do to address comorbidities in the folks that it -- that
7    it handles?
8        A. May we speak specifically about Mr. Desmond,
9    for example?
10        Q. Well, you can explain --
11        A. Okay.
12        Q. -- however you want to.
13        A. Well, he was suffering from alcohol
14    dependence, and he had medical needs, so comorbidities,
15    or, under the other things, he had, you know, medical
16    detox, he was admitted to Peachford, then he had this --
17    for five years he had been suffering from the
18    excruciating abdominal pain, he felt like it was a
19    stabbing thing, and no doctors had any answers for him.
20    So typically when we have abdominal pain that has no
21    medical etiology, we assign that to the possibility it
22    could be anxiety. Well, Mr. Patrick Desmond started
23    using weed when he was about -- he got caught using weed
24    when he was 14; that was his first problem. He had
25    already been a little anxious and -- because of his

Page 80

1    multiple travels, 'cause they were a military family.
2    So he was suffering probably what we think of as
3    anxiety.
4        Q. And -- and I guess that's my question, is,
5    when Nar -- when Patrick Desmond enrolls in the Narconon
6    program, --
7        A. Yes.
8        Q. -- what did Narconon do, or any of the people
9    who interacted with Patrick, including Dr. Robbins, --
10        A. Uh-huh (affirmative).
11        Q. -- what did -- did -- did they do to determine
12    whether or not there was some comorbidity at issue here,
13    whether Patrick suffered, in addition from his
14    addiction, from depression or anxiety?
15        A. You know, Mr. Harris, it's a excellent
16    question, and -- and Narconon I think will admit that
17    they're not psychiatric experts and they don't really --
18    they're not really going to become psychiatric experts,
19    so they defer to an expert.
20        Q. Well, who did they defer to?
21        A. Dr. Darvin Hege.
22        Q. Okay. --
23        A. Yeah.
24        Q. -- All right. --
25        A. Yeah.

Desmond, et al. Case 1:13-cv-02217-SCJ    Document 1-2    Filed 07/02/13    Page 22 of 73

Narconon, et al.                                                                March 21, 2012

Page 81

1  Q.  -- All right. And what did Dr. Hege do to
2  address those issues?
3  A.  He did a comprehensive psychiatric evaluation,
4  he -- he had a meeting and a physical -- a psychiatric
5  examination with Mr. Patrick Desmond, and then admitted
6  him to the hospital. And had another opportunity to
7  examine him again on the day of discharge, and diagnosed
8  him with -- well, I don't remember what the discharge
9  papers say. But he treated him for his withdrawal. And
10  did not specifically mention any need for any further
11  specific psychiatric care. And -- and I think that's
12  okay, 'cause based on Mr. Patrick Desmond's writings and
13  interactions, he was not in an acute state of anxiety
14  anymore.
15      But I'll go back, and this will be very brief,
16  that headaches and anx -- headaches and abdominal pain
17  are core symptoms of anxiety. He had no medical test
18  that could find anything wrong with him, but the
19  vitamins, the sauna phase, I'm not sure what it was, but
20  after weeks and weeks in that sauna, he felt relaxed,
21  peaceful and exuberant that, according to his own
22  writings, that his abdominal pain had gone, it
23  disappeared, and he had never felt better. Pardon me,
24  maybe I'm paraphrasing, but I think he said something
25  that he had never felt better before. So it was a very

Page 82

1  strong -- a good thing, according to Mr. Patrick
2  Desmond, those first few weeks or months that he
3  experienced relief of his abdominal symptoms, that
4  were -- so, in that sense, that it addressed his medical
5  needs and they -- and they did in essence address his --
6  whatever it was. Whether it was anxiety or -- well, I
7  don't know what -- it wasn't an ulcer, 'cause it -- you
8  can't treat an ul -- you know, sauna --
9  Q.  What did they do the second time, when he came
10  back? What did they do to address his comorbidities the
11  second time, when he returned to the program?
12  A.  As far as I know, he did not have return of
13  the abdominal pain. He had not been gone that long, and
14  I don't know if he was suffering from any comorbidities
15  at the time, except for the morbidity of continued
16  problems with his alcohol dependence.
17  Q.  Okay. But your -- your -- I think number 4 on
18  your -- on your list is that an effective drug and
19  alcohol rehabilitation program needs to have processes
20  and procedures in place to address comorbidities in
21  addicts, fair?
22  A.  Very fair, Mr. Harris; but it's not what the
23  point actually says. It says that treatment --
24  effective treatment needs to attend to the multiple
25  needs of the individual, not just his drug abuse. So

Page 83

1  the social, occupational, legal; that's more of the
2  point of this bullet, although your point is also
3  very -- very appropriate.
4  Q.  What -- what does the Narconon program do to
5  address the vocational needs of its students?
6  A.  They're -- it's quite probably, I would say,
7  one of their strengths. My understanding, my basic
8  understanding of the Narconon philosophy is something
9  called hatting. Hatting. And I believe that has
10  something to do with me giving you a title and
11  responsibility, because in their strange way of saying
12  it, therefore you now get to take up that space, you get
13  to have that space where you sit there, you -- you
14  possess that space. What it means to a psychiatrist is,
15  "Mr. Harris, I've given you this job. I believe in you.
16  I think you can do it. And I'm going to support you and
17  make sure you succeed." That's what a psychiatrist
18  would interpret. At least, that's what Adolph Casal
19  would interpret as hatting, although I am not -- I -- I
20  can't say that I've studied hatting and what they mean
21  by it in more detail, but -- but you see that. As soon
22  as they graduate, they start giving them responsibility.
23  Giving them jobs, and giving them cash. There are few
24  things in our culture that stimulate our sense of
25  accomplishment than cash. So they gain confidence.

Page 84

1  "Hey, I can hold down a job." And --
2  Q.  At Narconon?
3  A.  Yes, sir. And if we can -- if you'd like to
4  talk about, for example, Mr. Brad Taylor, who had a
5  great deal of confidence when he came back to Atlanta,
6  and he was able to get a job, and he -- and in the
7  deposition that he provided to you guys was very content
8  with himself and his ability to remain in recovery. And
9  was -- and seemed to be, my basic -- my best
10  recollection of what he said, was quite proud of his
11  ability to pay off those big fines in Tennessee, and
12  maintain sober, and continue in gainful employment.
13  Although I can't recall what his employment was. I
14  believe he was in -- moved back to Atlanta.
15  Q.  Was he court-ordered to be in the program?
16  A.  Oh, yes, sir.
17  Q.  Was he court-ordered to attend a residential
18  facility?
19  A.  Mr. Brad Taylor, I have no recollection of
20  what the details of his court's were. But --
21  Q.  Have you seen his file?
22  A.  His file.
23      MS. MARSCHALK: His Narconon file; he's
24  asking you if you've seen -- if you've seen
25  that file.

Page 85

1    THE WITNESS: I don't think I've seen
2  his Narconon file, Mr. Harris.
3  BY MR. HARRIS:
4    Q.  Are you relying on the testimony of Mr. Taylor
5  about his treatment in any way for the bases of your
6  opinion?
7    A.  Yes, sir; I've read it.  And that's certainly
8  part of my opinion.  And, to answer your question, I
9  don't think I ever saw anyone's file except for
10  Mr. Patrick Desmond.
11    Q.  All right.  Let's just try to get through --
12    A.  Yeah.
13    Q.  I didn't mean to interrupt you, Doctor; --
14    A.  Sure.
15    Q.  -- were you finished with --
16    A.  Oh, Mr. Harris, I will actually ask you to
17  interrupt me if you've had enough.
18    Q.  I can't -- I can't do that.  Although I
19  probably will every now and then.
20    A.  Okay.  Just kind of make -- give me -- give me
21  a signal.
22    Q.  I understand your -- your opinion and your
23  point, I think, about the vocational --
24    A.  Yes, sir.
25    Q.  -- aspect.

Page 86

1    A.  The hatting.
2    Q.  And, as I understand it, you're -- you're
3  saying that the Narconon program is strong because it
4  allows folks to graduate and obtain a job --
5    A.  Uh-huh (affirmative).
6    Q.  -- within Narconon itself?
7    A.  Uh-huh (affirmative).
8    Q.  And then that may or may not translate into
9  them being able to do something out in the real world?
10    A.  Yes, sir.
11    Q.  Anything more than that?
12      I mean, you would agree with me, Doctor, that
13  there's no real vocational training component of the
14  program?  They're not trying to reintroduce folks back
15  into --
16    A.  No.
17    Q.  -- the world in terms of getting a job?
18    A.  Absolutely correct.  And even then, it's after
19  they've graduated and they can get a -- a job.  In
20  Narconon.  So...
21    Q.  You're not a Scientologist, are you?
22    A.  No, sir.  I'm a Catholic.
23    Q.  Okay.  Do you -- do you have -- do you know
24  whether or not the Narconon materials rely upon the
25  principles and teachings of Scientology?

Page 87

1    A.  I believe that they do.
2    Q.  Do you know what Scientology's view of
3  psychiatry is?
4    A.  Most certainly.
5    Q.  And tell me what that is.
6    A.  My understanding is they think that
7  psychiatrists tend to abuse their power, and to give
8  more medicines instead of helping people get off of
9  medicines.
10    Q.  And, in fact, Scientology is quite hostile to
11  psychiatry?
12    A.  I agree.
13    Q.  And, in fact, Scientology is quite hostile to
14  the use of psychiatric drugs, true?
15    A.  I agree.
16    Q.  But you, sir, I would assume, routinely
17  prescribe for your patients psychiatric drugs?
18    A.  Yes, sir.
19    Q.  And you think -- do you think it's within the
20  standard of care to not prescribe, as a -- sort of a
21  blanket rule, psychiatric drugs for the treatment of
22  mental disorders?
23    A.  I agree with you; I think that it would be a
24  mistake to, as you say, blanket not prescribe any
25  medications for the treatment of any kind of disorder --

Page 88

1  mental, mental disorders, or any other disorders, yes, I
2  agree.
3    Q.  Yes.  But -- but even though Narconon, and
4  the -- the program itself, because it rests on
5  principles of Scientology, is hostile to that notion,
6  you're still comfortable opining that it's a program
7  that comports with the standard of care?
8    A.  Most certainly.
9    Q.  Okay.  All right.  What's number 5 on your
10  list?
11    A.  1, 2, 3, 4, 5.  "Remaining in treatment for an
12  adequate period of time is critical."  So there --
13  that's vague, but we do have some research--and I can't
14  quote you the article, Mr. Harris, I'm sorry--that shows
15  that the length of time -- the longer the time, the
16  greater likelihood of longer-term abstinence from use.
17  So in this regard I think that Narconon met
18  Mr. Desmond's needs, in that they were quite flexible
19  and willing for him to stay as long as the courts wanted
20  him to stay.  And also, on a side note, kind of commend
21  the court for, you know, making him stay for six months,
22  because I think six months would be a great time to try,
23  and he'd never -- to my understanding, he'd never had a
24  six-month concerted time of treatment.
25    Q.  Well, he didn't have a six-month concerted

March 21, 2012

Page 89

1  time of treatment in this case, either, did he, Doctor?
2  A.  Well, my understanding is, to answer your --
3  to answer your question, my understanding is it was
4  about four or five months, he finished, and then he
5  transitioned into a staff position.
6  Q.  But did he receive any treatment after he
7  graduated from the program, after three or four months
8  or so?
9  A.  I think he was more along the lines of being
10  part of the staff, as almost like a therapeutic
11  community type position.
12  Q.  Okay.  Well, tell me what bases you have for
13  the opinion that after he graduates from the program
14  after four months, that he entered into a therapeutic
15  community?
16  A.  He did not.  He did not.  It was more like
17  that.  It was like --
18  Q.  How?
19  A.  Well, he's in a recovery environment.  He's
20  got a responsibility.  And I believe, if I'm not
21  mistaken, it was the sauna.
22  Q.  Okay.  Well, he -- he graduates from the
23  program, and then immediately assumes a -- an employee
24  role at Narconon, fair?
25  A.  I believe so, yes.

Page 90

1  Q.  And it was actually I think a dual role; he
2  worked at Delgado at some point and Narconon at some
3  point?
4  A.  I don't remem -- I'm sorry, Mr. Harris, sure.
5  if he worked for -- if you say so, Mr. Harris, sure.
6  But I don't remember -- I don't remember anything about
7  the -- working for Delgado, but I definitely remember
8  something about him working at sauna --
9  Q.  Well --
10  A.  -- and --
11  Q.  But the bottom line is he was assigned for six
12  months of treatment.
13  A.  Oh.  Good point.
14  Q.  Okay?
15  A.  Yes, sir.
16  Q.  Right?
17  A.  Right.  Right.
18  Q.  And he got four months of treatment?
19  A.  Okay.
20  Q.  So for two months Narconon used him as an
21  employee, but he wasn't getting what the court mandated.
22  Isn't that true, Doctor?
23  MS. MARSCHALK: Object to form.
24  THE WITNESS: That -- that might be
25  true, Mr. Harris.

Page 91

1  BY MR. HARRIS:
2  Q.  And you think that's appropriate?
3  A.  Yes, sir, Mr. Harris.  I never use the court's
4  opinion, with all respect to the judge, as the basis of
5  my medical treatments.  I -- you know, if I clinically
6  believe that it's time for you to stop taking this
7  medicine, and you're well, I'm going to stop the
8  medicine, of course, so -- you know, with all due
9  respect to the court, so I base my medical opinion about
10  your needs based on you.
11  Q.  In your experience at facilities that you've
12  worked with, do folks who graduate from a drug and
13  alcohol treatment program immediately assume a
14  supervisory role over other addicts?
15  MS. MARSCHALK: Object to the form.
16  THE WITNESS: Mr. Harris, I do not know
17  the answer to that question.  And -- because
18  I'm -- I'm not intimately aware of the time
19  line of my colleagues' employment
20  relationships.  And certainly for a physician
21  there is a time period where you have to be
22  under supervision to -- to regain your
23  license.  So --
24  BY MR. HARRIS:
25  Q.  Well, let's --

Page 92

1  A.  -- you're -- yes, sir.
2  Q.  I didn't mean to cut you off.
3  A.  No...
4  Q.  But you -- you know from looking at the
5  depositions --
6  A.  Uh-huh (affirmative).
7  Q.  -- in this case that there were a number of
8  students who would graduate from the program --
9  A.  Uh-huh (affirmative).
10  Q.  -- and then immediately become monitors --
11  A.  Yes, sir.
12  Q.  -- in the housing component.
13  A.  Um -- um --
14  Q.  Just -- just ans -- do -- do you know that, or
15  not?
16  A.  I am a little unsure about -- no, I think I am
17  sure about that.  I believe -- I'm not sure if there's a
18  lag time between -- well, it's clear that the Delgados
19  employed recently recovered students.
20  Q.  As did Narconon.
21  A.  Now, Narco -- Narconon doing it, I don't --
22  you said the word "supervisory"; I'm not sure if -- if
23  that is what I understood the role to be.  With mis --
24  Q.  Well, what was Patrick doing in the sauna
25  program?

**Page 93**

1　A.　Monitoring.　He -- or, I believe -- maybe it
2　was another gentleman, maybe it was Mr. Brad Taylor or
3　another monitor, said exactly what his duties were, and
4　that's my basis of understanding what their duties were.
5　They were there with the nurse; they -- you know, if a
6　guy started to wander around and go smoke a cigarette,
7　he'd say, you know, "Hey, man, it's time to go back in,"
8　or -- or something along those lines.　He -- I don't
9　believe that these monitors had any obligations to train
10　or to coach or to advise, just to follow their
11　instructions; "Hey, if you're out of the sauna, hey,
12　man, it's time to --" --
13　Q.　But they --
14　A.　-- "go back in."
15　Q.　But they did have a responsibility under the
16　program to report any ethics violations that other
17　students may have committed?
18　A.　I believe that would be reasonable, and I'm --
19　that might even be part of their -- seems to be part of
20　their -- their expectation; it might even be written
21　down in their rules.　And --
22　Q.　Well, do you think it comports with the
23　standard of care for a drug and alcohol treatment
24　facility to have students graduate and then assume --
25　without any intervening period of time, assume any kind

**Page 94**

1　of monitoring or supervisory role?
2　A.　Mr. Harris, I can honestly say that I don't
3　know the answer to that question, because many of my
4　colleagues are in recovery, and many of the monitors and
5　the truck/bus drivers are in recovery, and I just don't
6　know how long they're in recovery before they started.
7　For example, Mr. Bert is a gentleman who works at
8　Breakthrough Recovery Outreach; he's in charge of
9　housing there, and he's been in recovery for a long
10　time, and he -- but, see, Mr. Harris, I actually don't
11　have any knowledge of how long he was graduated before
12　he started working.
13　Q.　Well --
14　A.　So -- I don't -- I don't know.　So standard of
15　care means -- I know what my other friends are doing in
16　town, and on that point I -- I don't know, to answer
17　that question.
18　Q.　All right.　Well, then, let's put aside the
19　standard of care for a second.　In your practice, would
20　you allow a person to graduate from a drug and alcohol
21　treatment program and then immediately, without any
22　intervening period of abstinence, immediately assume a
23　supervisory role or a monitoring role over other
24　students?
25　　　　MS. MARSCHALK: Object to form.

**Page 95**

1　　　　THE WITNESS: This is a hypothetical
2　question, 'cause I'm not in a position to
3　hire people, Mr. Harris.　But I truly do
4　believe I would, and I'll tell you why.
5　BY MR. HARRIS:
6　Q.　Okay.　Tell me why.
7　A.　Because when I release you, it's a very
8　exciting day.　And I think you're new.　I think you're a
9　different person that day, or -- during the weeks prior
10　to your discharge, we're really moving and getting
11　excited about that day, and you're a different person.
12　　　　I mean, you have had a period of abstinence
13　and you've proven yourself deemed worthy of -- of
14　graduation and discharge.　So I would be doing you a
15　disservice if I say, "You've graduated my program but
16　you are incompetent to serve in any kind of position."
17　In other words, the day you leave me, I hope you can get
18　a job at McDonald's or Walmart or Target or SunTrust.
19　Q.　My question may not have been clear, then,
20　based on your answer.　You would agree with me that if
21　someone graduates from a drug and alcohol treatment
22　program, they are at a considerable danger of relapsing
23　after they leave the program?
24　A.　Yes.
25　Q.　The statistics overwhelmingly support that?

**Page 96**

1　A.　Yes.　I agree, fully.
2　Q.　And therefore wouldn't you agree with me,
3　Doctor, that because of the danger of relapse, people
4　who immediately grad -- or, people who graduate from a
5　program should not be in a position where they're
6　determining whether or not other folks in a program are
7　using alcohol, and having to report that to the program;
8　does that make sense?
9　A.　Yeah -- Mr. Harris, I will have to disagree
10　with you.
11　Q.　Okay.
12　A.　I -- I think that, sure, it's all about
13　recovery, it's all about helping your -- you know,
14　being -- being helpful to other people.　And if -- and
15　if it means telling somebody about your drug use, you
16　know, "I'm in recovery and I -- I got to tell the group
17　that you've used again," I mean, that's -- that's part
18　of -- that's part of recovery.　And, now, I wouldn't
19　necessarily want someone in, as you say, a supervisory
20　role, but as far as a monitoring role, I think that
21　would be very reasonable.
22　Q.　What's the difference?
23　A.　Well, if I'm supervising you, I think I have
24　power over you.　If I'm monitoring you, I'm informing
25　the people that have power about your behavior.　I think

Case 2:14-cv-00283-GMN-NJK   Document 1-6   Filed 02/24/14   Page 27 of 67

March 21, 2012

Desmon Case 1:13-cv-02217-SCJ   Document 1-2   Filed 07/02/13   Page 26 of 73
Narconon, et al.

Page 97

1  that's -- in my understanding of what that might mean or
2  what it -- that's my understanding of what it means,
3  Mr. Harris.
4      Q.  Well, you've read Dr. Roy's deposition?
5      A.  Yes, sir.
6      Q.  And Dr. Roy has an opinion that there ought to
7  be some intervening period of time where you make sure
8  that the person is sort of sticking with their rehab;
9  you remember that?
10     A.  No, sir, I don't.  I think it's a reasonable
11  statement, but -- but I'm also saying if I'm giving you
12  my stamp of approval, you graduated from my program, I
13  believe that I've succeeded, and that you can start
14  working immediately at Walmart, Target or back at
15  whatever you were doing.  Unless, of course, it was, you
16  know, overly stressful or something like that, you know;
17  if you're the CEO, maybe you should take a break, but...
18     Q.  Okay.  Well, I think number 5 was the length
19  of the program; we've discussed that.
20     A.  Critical period.  "Counseling--individual
21  and/or group--or other behavioral therapies are the most
22  commonly used form of drug abuse treatment."  This is
23  a -- just a general statement, Mr. Harris; it just --
24  it's -- it just informs us that the most common form of
25  treatment in these programs are individual and/or group

Page 98

1  and they tend to be behavioral.  And if --
2      Q.  Is that --
3      A.  -- and if --
4      Q.  -- cognitive behavioral?
5      A.  What it says here is "behavioral therapies,"
6  but in practice, yes, it's -- of course, it's cognitive
7  behavioral, exactly right.  The --
8      Q.  Well, do -- do you a -- you believe, Doctor,
9  that an effective drug and alcohol rehabilitation
10  program should con -- should include as part of its
11  program some cognitive behavioral therapy or group
12  therapy?
13     A.  Without question.  I mean, it would be hard to
14  imagine that there was a reasonable program that didn't
15  include cognitive behavioral training.
16     Q.  Well, can you tell me where the Narconon
17  program provides cognitive behar -- behavioral or group
18  therapy?
19     A.  Man, that's all they do.
20     Q.  Okay.
21     A.  They're in those rooms all day long, training
22  on behaviors, for example -- in the TRs, for example,
23  "Why are you hesitating?  Why aren't you following my
24  instructions?"  Because there's all these doubts and
25  things and thoughts, and they have them do these bizarre

Page 99

1  things like talking to an ashtray.  "Why are you
2  thinking about it?  Why don't you follow the
3  instructions?"  'Cause all these doubts and catastrophic
4  thinking and worries about "This is weird, I shouldn't
5  be doing this.  This is --" -- So they, in practice, do
6  a lot of cognitive training.  And then there's a lot of
7  clues that that's -- that's really what they're doing,
8  actually.  They're reshaping the way you think.  And,
9  you know, even the lingo is -- that Mr. Patrick Desmond
10  used in his success story dated February 6th, 2008,
11  "Objectives were extremely beneficial to me, and I was
12  loving my cognitions."  So the guy was -- had new
13  thoughts.  And that's what CBT, cognitive behavior
14  therapy, is.  You're a new person.  You have new
15  thoughts.  You have new beliefs.  You can't have new
16  cognitions, new thoughts, without new -- a new belief
17  structure.  So -- because your thoughts are simply a
18  product of the things you believe.
19     Q.  What's the role of a therapist in cognitive
20  behavioral therapy?
21     A.  It can be anywhere betw -- it can be anything
22  from, "Hey, read this book and come back to me and ask
23  me questions," to walking you through every single
24  detail of, "Okay, what was that cognition?  What was
25  the --" -- did they provide manualized cognitive

Page 100

1  behavior therapy a la Aaron Beck, no; few people do
2  that, few people are certified to do that even in my
3  field.  Did they provide some pretty intense behavioral
4  things that far and -- far and away are more intensive
5  than your average substance abuse program, which the
6  guys are just sitting in -- average substance abuse
7  program, they're just sitting at a table like this and
8  the teacher's talking, talking, talking, they're doing
9  some talking, some experiential things, but these guys
10  were actually doing some ex -- intensive behavioral
11  things together, and working with clay, and doing other
12  things that really help solidify these ideas and -- or,
13  these new ideas in their head.  New i -- the new ideas
14  me -- being that "I can make a decision," that "I can
15  take space," that "I can take responsibility," that
16  "being an ethical person is possible."  Instead of all
17  those doubts, doubts, doubts, doubts, doubts.  And
18  through -- you know, this is much more detailed, much
19  more intensive than a -- than any other substance abuse
20  program I've ever been involved in, because even the
21  beginning TRs, they're -- the -- the -- the twins are
22  saying, "You touch the wall.  You do this."  Many people
23  with addictions have no idea what it means to be
24  assertive.  To actually communicate.  They were really
25  pushed out of their norm and out of their -- some of

Page 101

1  them. Some of them probably have a lot of experience
2  yelling at people and telling them what to do. So
3  they're -- these are really, you know, tangible ways
4  that these people are really changing and breaking out
5  of their old ways of thinking and believing. So his own
6  words, his cognitions, Mr. Patrick Desmond was amazed
7  and pleased with his new cognitions. I mean, that's a
8  strong evidence that he had new beliefs, new thoughts.
9  So those are my -- those are some of the -- the
10 reassuring points that what was happening in those rooms
11 was actually changing their beliefs and changing their
12 un -- ineffective ways of thinking.
13     Q.  All right. So you believe that the TRs, then,
14 provided sufficient cognitive behavioral therapy to --
15 to comport with what you've described as an effective
16 treatment program?
17     A.  Yes, sir.
18     Q.  You've relied numerous times on the success
19 stories in our discussions here today. Doctor, you --
20 you know from the testimony that is in the record that
21 the students report that the only way you got to move up
22 to the next level was if you wrote a success story.
23 Have you read that?
24     A.  I vaguely remember something about that, maybe
25 it was Ms. Riepe, something along those lines; you had

Page 102

1  to kind of give them what they -- you know, give them --
2     Q.  You had to tell them what they wanted to
3  hear, --
4     A.  Uh-huh (affirmative).
5     Q.  - or you didn't move up to the --
6     A.  Uh-huh (affirmative).
7     Q.  -- next level?
8     A.  That seems very reasonable. You have to pass
9  the course in order to graduate.
10    Q.  Okay. But -- but you're -- you're relying on
11 these reports where the students are basically having to
12 tell Narconon what they want to hear in order to move to
13 the next book, --
14        MS. MARSCHALK: Object --
15 BY MR. HARRIS:
16    Q.  -- and I'm just asking you, you know, does
17 that not concern you in any way, that maybe these
18 students are sort of puffing a little bit in order --
19    A.  Uh-huh (affirmative).
20    Q.  -- to get up to the next level?
21        MS. MARSCHALK: Object to form.
22        THE WITNESS: Mr. Harris, I think that's
23    an excellent question.
24 BY MR. HARRIS:
25    Q.  Thank you.

Page 103

1     A.  You're welcome. And I think that had it not
2  been for the fact that --
3     Q.  She objected to it, though. Even though it
4  was excellent.
5        MS. MARSCHALK: I don't think it was an
6     excellent question.
7        THE WITNESS: Well, I'm sorry, I
8     disagree with you. I think that --
9  BY MR. HARRIS:
10    Q.  Keep going.
11    A.  -- that --
12        MS. MARSCHALK: It's okay.
13        THE WITNESS: I think that if I'm
14    only -- if I'm only basing my opinion on a
15    couple of pages that he wrote, and if I'm not
16    reading between the lines, that might be a
17    little foolish. I think that Mr. Patrick
18    Desmond was described as an affable,
19    motivated, energetic and friendly person, and
20    he was that way consistently. His writings
21    were consistent with the personality
22    perspectives that we've gotten from his mom,
23    his dad, and the people that testified about
24    him -- or -- in their depositions. So it
25    would be very strange that -- well, I'll --

Page 104

1  BY MR. HARRIS:
2     Q.  Have you read any other success stories, from
3  other students?
4     A.  I don't know if I've had any other pape --
5  students' files.
6     Q.  Okay. So, I mean, you don't know whether
7  every student writes a glowing report about the program
8  in order to move up to the next level?
9     A.  I have -- don't think I have any information
10 about anybody else's file, --
11    Q.  But that --
12    A.  -- Mr. Harris.
13    Q.  -- that wouldn't surprise you, I mean,
14 you're -- you're a psychiatrist, and it wouldn't
15 surprise you if the students in this program wrote these
16 glowing reports just so they could be done with level 3
17 and move on to level 4?
18        MS. MARSCHALK: Object to form.
19        THE WITNESS: Mr. Harris, I will agree
20    with you, because sometimes people aren't
21    taking this program seriously. Mr. Patrick
22    Desmond seemed to be taking it very
23    seriously, based on all the things that he
24    wrote. Consistently and...
25 BY MR. HARRIS:

March 21, 2012

**Page 105**

1  Q. Okay. I -- I'm sorry. All right, so
2  cognitive behavioral therapy, that was number 6. Let's
3  try to get through your list, if we can.
4  A. Yep. You got it. "Medications are an
5  important element of treatment of any patient,
6  especially when combined with counseling and other
7  behavioral therapies."
8  Q. But, as we've already discussed, Narconon is
9  hostile to psychiatric medications?
10  A. He -- he was seen by Dr. Darvin Hege, and --
11  M.D., and -- at Peachford, and, you know, anything he
12  needed -- he got detoxed at the time. So he didn't need
13  any further medications, according to Dr. Hege.
14  Q. Okay. But -- but you understand from reading
15  Ms. Rieser's deposition that Narconon will not accept
16  into the program anyone who is using any kind of
17  psychiatric medication?
18  A. Uh-huh (affirmative). Well --
19  Q. Is that -- do -- well --
20  A. Sorry.
21  Q. Do you understand that?
22  A. No, sir; I did not remember that statement.
23  Q. Well, do you think that that comports with the
24  standard of care? A program that will not accept into
25  its treatment program any student who is using any kind

**Page 106**

1  of psychiatric drug.
2  A. Mr. Harris, the reason it does comport fully
3  with the standard of care is the following reason. That
4  no one is forced to treat anyone they don't want to
5  treat. So if I have a philosophy and you don't abide by
6  that philosophy, I can't help you. No single treatment
7  is appropriate for everyone. So if you knock on my door
8  and you don't like what I've got, then you must go
9  somewhere else, 'cause no single treatment is
10  appropriate for everyone.
11  Q. All right. Fair enough. Tell me what that
12  means, then, "Medications are important."
13  A. Okay. This -- these organizations have a lot
14  of physicians in them, and physicians tend to believe
15  that Antabuse and acamprosate and these other
16  medications can be useful. And I think that -- I think
17  those -- I think there's evidence to show that those
18  medicines can be useful. On the other hand, there's a
19  huge -- in the 12-Step community and the recovery
20  community, a huge move to stay away from chemicals if at
21  all possible. So I would definitely consider
22  medications and chemicals had someone -- oh, sorry, you
23  didn't ask me that question, but, yes, medications can
24  be helpful. And many programs try to avoid
25  medications -- many programs that I'm aware of try to

**Page 107**

1  avoid medications as much as possible.
2  Q. Okay. Anything else on number 7?
3  A. No, sir.
4  Q. Number 8?
5  A. "An individual's treatment and service plan --
6  services plan must be addressed [sic] continually and
7  modified as necessarily -- as -- as necessary to ensure
8  that it meets his or her changing needs." And according
9  to Ms. Riepe, Mr. Patrick Desmond's treatment plan was
10  updated as needed, regularly, and was never in default.
11  Q. Well, have you looked at his treatment --
12  A. Yes, sir.
13  Q. -- plan?
14  A. Yes, sir.
15  Q. Do you see any evidence that it was updated or
16  modified beyond when it was initially put together when
17  he was admitted?
18  A. Mr. Harris, I didn't look at the treatment
19  plan with that criticism in mind. I noted that they
20  were there, I noted that abstinence was the goal, and I
21  was satisfied that -- with abstinence as his goal and --
22  so...
23  Q. Okay.
24  A. I --
25  Q. So --

**Page 108**

1  A. I --
2  Q. I guess, bottom line, do you know whether or
3  not his treatment plan was modified as he went?
4  A. I know -- I do not know, except from what
5  Ms. Riepe said, that it was up -- that it was
6  continually up to date. On time. So, no.
7  Q. Okay.
8  A. Uh-huh (affirmative).
9  Q. Anything else on that one?
10  A. No, sir. "Many drug addicts [sic] individuals
11  also have other mental disorders." Just a com -- just a
12  comorbidity we've already -- we've already discussed.
13  Q. Uh-huh (affirmative).
14  A. Okay? "Medically assisted detoxification is
15  only the first stage of addiction treatment and by
16  itself has little -- does little to change long-term,"
17  so there are studies to show that detox only is not
18  going to be helpful. Detox plus rehab. Yeah.
19  Q. So you've got to get off the -- the -- you've
20  got to get off the -- you have to address the physical
21  aspect of addiction, and then you began to address the
22  mental; --
23  A. Yes, sir.
24  Q. -- is that fair?
25  A. Yes, sir.

Desmond, et al. v.
Narconon, et al.

March 21, 2012

---

**Page 109**

1   Q. Okay.
2   A. Yeah. Yeah. Yeah. "Treatment does not need
3 to be voluntary to be effective." So apparently there
4 must be -- if it's on this information sheet, there must
5 be some evidence to show that even guys in jail can
6 recover.
7   Q. All right. --
8   A. And --
9   Q. -- So it's your opinion, then, that
10 court-mandated treatment can be effective in --
11   A. Absolutely.
12   Q. -- addressing --
13   A. Absolutely.
14   Q. -- drug and alcohol --
15   A. Yes.
16   Q. -- problems?
17   A. As long as the program in the jail meets the
18 standard of care, you know, has the basics.
19   Q. Right. And you're -- you're describing for me
20 what a program that meets the standard of care should
21 include?
22   A. Yeah. And I would say that many programs
23 don't have all this exactly, don't have all these
24 things, but if they've got a bunch of these things, I'm
25 pretty happy.

---

**Page 110**

1   Q. Well, which ones can we get rid of?
2   A. Good question.
3   Q. I mean, I'm not trying to be --
4   A. No; that's a --
5   Q. -- flippant, Doctor; --
6   A. -- good question.
7   Q. -- I mean, I just need to know what program --
8 what a program that comports with the standard of care
9 has. And you've been, I thought, reading me this
10 comprehensive list, and now I understand you to be
11 telling me that you don't have to have them all --
12   A. Well, you -- I'm sorry, Mr. Harris, maybe I am
13 being a little ambiguous here. I'm going to stick with
14 what I've said prior, and if you'd just erase that from
15 my -- from your memory, --
16   Q. Okay.
17   A. -- that would be fine.
18   Q. All right. So, for the record, then, you
19 believe that a program that comports with the standard
20 of care needs to have the elements that you've been
21 outlining for me?
22   A. Nicely put. I fully agree.
23   Q. Thank you. 10?
24   A. Oh, okay. "Treatment does not need --" --
25 okay. This is probably number 12, I believe. I think

---

**Page 111**

1 this -- the next one; "Drug -- drug use during treatment
2 must be monitored continuously, as lapses occur --
3 during treatment do occur." I thought that was
4 number 12.
5   Q. Let's talk about that.
6   A. All right.
7   Q. So because relapse is a part of recovery, --
8   A. Uh-huh (affirmative).
9   Q. -- it's not uncommon for people who are
10 addicts to relapse and being -- begin using drugs again?
11   A. Yes, sir.
12   Q. And it's also not uncommon for people who have
13 addictions to -- who -- who may have an addiction in one
14 type of drug to want to experiment with other kinds of
15 drugs?
16   A. Yes, sir.
17   Q. And that's actually part of the treatment
18 protocol -- protocol that physicians like yourself go
19 through in dealing with patients; you ask them
20 routinely, "Are you having any cravings," fair?
21   A. I do. --
22   Q. Okay. Well, --
23   A. -- I do.
24   Q. -- I mean, is that something that a doctor
25 who's comporting with the standard of care ought to be

---

**Page 112**

1 doing --
2   A. Yes, sir.
3   Q. -- if they're treating addicts?
4   A. Yes, sir.
5   Q. And the -- this element that you're talking
6 about here is monitoring to be sure that people aren't
7 using drugs. Tell me what you think a program that
8 comports with the standard of care ought to be doing
9 to -- to do that kind of monitoring.
10   A. Two things, Mr. Harris. Based on my
11 understanding of what happens in our community, if
12 somebody looks inebriated in any -- any way, or looks
13 overly tired, then we would suspect. So that would be a
14 reason for a drug test. Or every now and then we need
15 to do surprise drug tests.
16   Q. Okay. So basically testing for cause and
17 random testing?
18   A. Yes. Testing for cause and random testing,
19 that sounds ex -- that sounds right.
20   Q. And if there's any reason to suspect that
21 someone in a program might be using, you ought to test
22 them?
23   A. Yes, sir.
24   Q. And then you ought to have some random drug
25 testing program in place?

---

Desmond, et al.  Case 1:13-cv-02217-SCJ   Document 1-2   Filed 07/02/13   Page 30 of 73
Narconon, et al.

**Page 113**

1   A. Yes.
2   Q. All right. Tell me what Narconon's program in
3   that regard looks like. What program did they have for
4   testing for cause, and what program did they have for
5   random testing?
6   A. They did drug screens, according to what
7   Ms. Mary Rieser says and what Ms. Riepe says.
8   Q. Okay. But there is testimony that those were
9   very sporadic, --
10   A. Uh-huh (affirmative).
11   Q. -- from other students, is there not, sir?
12   A. I'll think about it for a moment. I would --
13   I can't remember where I may have read it, but I would
14   be willing to agree that it might have been sporadic.
15   Q. Okay. Well, the -- my -- my point is that
16   Ms. -- Ms. Rieser testifies about the nature of their
17   testing program, --
18   A. Yes, sir.
19   Q. -- but then other students have testified that
20   it was sporadic to nonexistent. Right?
21   A. I -- honestly, I don't remember those level --
22   that level of detail. And so, I'm sorry, I won't be
23   able to confirm that statement. I -- I do recall,
24   though, clearly there are differences of opinion in the
25   frequency of the -- of the drug testing.

**Page 114**

1   Q. Okay.
2   A. And I -- yes, sir.
3   Q. Why -- why are you -- why are you deciding,
4   then, that Ms. Rieser's contention about drug testing is
5   accurate and some of the other testimony about it is
6   not?
7   A. No, sir. I'm definitely not in a position
8   to -- to -- to figure out who's more accurate. But what
9   I do know, Mr. Harris, is that they did have drug tests
10   from time to time, and it was their expectation, their
11   goal. I'm in no way saying that any program in this
12   city is perfect. I'm in no way saying people do things
13   exactly right all the time.
14   Q. I'm not -- I'm not talking about every
15   program, Doctor, and I want to be very clear about this.
16   You don't have any idea how the drug testing program in
17   practice operated at Narconon of Georgia, do you, sir?
18   A. I disagree with that statement. Because if
19   someone was reported as drinking, they'd have an ethics
20   meeting, and they would get drug test. They would
21   considerably get -- they would be at risk of getting a
22   drug test.
23   Q. How often? What percentage of folks who were
24   reported as drinking got tests?
25   A. That I have no data on. Or I have no

**Page 115**

1   recollection of any data on.
2   Q. The bottom line is that Ms. Rieser said, "We
3   had a drug testing program," and there are other
4   students who disagree with her in terms of how effective
5   and how often it occurred, true?
6   A. I'm willing to say that that's true, even
7   though I --
8   Q. Well, have you --
9   A. Mr. Harris, I'm sorry, I don't -- I don't -- I
10   don't remember what Ms. Rieser said, and I don't have
11   detailed recollection of what the students say. But I'm
12   certainly willing to go along with the idea that, yeah,
13   there's differences of opinion about how often and how
14   effective it was, Mr. Harris, I have no -- I have no
15   argument or no -- I'm not -- I wouldn't argue with that.
16   Q. You know that they had some drug testing going
17   on?
18   A. That's what I'm saying, Mr. Harris; they had
19   some drug testing going on, and the frequency, or what
20   triggered it, I just don't know.
21   Q. Well, you can't -- so then you cannot say that
22   the drug testing program specifically used and
23   implemented by Narconon of Georgia itself comported with
24   the standard of care?
25   MS. MARSCHALK: Object to form.

**Page 116**

1   THE WITNESS: Mr. Harris, I will say
2   that I actually don't know the standard of
3   care for the frequency of -- of random drug
4   screens.
5   BY MR. HARRIS:
6   Q. All right. Well, then, let's throw standard
7   of care out, then. You can't tell me whether or not the
8   specific drug testing protocol and program used by
9   Narconon of Georgia was an effective program, using your
10   terminology?
11   A. Well, come to think of it, in my daily
12   practice I rarely -- and I do PHP and IOP -- you know,
13   day -- day program. -- I rarely have to drug test.
14   It's on -- you know, it's -- we rare -- we rarely do.
15   Q. All right. Well, then, let's dig into it.
16   How often should you randomly test?
17   A. Oh, when they're in a program? I'd say that
18   anywhere between one to three times a month would seem
19   reasonable to me.
20   Q. All right. Did Narconon of Georgia randomly
21   test its students one to three times a month?
22   A. I don't know.
23   Q. Okay. So you've told me what you think is
24   reasonable, but you can't tell me whether or not
25   Narconon was doing what you think is reasonable?

Page 117

1   A.  I — I — I don't know if they were doing it
2  at that — at that frequency.  I know that it was
3  happening.
4   Q.  Looking at your CV, are you board certified in
5  addiction medicine?
6   A.  No.
7   Q.  What is your experience and training in
8  addiction medicine?
9   A.  I'm — I taught the course at Cornell when I
10  was on the faculty there --
11   Q.  What course?
12   A.  -- for junior medical students for substance
13  abuse treatment and — during their third year.  I
14  treated -- in the earlier part of my career, I treated
15  inpatients with substance abuse -- inpatients with
16  substance abuse -- on substance abuse unit.  But you
17  asked about my training.  Oh.  My training was a general
18  psychiatry residency, so I — general psychiatry
19  residency with the substance abuse training provided
20  through the Medical College of Georgia and the Veterans
21  Administration.  So we --
22   Q.  What --
23   A.  -- we --
24   Q.  What percentage of your practice is dedicated
25  to treating patients who have substance abuse problems?

Page 118

1   A.  50 percent.
2   Q.  50 percent?  Okay.  And that's what I'm trying
3  to understand.
4   A.  Yes.
5   Q.  And — and how do you -- how do you determine
6  those percentages?
7   A.  The -- I'm giving you a ballpark, because
8  the -- I would treat anybody that walks through the door
9  at Scottish Rite or Peachford.  So I would say that
10  the -- I would say that it may be actually higher than
11  50 percent.  I don't want to overstate it because so
12  many of my patients are suffering from -- from comorbid
13  anxiety and depression, so they typically come to me in
14  the crisis phase.  In the most dangerous phase.
15   Q.  And — and I understand what you're saying;
16  you're saying that your -- your patients may have
17  substance abuse problems when they present to you, and a
18  lot of them do, --
19   A.  Yes, sir, at -- at least half, yeah.
20   Q.  -- but do you hold yourself out as -- as a --
21  as a doctor who specializes in the field of addiction
22  medicine, per se?
23   A.  Yes, I do.
24   Q.  Okay.
25   A.  Yeah.

Page 119

1   Q.  All right.  So, anyway, moving this -- this
2  one to three -- bottom line is that's what you think,
3  one to three per month in terms of drug -- random
4  testing?
5   A.  I would be -- I would be satisfied if -- if --
6  if they were doing that one -- one to three times a
7  month random.  And also for cause at times.
8   Q.  And -- and for cause?
9   A.  Yes, sir.
10   Q.  Do you believe that the employees of a drug
11  and alcohol treatment facility ought to be trained in
12  the symptoms of drug use so that they can implement
13  testing for cause?
14   A.  That would be a good idea, yes.
15   Q.  Okay.  Well, I mean, is it your opinion that
16  that's what the standard of care requires?
17   A.  Is it my opinion that they have to have
18  specific training on that?
19   Q.  Yeah; I mean, if you're working at a drug and
20  alcohol treatment facility, should you know what
21  symptoms people are going to display if they start using
22  again?
23   A.  No.  You've got a good point, but Mr. Patrick
24  Dempsey -- Des -- Desmond had 14 years of knowing what
25  it looked like when you're intoxicated and drunk, so,

Page 120

1  no --
2   Q.  I don't mean to cut you off, but that's not my
3  question.
4   A.  Should they have training?
5   Q.  Yes.  Employees at drug and alcohol treatment
6  facilities, should they have training regarding
7  determining whether or not someone's manifesting
8  symptoms that they've started back using?  Does that
9  make sense?
10   A.  Yes, sir.  Your question --
11   Q.  Okay.
12   A.  -- is good.  And -- and I don't know the
13  answer to that question, because if you're talking about
14  training, sitting in a classroom and saying A, B and C,
15  I don't know if anybody off -- you know, if -- if we
16  offer that.  I mean, I think, you know, when you're
17  orienting for your position, you know, the medical
18  director or practice director or the clinical director
19  might say, "This is what we expect," you know, and so
20  during the orientation process there might be.
21   Q.  Well, should the medical director, then, have
22  training in addiction medicine?
23   A.  Not necessarily, 'cause most places don't --
24  aren't required to have one.  So...
25   Q.  All right.  Anyway, back to testing.

Page 121

1   A. Yes, sir.
2   Q. Is there anything else about the testing
3   procedures or protocols that you believe an effective
4   program should have?
5   A. I think we've --
6   Q. Covered it?
7   A. -- covered it. Yeah. Yeah. Yes, sir, I
8   think we have.
9   Lastly, treatment programs should assess
10  patients for evidence of other diseases; HIV,
11  hepatitis C and basic diseases like that. And -- and
12  if -- if my recollection serves me well, the doc -- the
13  medical doctor that -- that saw Mr. Patrick Desmond did
14  do some tests for infection and things like that, so
15  that was covered.
16  Q. All right. Thank you, Doctor.
17  A. You're welcome.
18  Q. All right. Now, you -- you've given me these
19  elements, we've talked about it. Your disclosure says
20  that "Narconon of Georgia provided a reasonable and
21  appropriate outpatient drug and alcohol education and
22  rehabilitation program, and that it met the applicable
23  standard of care."
24  A. Uh-huh (affirmative).
25  Q. Is it your opinion, then, that Narconon

Page 122

1   effectively implemented all of those elements that you
2   have described for me?
3   A. I'd say effectively, but not perfectly.
4   Q. Okay. Which ones did they not perfectly
5   implement?
6   A. Well, based on what you were telling me,
7   you're saying that there's a question, based on what the
8   students have told you, that maybe their drug tests were
9   not sufficient. --
10  Q. Well, it's --
11  A. -- Or not --
12  Q. -- it's not what they've told me, it's what's
13  in the record, and I'm asking you have you -- have you
14  looked at any of that stuff?
15  A. Yes, sir, I have. But, once again, I -- I
16  just don't have a good recollection of -- of what that
17  debate or argument was. About, you know, who said what
18  about who, and...
19  Okay. I'll go back to your question. And I
20  think your question was, have they effectively done
21  this? Yeah.
22  Q. Okay. Well --
23  A. Uh-huh (affirmative).
24  Q. And -- so you're comfortable, then, that 1
25  through 13, Narconon has effectively implemented those

Page 123

1   elements?
2   A. I think so. Yes.
3   Q. Okay.
4   Now, let's talk about statistics for relapse.
5   Have you seen any paperwork in this case where Narconon
6   contends that it has a 76 percent, I think, success
7   rate? Have you seen --
8   A. Yes, I have.
9   Q. Have you looked into that to determine whether
10  or not you think that's accurate?
11  A. I scanned some of the studies that were
12  provided to me.
13  Q. Uh-huh (affirmative). What studies were
14  provided to you?
15  A. There was a big ol' stack that I scanned. And
16  I didn't take a very close look at it. I...
17  Q. Who gave them to you?
18  A. I believe that Ms. Marschalk did.
19  Q. So Narconon provided you with the studies that
20  supported Narconon's contention that its program has a
21  76 percent success rate?
22  A. Yeah; that's why I went back to PubMed, to see
23  if I could find anything else.
24  Q. All right. Well, do you --
25  MR. HARRIS: I don't -- I don't know

Page 124

1   that I have a list of those.
2   MS. MARSCHALK: Jeff, it's -- it's on
3   that disclosure; it's on -- it's part of the
4   8,000-plus documents, the 8,000-plus pages of
5   documents that Narconon has provided in
6   discovery. Those studies are part of that --
7   MR. HARRIS: I'm not arguing with you
8   about it; I'm not -- I'm just saying I just
9   need to know which specific studies he's
10  looked at.
11  MS. MARSCHALK: Whatever the heck we
12  produced in discovery. It was in those
13  10,000, 8,000, however many pages.
14  THE WITNESS: Mr. Harris, may I tell you
15  that I'm not relying on any -- on any of
16  those studies for my opinion?
17  BY MR. HARRIS:
18  Q. I would love for you to tell me that.
19  A. I'm not relying on any of those studies for my
20  opinion.
21  Q. Okay. What are you relying on -- well, let me
22  ask you this; do you believe that that 76 percent
23  success ratio is accurate?
24  A. Mr. Harris, I'll be honest with you, that's a
25  big number.

Louis Adolph Casini, ----
March 21, 2012

**Page 125**

1  Q.  Yeah, it's -- it's a real big number.

2  A.  It's a big number.

3  Q.  And it's completely inconsistent --

4  A.  I -- I hope it's true, but, I mean, I would

5  need some convincing.

6  Q.  Yeah, well, it's completely inconsistent with

7  what most drug and alcohol treatment facilities

8  experience in terms of their success rate; you'd agree

9  with that?

10  A.  Yes, I would.

11  Q.  And what is a success -- well, first of all,

12  how do we define success rate?

13  A.  Abstinence to a certain number of years,

14  depending on how mu -- how far out you want to -- you

15  know, complete abstinence for either six, 12 or 24

16  months is what I've seen in the literature, and -- and

17  the numbers vary quite -- largely anywhere between, you

18  know, roughly speaking, 20 to 80 percent is -- is what

19  I've seen in --

20  Q.  Depending upon how far you go out in terms of

21  the length of time that they've abstained?

22  A.  Yes, sir.  Right.  How many people have -- are

23  still abstinent after six months or 12 months or 24

24  months.  And the numbers are all over the -- all over

25  the map.

**Page 126**

1  Q.  Okay.  Do you have any idea where Narconon is

2  getting the numbers that it's using?

3  A.  You know, in the interest of time -- I just

4  didn't have enough time to delve deeper into those

5  studies, Mr. Harris.  And I -- I would be happy to, but,

6  no, I don't have a clear understanding of where that

7  70 -- 70-something number came from, no, sir.

8  Q.  Okay.  What is a number that you think is an

9  accurate predictor of -- or -- or, an accurate number

10  for one year out?

11  A.  If -- so you're asking me a hypothetical

12  question; if -- if I have a -- a reasonable program and

13  I've got a hundred people --

14  Q.  Well, let me back up and do --

15  A.  Yes.

16  Q.  -- it this way.

17  A.  Yes, sir.

18  Q.  Let -- can you tell me, what is your opinion

19  in terms of -- strike that.

20          There have not been that many studies that

21  have looked at the abstinence rate for drug and alcohol

22  treatment programs, correct?

23  A.  Correct.  There -- it's hard to compare apples

24  to apples because of the variety of the -- of -- of

25  the -- of what's been looked at.

**Page 127**

1  Q.  Are you -- is there a -- based on the studies

2  that you've seen and the literature that you've seen, is

3  there some rate that you would be comfortable opining

4  is -- is accurate one year out?

5          Do you understand that question? --

6  A.  You know, sir, I --

7  Q.  -- It's horrible, but I know what I'm

8  thinking.

9  A.  You know, I can answer -- I can give you an

10  answer to the question I'm thinking about.  I'm

11  thinking, you know, if I had one-third of my patients

12  sober after one year, I would be jumping for joy.

13  Q.  And that's, I think, consistent with what the

14  literature supports, isn't it?  Perhaps if you're doing

15  really well, you got about a 33 percent success rate?

16  A.  You can find -- but, Mr. Harris, you also have

17  a little bit of a selection bias.  As you say, Narconon

18  won't take people that have major mental disorders, and

19  that's probably smart.  If you're on major psychiatric

20  medications -- and I didn't know this in prior -- I

21  should have assumed it, sir, but I -- I didn't know that

22  prior to what you said.  If you're not going to take

23  guys that have schizophrenia and bipolar disorder and

24  they're on Depakote and Haldol, your success rate's

25  going to be higher, 'cause you're not treating the

**Page 128**

1  guy -- your pool of people aren't as severe as my pool

2  of people.  So I'm treating the tougher patients that

3  have other cognitive problems, and haven't worked in

4  years, and have poorer health because of their chronic

5  psychiatric disorder.  So selection bias, I guess?

6  Maybe -- I'm not sure if it's selection bias, or just

7  the -- are you looking at the same population. --

8  Q.  Well, in your experience --

9  A.  -- So...

10  Q.  -- dealing with your patients --

11  A.  Uh-huh (affirmative).

12  Q.  -- and the people that --

13  A.  Uh-huh (affirmative).

14  Q.  -- you've been treating, --

15  A.  Uh-huh (affirmative).

16  Q.  -- one year out, what is your success rate in

17  terms of people abstaining?

18  A.  Oh, I don't know.  I haven't -- I haven't

19  tabbed -- I haven't kept track.  No.

20  Q.  Do you -- do you have any idea whether or not

21  there is any scientific basis for Narconon's 76 percent

22  success rate?

23  A.  All I know is that they have said that they're

24  basing that on some studies that I've scanned but I

25  haven't dug into.  So I can't -- I -- I don't know where

Page 129

1  that number came from, Mr. Harris, and I don't have an
2  opinion about how accurate it could be.
3     Q.  All right.  So you're not going to come into
4  court in Cobb County and say, "Hey, they got a
5  76 percent success rate"?
6     A.  No, sir; I don't think that -- if I were to
7  come up -- if I had that opinion, I suppose that
8  Ms. Marschalk would have to call you and tell you,
9  right?
10    Q.  She would.
11    A.  Yeah.  So --
12    Q.  But whether she would or not is a totally
13  different question.
14    A.  She would have to.  I'm assuming, Mr. Harris,
15  that if I had any brilliant epiphanies between now and
16  the future, that you would be the second person to know.
17    Q.  All right.  But -- but just to put this to
18  bed, that number seems awful high, based on what you
19  know, true?
20    A.  I -- I can't say true to that question,
21  because if their population tends to be a lot healthier
22  than mine, then maybe.  Maybe.  But what I can tell you
23  this without any ambiguity, that I just don't know where
24  they got that number, and I can't say that I agree with
25  that number, because I don't know where they got it.

Page 130

1     Q.  Okay.  All right.  And if you endeavor to
2  determine whether or not the 76 percent success rate is
3  accurate, you would under -- you would agree with me
4  that it's only fair that I know about that, right?
5     A.  Immediately.
6     Q.  And that you'll tell me?
7     A.  As soon as humanly possible.
8     Q.  Okay.  And you'll provide me with whatever it
9  is you're relying on for that contention?
10    A.  It would be my pleasure.
11    Q.  Okay.
12        MS. MARSCHALK:  Can we take a -- can we
13    go off the record for just a little bit?
14        MR. HARRIS:  Sure.
15        THE VIDEOGRAPHER:  Going off video at
16    1:33 p.m.
17        (Lunch recess at 1:33, resumed at 2:29.)
18        THE VIDEOGRAPHER:  We're back on video
19    record at 2:29 p.m.  This is the beginning of
20    tape number 3.
21  BY MR. HARRIS:
22    Q.  All right, Doctor.  Dr. Roy in this case was
23  disclosed, and as part of his disclosure there was a
24  document that listed I believe it was 12 -- excuse me,
25  13 points or opinions that he sort of generally had in

Page 131

1  this case.  Have you seen that?
2     A.  My assumption is, yes, sir, and -- but I'm
3  assuming it's been a while.
4     Q.  Okay.  I'm going to mark Plaintiffs'
5  Exhibit 5, and this is the document that I'm referring
6  to.  And actually it's several other people, but
7  specifically the second page refers to Dr. Roy.
8     A.  Yes, sir.
9        (Thereupon, marked for identification
10        purposes, Plaintiffs' Exhibit No. 5.)
11  BY MR. HARRIS:
12    Q.  Have you seen that?
13    A.  It looks very familiar, --
14    Q.  All right.
15    A.  -- yes.
16    Q.  And the reason I -- I'm showing it to you is
17  that it -- it looks to me like at least for some of
18  these bullet points you are responding directly to
19  Dr. Roy's opinions.  And in particular there is point
20  number 1; you -- I think we talked about that Narconon
21  provided a reasonable and appropriate facility that met
22  the standard of care?
23    A.  Number 1 --
24    Q.  In --
25    A.  -- says --

Page 132

1     Q.  In your disclosure, your disclosure. --
2     A.  Oh.
3     Q.  -- I'm sorry, Doctor.
4     A.  I'm sorry.  Yes, sir.
5     Q.  Right there.
6     A.  Yeah.  In my disclosure, "Narconon of Georgia
7  provided a reasonable and appropriate outpatient drug
8  and alcohol education and rehabilitation program, and
9  meets the applicable -- applicable standard of care."
10    Q.  And you -- and you -- you and I have gone
11  through these 13 different points that you believe, I
12  think, that Narconon provided, right?
13    A.  (Witness nods head affirmatively.)
14    Q.  Is there anything else in terms of that
15  opinion number 1 that you're -- that you intend to say
16  about the Narconon program in support of opinion
17  number 1?
18    A.  Give me just a moment and make sure I'm not
19  missing anything.
20    Q.  Sure.  I'm just trying to do this in kind of
21  an organized --
22    A.  Yeah.
23    Q.  -- fashion, so you know what -- what I'm
24  doing.
25    A.  Yes, sir.

Case 2:14-cv-00283-GMN-NJK   Document 1-6   Filed 02/24/14   Page 36 of 67

Desmond, et al., v. 2:13-cv-02217-SCJ   Document 1-2   Filed 07/02/13   Page 35 of 73
Narconon, et al.

March 21, 2012

Page 133

1     Number 1 is based on the -- yes, based on
2 the -- those 13 things we spoke of, in addition to my
3 review of some other documents, including Mr. Patrick
4 Desmond's course work.
5     Q.  Okay.  And I was just talking in a general
6 sense, not --
7     A.  Oh.  Yes.
8     Q.  -- not Patrick specifically.
9     A.  Yes.
10     Q.  But, as I understood your testimony, you were
11 supposed to look at this program and determine whether
12 or not you thought it was an appropriate program?
13     A.  Yes.
14     Q.  And -- and you did that, and you believe it
15 is?
16     A.  Yes, sir.
17     Q.  And you outlined for me 13 different things,
18 which are reflected in Exhibit No. 4, --
19     A.  Yes.
20     Q.  -- that you think a reasonable and effective
21 program should have?
22     A.  Yes.
23     Q.  And you believe that Narconon has all those
24 things?
25     A.  Yes.

Page 134

1     Q.  Now, you and I were having a discussion about
2 several of those things that you thought they might have
3 been insufficient in or lacking somewhat in; do you
4 remember that conversation?
5     A.  Yes.
6     Q.  Any other -- or, if you would, I want to make
7 sure we finish that list.  Is there anything on that
8 list, Exhibit No. 4, the list of 13 things, that you
9 believe Narconon was not -- I mean, did not have
10 completely addressed, for lack of a better way to put
11 it?
12     A.  Any other criticisms of Narconon?
13     Q.  No.  The 13 elements that you've outlined in
14 Plaintiffs' Exhibit 4.
15     A.  Okay.
16     Q.  I want to make sure that if you think Narconon
17 was deficient in any of those in any way, that we talk
18 about it.  And you're welcome to have that back.
19     A.  Yeah.  I think we had a pretty thorough
20 discussion, --
21     Q.  I know.
22     A.  -- but I'll ta -- I'll be happy to take
23 another quick glance.
24     Q.  Yeah, sure, --
25     A.  Yeah.

Page 135

1     Q.  -- and we can put it to bed.
2     A.  I'm very comfortable with our discussion up to
3 this point.
4     Q.  Okay.  All right.  Now, let's turn to the
5 sauna program.  Dr. Roy had the opinion that the sauna
6 program does not treat addiction.  Do you agree with
7 that?
8     A.  Completely and absolutely.
9     Q.  Okay.  What is the role or effectiveness in
10 the Narconon program of the sauna component?
11     MS. MARSCHALK: Object to form.
12     MR. HARRIS: I don't blame you; that was
13 terrible.
14 BY MR. HARRIS:
15     Q.  But go ahead.  I mean, you've looked at the
16 sauna program?
17     A.  Yes, sir.  Yes, sir. --
18     Q.  Okay.  And I just want to know --
19     A.  -- I have an opinion --
20     Q.  -- what your thoughts are about it.
21     A.  My opinion is that on a number -- in a number
22 of ways, the sauna program is very helpful.  In general,
23 and I can also speak to in Patrick Desmond's case.  But
24 in general, I am occupying you for weeks and weeks and
25 weeks, getting you to focus about -- on other things in

Page 136

1 a physically strenuous way, because being -- being in
2 that heat takes some getting used to.  I am giving you a
3 clear message from me.  If -- if I -- I don't provide
4 Narconon treatment, Mr. Harris, but the person that's
5 saying, "This is what I recommend; you go into the
6 sauna" is giving you a clear idea that "Taking care of
7 your health is very important.  And it's virtually the
8 first thing we're asking you to do.  We're asking you to
9 exercise, sweat, and," Narconon says, "cleanse your body
10 of toxins."
11     Q.  Well, and let's stop there.  Is there any
12 scientific support for the contention that the sauna
13 program cleanses your body of toxins?
14     A.  Not that I'm aware of.
15     Q.  Well, do you believe as a medical doctor that
16 the sauna program cleanses your body of toxins?
17     A.  I have no basis to say scientifically one way
18 or the other.  I haven't studied the literature on
19 saunas, so the answer is I -- I don't know.  I don't
20 know.
21     Q.  Have you looked at the Narconon literature on
22 what Narconon contends the benefits from the sauna
23 program are?
24     A.  Yes, I have.
25     Q.  And the sauna program, what Narconon contends

Page 137

1   is that in -- it in fact detoxifies your body. True?
2   A. True.
3   Q. But there's no scientific basis that you can
4   point me to to support that contention, is there, sir?
5   A. You're correct.
6   Q. So when Narconon states that the sauna program
7   detoxifies its students, you're not aware, as a medical
8   doctor, of any scientific basis for that contention?
9   A. I agree.
10  Q. The vitamin regimen. You're familiar with the
11  vitamin regimen?
12  A. Yes, sir.
13  Q. What -- do you have an opinion about whether
14  or not the vitamin regimen is effective at treating
15  addiction?
16  A. I believe that it has very likely no bearing
17  whatsoever on the treatment of addiction.
18  Q. And the same question with respect to
19  detoxifying a person.
20  A. There, there is a -- a role, because many
21  people that use are profoundly malnourished. In the
22  sense -- not necessarily calorically, but with
23  micronutrients. So there is a role for supplementing,
24  and it's standard allopathic medicine procedure to
25  provide various medi -- vitamins immediately, as soon as

Page 138

1   you walk in the door to an emergency detox, medically
2   assisted detox program.
3   Q. Well, are you familiar with the levels that
4   the Narconon program prescribes?
5   A. Yes, I am.
6   Q. And those levels far exceed the FDA numbers,
7   do they not, sir?
8   A. I believe they do.
9   Q. Okay. Well, do you know one way or the other?
10  A. I am led to believe, based on my general
11  understanding and other people's comments, that, yes,
12  they are higher than the -- than the typical dose of
13  vitamins.
14  Q. Well, and you I think indicated that having --
15  treating somebody who is an addict who might be
16  malnourished, it might be appropriate to give them
17  vitamins?
18  A. Yes.
19  Q. Okay. And that's not really what I'm asking.
20  I'm asking, the vitamin regimen, and the schedules
21  reflected in the Purification Rundown that's in the
22  materials that you've looked at, does that particular
23  program, at the doses that Narconon prescribes and
24  mandates, does that have any detoxification effect on
25  its students? From a medical standpoint.

Page 139

1   A. Detoxification benefits. I would in general
2   say there might be some.
3   Q. What's your basis for that?
4   A. General nutrition and general possible
5   deficiency.
6   Q. Can you point me to any medical journal or
7   medical study that says that providing students with
8   vitamins that are far in excess of the FDA numbers
9   results in any kind of detoxification?
10  A. I don't -- I don't know of any literature that
11  would state that. And I don't actually know if these
12  levels have actually been studied before. So I think
13  there -- Mr. Harris, I think there's a lot of unknowns.
14  Q. Well, you -- but you un -- you understand that
15  the Narconon materials state that these megadoses of
16  vitamins, these doses that are far in excess of the FDA,
17  that those have a detoxifying effect? You've read that,
18  have you not?
19  A. I -- I'm not sure if I exactly read that. I
20  may very well have, Mr. Harris, but I certainly do
21  understand that that is part of what they provide as
22  part of the detoxification part of the program. So,
23  yes, I -- my understanding is that Narconon does believe
24  that the sauna and the vitamins are part -- an essential
25  part of their detoxification program.

Page 140

1   Q. Okay. And I'm just trying to ask you, is, do
2   you know of any -- any medical or scientific support for
3   that contention?
4   A. None.
5   Q. None?
6   A. None.
7   Q. So number 5 and 6 on Dr. Roy's opinions
8   regarding the sauna program and the vitamin regimen, you
9   agree with both of those, do you not, sir?
10  A. Completely.
11  Q. Now, number 3, Dr. Roy has the opinion that
12  there were certain misrepresentations about the Narconon
13  program that were made to various people in the court
14  system and to the Desmonds in particular. Do you intend
15  to offer any opinion about that?
16       MS. MARSCHALK: And if I could just
17    object to the form of the question.
18       THE WITNESS: Mr. Harris, I have no
19    knowledge or understanding of how to judge
20    who said what and... None. None.
21  BY MR. HARRIS:
22  Q. Okay. You're not going to delve into that?
23  That's not your intention?
24  A. No. You are correct, I do not intend to. At
25  this time.

Page 141

1    Q.  Well, number 3 on Dr. Roy's opinion or
2  disclosure says, "Misrepresentations to students and
3  families: Narconon misrepresented its level of
4  treatment for alcohol and drug addiction to its
5  students, their families, and various drug courts across
6  the country."  Do -- do you --
7    A.  I --
8    Q.  -- see where I'm reading?
9    A.  Yes, sir, number 3; it's clearly there.  Yes.
10   Q.  Do -- do you have any opinions or
11 contentions --
12   A.  Yeah --
13   Q.  -- in disagreement with that?
14   MS. MARSCHALK:  Object to form.  Go
15 ahead.
16   THE WITNESS:  None.  Yeah.
17 BY MR. HARRIS:
18   Q.  So do you -- you're just not — you're not
19 prepared to talk about that?
20   A.  I can talk about the idea of what the standard
21 of care in Georgia is for level of care, and also the
22 InterQual Criteria for what's provided and what's paid
23 for by insurances.  In -- and -- in the — in the sense
24 that, you know, lockdown inpatient facilities are
25 virtually nonexistent in the State of Georgia, and that

Page 142

1  people use the word "residential" loosely, in the sense
2  of, yeah, there's a residential component or there's a
3  supported living component to, you know, residence
4  support.  But as far as number 3, I -- I have no
5  understanding or do not really feel competent to help
6  you determine who's telling the truth and who's not,
7  Mr. Harris.
8    Q.  Sure; that's outside of your expertise?
9    A.  Yes, sir, yes, sir; I -- so number 3, I don't
10 know if I can comment in a helpful manner, Mr. Harris.
11   Q.  You agree with me that -- that you reviewed
12 the record, there's some conflict --
13   A.  Yes.
14   Q.  -- about what representations were made to the
15 family?
16   A.  Yes, sir.
17   Q.  And you're going to leave it at that?
18   A.  Well, I will add one thing.
19   Q.  Okay.
20   A.  That Mr. Patrick Desmond is a -- a -- a 27-
21 and 28-year-old adult, competent human being, who sought
22 for himself the level of care he was receiving, and if
23 he had any objection to that as a competent, reasonable
24 adult, then it would certainly be reasonable for him
25 to -- to bring that up and -- and mention it to someone.

Page 143

1    And I -- I believe that his mother may have visited the
2  residence... I think, aside from those two comments,
3  Mr. Harris, I don't think I have any other comments on
4  number 3.
5    Q.  Okay.  Well, what's -- what's the medical
6  basis or what -- what training do you have as a
7  physician to decide or give an opinion about what
8  reasonable people should or shouldn't do?  How does that
9  have anything to do with you being a doctor?
10   A.  Your question is what does my expertise and
11 training have to do with understanding what a reasonable
12 thing to do is?
13   Q.  Uh-huh (affirmative).
14   A.  I guess I have to make those judgments all day
15 long.
16   Q.  Right; but, I mean, your contention is that
17 Patrick should have done whatever you des --
18   A.  No, sir.  I didn't say should have -- "should
19 have."  I said -- I hope I said, Mr. Harris, that he
20 could have, had he been disturbed or uncomfortable or
21 dissatisfied with what he was receiving, then as a
22 28-year-old competent adult, that he could have lodged a
23 complaint or -- or mentioned it or said, "Hey, wait a
24 minute, is this what I -- is this what I was really
25 getting?"

Page 144

1    So, could have.  Not -- should have, I
2  don't -- I certainly don't want to put the word "should"
3  in any of Mr. Patrick Des -- Desmond's... So...
4    Q.  One of the students in this case, in the
5  deposition, said--and I think this is a direct
6  quote--that addicts don't always know what they need.
7  Do you recall reading that statement?
8    A.  I do not.
9    Q.  Do you agree with it?
10   A.  I do.
11   Q.  Now, let's talk about the residential
12 component.  First of all, what kind of facility was
13 Narconon of Georgia licensed to operate at the time of
14 Patrick Desmond's death?
15   A.  Based on my understanding of what I've read,
16 it is an outpatient drug education and rehabilitation
17 center.
18   Q.  And what have you read that deals specifically
19 with that issue?  I mean, I realize a lot of these
20 materials may deal with it; and I'm just trying to
21 narrow down, what is it that you're relying on for that
22 contention?
23   A.  What they're actually doing.  They're spending
24 some hours in a clinic, and talking and doing groups,
25 and then they leave for the day.

Case 2:14-cv-00283-GMN-NJK   Document 1-6   Filed 02/24/14   Page 39 of 67

March 21, 2012

Desmond, et al. v. 2:13-cv-02217-SCJ   Document 1-2   Filed 07/02/13   Page 38 of 73
Narconon, et al.

Page 145

1   Q.  Okay. Now, what -- what level of care -- is
2   there -- is there a way to quantify what level of care
3   an outpatient facility is allowed to provide?
4   A.  My understanding--and I'm not an expert in
5   licensing and that sort of thing--is that you do have to
6   have a license to do this, but then there are also some
7   guidelines, and I believe that some states do use ASAM.
8   Q.  Are you going to be talking about that? Are
9   you going to be pulling out the reg and saying,
10  "Hey, --" --
11  A.  Huh-uh (negative).
12  Q.  -- "Narconon has a license to do X, and under
13  the DHR regs here's the kind of care they can provide"?
14  A.  I don't intend to do that at this time.
15  Q.  Have you read the DHR regulations?
16  A.  I have -- I'm -- I'm not sure what I was
17  reading, but I have scanned some information that says
18  what -- that -- and it's in my notes here, Mr. Harris,
19  that -- on Page 4 of my personal notes, that, "ASAM
20  level 1 is approximately 18 to nine -- eight to 19 hours
21  per week," and -- and somewhere I wrote the Nar -- here
22  I wrote the Narconon of Georgia is an IOP, an intensive
23  outpatient program. So...
24  Q.  Yeah; and I understand that -- that -- that
25  there's an ASAM distinction, and in fact the regs

Page 146

1   mention ASAM from time to time, but I -- my question's a
2   little bit different.
3   A.  Yeah.
4   Q.  Do you -- do you intend to be an expert
5   witness and say that Narconon was operating its program
6   in conformity with the DHR regulations?
7   A.  I don't think I'm going to say anything about
8   that.
9   Q.  Okay. Now, you've, several times throughout
10  your deposition, said that you believe that people use
11  the term "residential facility," I think, incorrectly.
12  Do you recall saying that?
13  A.  I do.
14  Q.  Tell me what you meant when you said that.
15  A.  People come to me looking for treatment, and
16  sometimes the emergency treatment isn't enough. They
17  want longer-term treatment, and they use the word
18  "residential" all the time. It is -- so I think in any
19  situation you're always, I should say, managing your
20  customers' expectations, in the sense that, "Okay, I
21  understand what you're looking for, and here is what we
22  think you need, and here's what we think is available."
23  So there's a transition in the process of, you know,
24  "What I had in mind, and what I needed, and what's
25  really available, and what I can afford." So in -- in

Page 147

1   essence, people throw out the word "residential" in
2   Georgia when there's any type of a supported living
3   component to a program.
4       And I base that on my daily practice and my
5   understanding of what we provide, in -- my colleagues
6   and I, in -- in addition to, you know, the -- for
7   example, I -- going back to one of the places I
8   practice, Breakthrough Recovery Outreach, they -- they
9   have a residential -- resident -- they're not
10  residential, but they have a residential component.
11  They have -- in other words, they have cop -- they have
12  apartments. Vans, and drivers, and things like that.
13  Q.  Well, let's talk about Patrick Desmond.
14  Patrick Desmond was sentenced to a residential facility,
15  was he not?
16  A.  I'm -- I'm sorry, Mr. Harris, I actually would
17  have to review -- if you'd like me to -- I -- I can't
18  remember exactly what the court document said,
19  Mr. Harris. I don't know if I actually saw one. So
20  forgive me for not knowing that. I'd be happy to read a
21  document if you've got one.
22  Q.  Well, I mean, as you sit here right now, you
23  don't know what level of care that Patrick was required,
24  pursuant to the terms of the court order, to receive?
25  A.  My understanding is the judge wanted him to

Page 148

1   get treatment, and it had to be, you know, long-term; I
2   believe it was six months. But at present my
3   recollection of what the actual -- I don't know if I
4   ever saw a statement from the judge, Mr. Harris. So I'd
5   be happy to review one if -- if there is, or I don't --
6   sorry.
7   Q.  Well, as you sit here right now, you don't
8   know what level of care Patrick was sentenced by the
9   drug court in Florida to receive?
10  A.  Correct.
11  Q.  The term "residential drug and alcohol
12  treatment facility," is that -- is that a term that --
13  well, let me ask you this. What does that mean? What
14  is a residential drug and alcohol treatment facility, in
15  your opinion?
16  A.  I will tell you that I don't know of one in
17  the State of Georgia. A residential treatment facility
18  in the context of InterQual Criteria -- InterQual is the
19  group of criteria that have been put together to allow
20  insurance companies and providers to talk, and to
21  dispute what level of care this patient should be
22  getting. Residential is not listed in that for
23  substance abuse. InterQual doesn't have a residential
24  component for substance abuse. And also in those
25  guidelines from NIDA, residential is not included in

Case 2:14-cv-00283-GMN-NJK   Document 1-6   Filed 02/24/14   Page 40 of 67

March 21, 2012

Desmond et al. v.
Narconon, et al.
Case T:13-cv-02217-SCJ   Document 1-2   Filed 07/02/13   Page 39 of 73

**Page 149**

1 that, either. So I don't know what residential
2 substance abuse really means in the State of Georgia. I
3 don't know anyone that's really providing that, except
4 for maybe some of the boutique places that -- that very
5 affluent and rich people would go to, and I don't have
6 any experience in those kind of places 'cause I -- I
7 don't -- I treat regular people every day. I don't have
8 clientele that have the kind of money to just go
9 wherever they want and pay for whatever they want
10 regardless of -- or, with less regard to costs and with
11 less regard to the minimum -- minimally restrictive
12 level of care. So there's always a push to give the
13 most freedom possible and give the most autonomy
14 possible. Because it's efficient and effective care,
15 and -- and not utilizing -- I mean, the Desmonds only
16 have so much amount of money to spend, and if they were
17 going to pay for an inpatient, you know, lockdown
18 facility, they have to find one in the country, and then
19 it would be -- it would be, at least, my guess is, three
20 or four times more expensive.
21     Q.  Well, do -- do you know whether or not the
22 drug court of Florida required that Patrick attend a
23 lockdown facility, to use your terms?
24     A.  No, sir. I do know that they required him to
25 be in treatment, but I don't, right now, know if they

**Page 150**

1 required a lockdown or not.
2     Q.  Well, did -- have you read Lisa Mooty's
3 deposition?
4     A.  Lisa Mooty. I did; and Lisa Mooty said
5 something about that being the requirement. But I
6 haven't -- I don't think I've ever read a document from
7 the court.
8     Q.  Well, do -- well, let me ask you this. Do you
9 know what Lisa Mooty said in her deposition that the
10 drug court required in terms of the level of care that
11 Patrick was sentenced to receive?
12     A.  Certainly I understand what she said, and I
13 understand that she is not the court. I understand that
14 she is an agent of the court, and is a separate agency
15 altogether, as -- and my basic understanding of how it
16 works down in Florida, and that yet I have not seen a
17 document about what the judge really had in mind. So...
18     Q.  All right. Well, you haven't seen the order;
19 we've established that.
20     A.  Okay. Right.
21     Q.  There is testimony in the record from Lisa
22 Mooty, who is the drug court administrator, describing
23 what level of care the drug court mandated Patrick
24 receive.
25     A.  Yes, sir.

**Page 151**

1     Q.  And you have read that testimony?
2     A.  I believe I -- I have, yes, I have.
3     Q.  Do you know what it says, what that testimony
4 says?
5     A.  My understanding is that Lisa Mooty said that
6 residential--whatever she meant by that, which, once
7 again, I don't know if people understand what that
8 means--is what was expected.
9     Q.  Well, okay. But do you recall her saying that
10 she had the expectation that there would be 24-hour
11 care, and that Patrick would be closely monitored and
12 supervised?
13     A.  Mr. -- I'm sorry, it was one of the first
14 depositions I read. I'd be happy to re-review that,
15 but...
16     Q.  Well, are you going to come into court and say
17 that the Narconon of Georgia facility met the
18 requirements of the drug court of Florida?
19     A.  Not knowing what the drug court of Florida
20 says, I can't opine on that, because I don't know if
21 Ms. Mooty represents the court. I -- I -- sorry,
22 Mr. Harris, I don't -- I don't know if I can do that.
23     Q.  All right. Well, does -- is Narconon of
24 Georgia entitled to provide residential facilities, as
25 you understand the term to mean?

**Page 152**

1     A.  I don't believe they're in the business of
2 residential treatment.
3     Q.  And what do you base that on?
4     A.  The program materials, and the scope of the
5 licensure, and what's happening in this clinic is, you
6 know, drug, substance abuse education and recovery,
7 and...
8     Q.  All right. So your belief -- well, you
9 understand that there's a contention in this case by the
10 plaintiffs that -- that Narconon of Georgia was
11 operating or controlling an unlicensed residential
12 facility, you understand that that's a contention?
13     A.  I -- I do now; I -- it wasn't maybe perfectly
14 clear to me before, but I -- I will accept that that's a
15 contention.
16     Q.  Well, before your deposition you didn't -- you
17 didn't understand that that was one of the issues in
18 dispute in this case?
19     A.  Well, I -- I'm -- I'm not sure what the -- all
20 the complaints are that they have about this program,
21 but I don't -- I don't think I've talked -- I don't
22 think I've addressed anything about residence in my
23 disclosures. I -- I -- you know, I --
24     Q.  Well, and -- and I -- that's exactly what I'm
25 trying to get to; --

Case 2:14-cv-00283-GMN-NJK   Document 1-6   Filed 02/24/14   Page 41 of 67

March 21, 2012
Desmond, et al, v.
Narconon et al. 13-cv-02217-SCJ   Document 1-2   Filed 07/02/13   Page 40 of 73

1  A. Ah.
2  Q. -- it's your belief that Narconon of Georgia
3  was purely an outpatient facility, --
4  A. Yes.
5  Q. -- correct?
6  A. Yes.
7  Q. And your -- your -- you don't have any
8  opinion -- well, you base the opinion that it's an
9  outpatient facility on, I think what you said was, the
10 program materials, and what else?
11 A. It's what they do, it's what they're doing all
12 day, they're in a clinic all day, just like at
13 Breakthrough, just like at Peachford, they're in a
14 clinic all day. They go home at night. I mean, they --
15 they leave. They are -- are not there. And it's the
16 same thing with Peachford, same -- with Peachford's day
17 program, same things with Ridgeview's program, same
18 thing with Breakthrough Recovery Outreach's program;
19 they leave. They're out of my control when they leave.
20 You know, like 3 o'clock or whatever and they leave, my
21 anxiety goes up, 'cause they -- they're walking out the
22 door, and I hope to see them tomorrow in good shape. So
23 they're out of my, you know, field of view at that --
24 you know, at -- you know, either after lunch or after
25 3:00 p.m. So...

1  Q. All right. Well, all I want to know is, it's
2  your belief that Narconon's operating an outpatient
3  facility, --
4  A. (Witness nods head affirmatively.)
5  Q. -- and I think you've told me the -- the
6  reasons why you believe that.
7  A. Yes, sir.
8  Q. Have you been provided with a document that's
9  called the "Urgent Directive"?
10 A. Uh-huh (affirmative). Oh, most certainly.
11 Q. All right. Well, let's talk about that.
12    (Discussion off the record.)
13    (Thereupon, marked for identification
14    purposes, Plaintiffs' Exhibit No. 6.)
15 BY MR. HARRIS:
16 Q. You said most definitely --
17 A. Oh, yes.
18 Q. And why are you so exuberant about that?
19 A. Because -- a couple of reasons.
20 Q. Okay.
21 A. Let me make sure I'm talking about the same
22 document, Mr. Harris. Because -- March -- 12th of
23 March, 2008. Okay. Here's why. Because there -- there
24 are some -- there are some complaints that things were
25 not working perfectly. And somebody was able to raise

1  those concerns, and it appears that an independent board
2  of investigation, independent board of -- some kind of
3  independent board, some -- they got a committee together
4  and they said, "Hey, what's going on here, let's look at
5  these things," and -- and they said, "We've got some
6  problems." --
7  Q. Uh-huh (affirmative).
8  A. -- "Let's -- let's do something about it."
9  And I find that very refreshing. If you've got an
10 organization that's trying to sweep things under the
11 rug, I'm a little worried. But if you've got an
12 organization full of imperfect human beings that is in
13 constant flux, with stress, and people coming in and,
14 you know, just life, there's going to be imperfections,
15 and there needs to be a dispassionate, open,
16 non-threatening way of fixing normal problems that occur
17 in any substance abuse program -- or, any psychiatric or
18 substance abuse program.
19    So I -- I got this later in the -- in the --
20 later in the process of my studies, and I -- I found
21 this to be very reassuring.
22 Q. Okay. What -- wit -- do you -- which opinion,
23 if any, do you intend to use this document in support
24 of?
25 A. Good question.

1  Q. I mean, other than it's refreshing, is there
2  anything in particular that you plan on using and
3  relying on?
4  A. I would say that it would fall under number 3,
5  the treat -- of my statements, the treatment plan -- no,
6  not treatment plan. The staffing -- number 1; they
7  provided "a reasonable and appropriate outpatient drug
8  and alcohol rehabilitation program," and
9  the reason I believe that they -- one of the reasons I
10 believe that they are reasonable and appropriate is
11 because they're willing to address problems that come up
12 in every substance abuse program.
13 Q. Okay. So it's your opinion, then, sir, that
14 Narconon identified issues related to the housing at
15 Delgado Development, and that it determined that there
16 were a number of issues and problems, and that Narconon
17 and Delgado addressed those issues and problems?
18 A. Mr. Harris, I -- not fully. I -- I don't know
19 to what degree they were addressed, but I think they
20 were brought up. I don't know if there was an action --
21 I don't know if I've seen an action plan and a
22 revisiting of what the results of that action plan were.
23 So -- but -- by "address," I think the problems were
24 brought up, and I'm not sure what went forward in --
25 in -- in -- in -- in -- in remediating or fixing some of

Case 2:14-cv-00283-GMN-NJK  Document 1-6  Filed 02/24/14  Page 42 of 67

March 21, 2012

Desmond v.
Narconon, et al.

Case 3:13-cv-02217-SCJ  Document 1-2  Filed 07/02/13  Page 41 of 73

Page 159

Page 157

1  the problems. I don't want to overstate the --
2  Q. Okay. So -- so -- but there are a number of
3  problems that are identified?
4  A. Yes, sir.
5  Q. Those problems are identified prior to Patrick
6  Desmond's death?
7  A. Uh-huh (affirmative).
8  Q. Right?
9  A. This was -- this was March 2, and he was still
10  alive then.
11  Q. Okay. And so these problems are identified
12  before his death?
13  A. Yes, sir.
14  Q. But you don't know whether any of these
15  problems were actually addressed --
16  A. I have no information --
17  Q. -- before he died?
18  A. -- one way or the other at this time about
19  whether -- what was fixed and what wasn't.
20  Q. So the sum total, then, of your opinion or
21  reliance on this document is that you find it refreshing
22  that -- that these things were at least discussed or
23  talked about or --
24  A. I found it refreshing and very appropriate
25  that people are willing to look at themselves and

Page 158

1  criticize themselves and try to help continuing to
2  improve themselves. I think it sets a good example for
3  the students there that they're willing to have the
4  humility to --
5  Q. Well, and let's just cut --
6  A. -- look at themselves.
7  Q. Let's just cut to the chase; I mean, are you
8  going to -- are you going to come in and are you going
9  to give the opinion that -- that, independent from
10  Narconon, that the services that were provided by
11  Delgado Development were appropriate, done in a correct
12  manner, et cetera?
13  A. I'm in the business of -- of providing
14  psychiatric and substance abuse care, and I'm not in the
15  business of providing residence support care, so I -- I
16  don't think I'm an expert in critiquing the quality of
17  a -- of a residence support or a therapeutic community.
18  But I do have some knowledge of what's in the community;
19  I can compare, maybe.
20  Q. Well, and that's my question. Are you going
21  to come in and you're going to say, "Okay, I thought
22  Delgado had a -- had an appropriate number of monitors,"
23  or that "their staffing was appropriately trained," or
24  "the oversight of the students was appropriate," that
25  sort of thing? Are you going to be giving opinions

Page 159

1  about that?
2  A. No, sir. I don't think I have enough
3  information about their staffing ratios to give you a
4  good opinion about that.
5  Q. Now, you mentioned other facilities that --
6  that refer patients to supportive housing. Are you
7  familiar with what was going on at Delgado? Do you
8  define that as supportive housing?
9  A. That's a gen -- I use the word "residence
10  support" -- I think I use the word "residence support"
11  when I write progress notes on patients, depending on
12  when they're living, you know, "Return home tonight,
13  return to residence support --" -- residential support,
14  actually I use the word "residential support," if I'm
15  not mistaken. Residential support. So -- now I forgot
16  your question. Sorry.
17  Q. How do you define what Delgado Development was
18  doing?
19      MR. HYNES: Object to the form.
20      THE WITNESS: Residence support.
21  BY MR. HARRIS:
22  Q. Okay. You -- you were mentioning these other
23  programs; is it your opinion that -- well, does -- does
24  a outpatient drug and alcohol treatment facility have
25  any obligation, in your opinion, to determine how a

Page 160

1  residential support facility is operating if -- if that
2  facility is sending students there? Do you understand
3  my question?
4  A. You know -- yes, sir, Mr. Harris. Now, I
5  think that the -- the main point is that I think when
6  any consumer -- any consumer has the ability to walk --
7  to vote with their feet.
8  Q. That's not what I asked.
9  A. I'm sorry.
10  Q. If you have a drug alcohol -- drug -- if you
11  have a drug -- an outpatient drug and alcohol
12  rehabilitation facility, --
13  A. Yes, sir.
14  Q. -- and you are referring students to that
15  facility, --
16  A. To the day program facility, the --
17  Q. No; the -- the resident --
18  A. Oh, the residential support facility.
19  Q. Right. -- do you believe that there's any
20  obligation -- obligation on the part of the drug and
21  alcohol rehab facility to determine the conditions at
22  the residential facility?
23      MS. MARSCHALK: Object to form.
24      THE WITNESS: "Obligation to determine"
25  is maybe a too strong of a word. I think an

Page 161

1   obligation to be aware, and to be aware of
2   problems, and to be able to address problems
3   or, you know, make some changes, would be
4   what I -- the way I would look at it.
5   BY MR. HARRIS:
6       Q. Well, let me ask, in your practice, do you do
7   that, do you refer students to residential components?
8       A. Yes, sir.
9       Q. Have you done anything to determine what level
10  of care or how the operations are ongoing at those
11  residential facilities?
12      A. I have made a site visit to one of the places,
13  and... I have. --
14      Q. Okay.
15      A. -- Uh-huh (affirmative).
16      Q. And -- and what else have you done?
17      A. I'm in regular communication with the -- with
18  the, you know, the owner and the director, and... And
19  then the other place, Metro Atlanta Recovery Residence.
20  Metro Atlanta Recovery Residence.
21      Q. Where do you refer your patients to, or your
22  students to?
23      A. I refer them to -- for res -- if they need
24  residence support?
25      Q. Uh-huh (affirmative).

Page 163

1       Q. Do you -- tell me what you recall about those;
2   what -- what was -- what was the person mandated to do?
3       A. You know, once again, I didn't see the court
4   order; all I knew was that we were looking for a higher
5   level of care for this person. We found one, and a
6   couple of guys came and took him to the airport and took
7   him home. I believe there are two -- two cases where I
8   remember that being the case. These were patients that
9   were in -- in the -- in the first phase of treatment.
10  In the -- in the lockdown hospital phase. But I don't
11  remember what level of care those places really were.
12      Q. All right. Let's turn to this issue of the
13  med -- you mentioned medical director. Who was the
14  medical director for Narconon of Georgia at the time of
15  Patrick Desmond's death?
16      A. Dr. Robbins, let me -- I'm thinking maybe I
17  need a cup of coffee here. That's her name.
18  Dr. Robbins, I believe.
19      Q. Have you read Dr. Robbins' deposition?
20      A. If I have, I -- I'm having trouble remembering
21  anything from it, Mr. Harris, I'm sorry.
22      Q. Do you know whether or not, in order to obtain
23  the license that Narconon had, or the two licenses that
24  it had, at the time of Patrick Desmond's death, that it
25  was required to have a medical director?

Page 162

1       A. Metro Atlanta Recovery Residence, Ridgeview,
2   and Breakthrough Recovery Outreach. Mostly. And then
3   there are a few places out of state--Utah and other
4   places--but I don't remember their names.
5       Q. Okay. And why do you -- why do you refer your
6   patients to those three facilities?
7       A. They're local.
8       Q. Okay.
9       A. I know the people that are there, somewhat,
10  more -- more -- some more than less. I trust them.
11      Q. Why do you trust them?
12      A. I haven't heard a lot of complaints.
13  Ridgeview's been in the community for decades; I've had
14  lunch with the medical director numerous times. Metro
15  Atlanta Recovery Residence is a great nonprofit in town
16  that really helps people. I know Dr. Mike Vaughn,
17  medical director. Metro Atlanta Recovery Residence has
18  zero monitors. Zero monitors. They are self-run, and
19  the people that live there do it on their own.
20      Q. In your experience, have you ever treated a
21  patient who was court-ordered to be in a residential
22  facility?
23      A. Court-ordered to be in a residential facility.
24  I believe -- I believe in some ways I have,
25  maybe twice, uh-huh (affirmative).

Page 164

1       A. The an -- the answer to your question is, I
2   believe, yes; I believe that -- I believe that if you're
3   doing detox, you need to have a medical director.
4       Q. All right. Well, and I'm just asking you,
5   apart from the detox, in order to have the two licenses,
6   one -- one was outpatient, and the other --
7       A. Uh-huh (affirmative).
8       Q. -- was for ambulatory --
9       A. Uh-huh (affirmative).
10      Q. -- detoxification. In order to have those two
11  licenses, do you know whether or not Narconon of
12  Georgia, at the time of Patrick Desmond's death, was
13  required to have a medical director?
14          MS. MARSCHALK: Object to form.
15  BY MR. HARRIS:
16      Q. Well, she doesn't like my question, so I'll
17  start over.
18          What licenses did Narconon of Georgia have at
19  the time of Patrick Desmond's death?
20      A. You know, I haven't actually -- I don't know
21  if I've actually seen a license. I know they were
22  running a -- the -- the program -- the, you know,
23  education and recovery program and the detox program,
24  and I understand that because of the medical stuff for
25  the detox program they really required medical -- M.D.

Desmond, et al. v.
Narconon, et al.   13-cv-02217-SCJ   Document 1-2   Filed 07/02/13   Page 43 of 73   Louis Adolph Casal, M.D.
March 21, 2012

Page 165

1  supervision, so Dr. Robbins I think was contracted to
2  make sure that these guys were taken care of.
3      Q.  What -- and what is your understanding of what
4  Dr. Robbins' role was as medical director?
5      A.  She was pure medical. She was -- she
6  practices medicine. She's not like a psychiatrist or
7  anything. And it -- I think it would be unreasonable to
8  have any other expectation of her than to do what she
9  does. And that's practice I believe it's general
10 medicine, and to examine body -- take a history, examine
11 your body, and assess your health, and make
12 recommendations, and then say, "Hey, come back and see
13 me if you --" -- you know, "next time you're scheduled
14 to, or if you have a problem in the interim." So I --
15     Q.  Have you reviewed the -- the contract between
16 Narconon and Dr. Robbins?
17     A.  I believe I have. And I believe I must
18 have -- maybe I did read Dr. Robbins' deposition. I'm
19 sorry, I'm having trouble remembering. It might have
20 been one of the first ones I read. But I think I may
21 have scanned -- read it, yes, I may have.
22     Q.  Well, do you have an opinion about whether or
23 not Dr. Robbins was fulfilling her contractual duties as
24 medical director --
25     A.  Ah.

Page 166

1      Q.  -- of Narconon of Georgia?
2      A.  I have no opinion, because I can't remember
3  the details of either her deposition or the contract.
4  But, on the other hand, if -- if I -- it would be
5  helpful, I would be happy to do that. But I don't have,
6  right now as I sit here, as you say, an opinion about
7  whether she was fulfilling her contractual obligations.
8      Q.  All right. And -- and there is a provision of
9  the DHR regulations that delineate the duties of medical
10 directors for certain categories of licenses?
11     A:  Okay.
12     Q.  Are you familiar with that?
13     A.  No, sir.
14     Q.  So you're not going to be giving an opinion
15 about whether or not Dr. Robbins was fulfilling her
16 statutory or regulatory duties as medical director.
17 Fair?
18     A.  I will -- correct. I agree.
19     Q.  Who was the clinical director of Narconon of
20 Georgia at the time of Patrick Desmond's death?
21     A.  You know, the term -- the titles kind of
22 escape me right now. Lisa Rieser -- Mary Rieser is the
23 person that I remember being the one that seems to be in
24 charge. I don't -- don't...
25     Q.  Do you know who the clinical director of

Page 167

1  Narconon of Georgia was at the time of Patrick's death?
2      A.  I can't remember right now.
3      Q.  Do you know what -- what the regulatory scheme
4  requires that the clinical director do for the category
5  of license that Narconon had at the time of Patrick's
6  death?
7      A.  No, sir, I don't remember details of what
8  their specific duties are.
9          The typical situation would be reviewing
10 treatment plans.
11     Q.  Well, since you brought that up, what is the
12 typical responsibility of a clinical director?
13     A.  In my experience, clinical directors make sure
14 patients are where they are need -- where they need to
15 be, or that staff is making sure they are where they
16 need to be, and that they're getting treatment they
17 need, and that paperwork's in order, and phone calls are
18 being answered to provide information to outside
19 agencies and families, and making sure -- you know, the
20 person in charge, making sure the place is -- is
21 running -- responsible for making sure it's running the
22 way it's designed to run.
23     Q.  Okay. Do you know whether that was done in
24 Narconon of Georgia's case?
25     A.  My only knowledge of -- of specific examples

Page 168

1  of what was actually happening there are from my reading
2  of Mr. Patrick Desmond's case material. And so I would
3  have to conclude that his therapy progressed as one
4  would expect, so, yes, I would say that, in his case, it
5  was progressing as -- that -- that the role was filled
6  appropriately.
7      Q.  Now, you -- you -- you listed what you believe
8  the typical requirements for a clinical director would
9  be, what the clinical director generally or typically
10 does, in your experience.
11     A.  Yes, sir.
12     Q.  Do you recall doing that?
13     A.  Yeah.
14     Q.  Do you know whether or not at the time that
15 Patrick died, that those typical responsibilities were
16 being performed by a clinical director?
17     A.  I don't -- I don't know.
18     Q.  You don't know?
19     A.  Huh-uh (negative).
20     Q.  Because you don't know who the clinical
21 director was?
22     A.  Well, more so because I don't know if there
23 was any names in his -- in his actual file.
24     Q.  Dr. Roy's opinion number 11 is that "The
25 housing component of Narconon failed to provide an

Louis Adolph Casal, M.D.
March 21, 2012

Page 169

1  adequate sober living environment. Students' access to
2  drugs and alcohol at Narconon's housing facility was
3  inappropriate. Narconon had a duty to ensure that its
4  housing component was conducted in a way that supports a
5  proper drug and alcohol treatment philosophy, including
6  ensuring an absence of alcohol and drugs at the housing
7  facility, and Narconon's housing component also failed
8  to provide an adequate level of supervision and trained
9  staff." Now, do you intend to address any of those
10  opinions specifically?
11        MS. MARSCHALK: Object to form.
12        THE WITNESS: I don't have professional
13  opinions about residence support programs.
14  BY MR. HARRIS:
15     Q. Well, do you have any opinions or
16  disagreements with paragraph 11, so that we can talk
17  about them?
18     A. Yes, sir. I'll read it -- I'll review it
19  again.
20     Q. Sure.
21     A. "Housing: The housing component of Narconon
22  failed to provide an adequate sober living environment."
23  My understanding is that there were some complaints, and
24  some of the students were saying that at times, you
25  know, things were a little loose, and the -- that is

Page 170

1  true of every program that I'm involved with. That at
2  times they do find -- they do find substances, so --
3  so...
4     Q. I hate to cut you off, --
5     A. Yeah.
6     Q. -- but, I mean, I'm not -- I'm not interested
7  in every other program; I just want to know whether or
8  not you intend to disagree with any of the statements --
9     A. Okay.
10     Q. -- in paragraph 11, --
11     A. I'll speed it up.
12     Q. -- so that we can talk about them.
13     A. Yes, sir. "A student's access to drugs and
14  alcohol at Narconon housing facility was inappropriate."
15  A student's access... "Narconon had a duty to ensure
16  that its housing component was conducted in a way
17  that..." -- well, to my knowledge, Narconon has -- "its
18  hou -- housing component"... Well, it depends on what's
19  meant by "housing component." I think Narconon would
20  have a duty in general to make sure that -- that housing
21  is -- is -- is meeting what Narconon feels their --
22  their needs are. To keep -- keep their patient -- keep
23  their students on track. "Component was conducted in a
24  way that supports proper... "Ensuring absence of
25  alcohol and drugs at the facility. Narconon's housing

Page 171

1  component also failed to provide..."
2        I -- I really don't have enough information or
3  expertise in housing to provide, yeah, any solid
4  opinions about number 11.
5     Q. Fair enough. Do you intend to have an opinion
6  about -- or, do you have an opinion about the medical
7  cause of death for Mr. Desmond?
8     A. I've reviewed the death stuff, the death
9  information.
10     Q. You've reviewed, I assume, the deposition of
11  Dr. Gowitt?
12     A. I have reviewed it, though --
13     Q. Well, are you --
14     A. -- most of it superficially, so... My
15  understanding is that he died from opiate overdose.
16     Q. Is that what you gleaned from Dr. Gowitt's
17  deposition, that he died from opiate overdose?
18     A. I think that's what I've gleaned from other
19  places in the testimony, and -- 'cause right now I can't
20  remember reading the details of Dr. Gowitt's deposition.
21     Q. Well, do -- are you intending to give an
22  opinion about the cause of death? If so, then we need
23  to talk about it.
24     A. My understanding is that the cause of death,
25  because of the medical record that's crystal clear, he

Page 172

1  had a -- a opiate level that was toxic, that he died
2  from an overdose of -- of opiate.
3     Q. All right. Well, so if Dr. Gowitt says that
4  his death was actually caused by a combination of
5  alcohol and heroin, do you intend to disagree with that?
6     A. Physiologically, combination of alcohol and
7  opiate. I'm going to say that I'm not a toxicologist,
8  and I can't remember the last time I had someone die
9  from any kind of alcohol-related -- directly
10  alcohol-related problem, but I have had patients die
11  from opiate-related -- I'm pointing the finger at the --
12  at the morphine here. And you're asking me could
13  alcohol have played a role in it?
14     Q. No, I'm not asking you that at all.
15     A. I'm sorry.
16     Q. I'm just asking you whether or not you intend
17  to in any way disagree with or talk about cause of
18  death, or whether you're just going to defer to
19  Dr. Gowitt, the pathologist in this case?
20     A. Can you refresh my memory what Dr. Gowitt
21  concluded?
22     Q. Well, do you know what he concluded?
23     A. I'm afraid I can't remember right now.
24     Q. And you understand, again, that that's the
25  reason I'm here, right? I'm trying to get your

Louis Adolph Casal, M.D.
March 21, 2012

**Page 173**

1  opinions.
2    A.  My --
3    Q.  So are you going to go back and read
4  Dr. Gowitt's deposition and figure out what he concluded
5  and have, presumably, some opinion one way or the other
6  that I need to know about?  I mean, if you --
7        MS. MARSCHALK: We do not intend to
8    discuss -- to have Dr. Casal offer any
9    opinion about causation.
10       MR. HARRIS: Great.
11       MS. MARSCHALK: Sorry.  About cause of
12   death.  Obviously, we've --
13       MR. HARRIS: I understand.
14       MS. MARSCHALK: -- disclosed -- right --
15   the proximate cause.
16       MR. HARRIS: I understand the
17   distinction.  Okay.  Fair enough.
18       THE WITNESS: Well, --
19  BY MR. HARRIS:
20   Q.  Because you do have --
21   A.  -- Mr. Harris, --
22   Q.  -- you do have a -- you have essentially a
23  causation opinion that no negligence on the part of
24  Narconon resulted in his death?
25   A.  Yes, sir.

**Page 174**

1    Q.  And that -- that's not what I was talking
2  about.
3    A.  I'm sorry.  You know, I think what's happening
4  is I'm feeling a little tired; I probably need like a
5  two-minute --
6    Q.  Sure.  Absolutely.
7    A.  -- little shot of coffee.
8    Q.  Go -- go take -- go get some coffee.
9    A.  Yeah.  Just two minutes.
10       MS. MARSCHALK: Go off the record.
11       THE VIDEOGRAPHER: Going off video
12   record at 3:21 p.m.
13       (Recess at 3:21, resumed at 3:28.)
14       THE VIDEOGRAPHER: We're back on video
15   record at 3:28 p.m.
16  BY MR. HARRIS:
17   Q.  Your -- your attorney has assured me that
18  you're not going to be talking about housing, but since
19  there was a great deal of questioning in Dr. Roy's
20  question about this, I want to make sure that we cover
21  it a little bit.  Are you going to give any opinions
22  about when you should basically give up on somebody in a
23  rehab program and kick them out?  You understand my
24  question?
25   A.  Yes.

**Page 175**

1    Q.  I mean, what --
2    A.  Yeah.
3    Q.  -- what do you do in order to get booted as
4  opposed to giving -- given a second chance?
5    A.  I guess that's a -- I -- a question that I can
6  answer. I -- I wasn't intending to provide that
7  opinion, unless you need me to.
8    Q.  No, I don't need you to; if you're not
9  intending to talk about that, then we'll leave it at
10  that.
11   A.  Okay.  Am I allowed to look at her when I --
12  before I answer the question?
13   Q.  If it speeds things up, absolutely.
14   A.  You got it.  You got it.
15   Q.  If it's a really good question and I don't
16  want you to, then I'll yell and --
17   A.  Okay.
18   Q.  I'll -- I'll arbitrarily silence --
19   A.  Okay.  You're the boss.
20   Q.  At the beginning of the deposition we started
21  talking about your role in this case, and I forgot to
22  ask you this; were you familiar with Narconon before you
23  were retained in this case?
24   A.  Yes, sir.
25   Q.  How were you familiar with them?

**Page 176**

1    A.  I would receive flyers and -- in the mail,
2  briefly describing their services, a nonprofit
3  organization, and -- and so I came to understand that
4  they were in the business of helping people recover from
5  drugs and alcohol, and that was it.  So -- that was it,
6  yeah.
7    Q.  Fair to say, though, that before you did your
8  work in this case you didn't really dig into their
9  qualifications and what they were doing?
10   A.  Correct.  Correct.
11   Q.  Had you ever referred a patient there?
12   A.  No, sir.
13   Q.  Any reason?
14   A.  Well, my friends over at Breakthrough and MARR
15  would say, "Hey, what are you doing?"
16   Q.  Do you --
17   A.  So, in other words, I have a practice pattern
18  that -- certain referral patterns.
19   Q.  Had you ever heard anything negative about the
20  program before you were retained?
21   A.  I've never heard anything negative about the
22  program before I was retained.
23   Q.  Similarly to this thing of cause of death, but
24  I -- it's a little bit different; are you going to talk
25  about how being opiate-naive in any way enhances or

Page 177

1  increases your chance of overdosing?
2  A. Nope.
3  Q. Okay. Good.
4        Drug testing, the -- I mean, I'm sorry, the
5  medication protocols that Narconon had; are you going to
6  talk about that, that they had an appropriate protocol
7  for how to dispense medications and handle medications,
8  that sort of thing? You can look at her, but that's
9  clearly under number 1.
10  A. Oh, sorry.
11        MS. MARSCHALK: He's -- he's asking you
12  whether or not --
13        THE WITNESS: Right. Right.
14        MS. MARSCHALK: Right.
15  BY MR. HARRIS:
16  Q. I mean, you -- just to cut through, I mean,
17  there have been various people talking about how
18  medicines were dispensed and how they kept up with them
19  and all that --
20  A. Yeah.
21  Q. -- sort of good stuff.
22  A. Yeah.
23  Q. And you've seen that in the testimony; are you
24  going to be coming in and saying, "Hey, I think the way
25  they handled it was fine," or... If you're not, we

Page 178

1  won't talk about it.
2  A. I am not going to discuss their medication
3  administration and distribution, or the medication
4  administration practices.
5  Q. Great. Have you ever been sued before?
6  A. No, sir.
7  Q. And then you've mentioned -- the last thing I
8  want to just talk about is this ASAM issue Dr. Roy talks
9  about. He says in his disclosure that -- that Narconon
10  was licensed as an ASAM level 1; however, he believed it
11  was operating at a higher ASAM level. Do you agree with
12  that?
13  A. I disagree with that statement.
14  Q. Tell me why.
15  A. From what I see in the books and in
16  Mr. Patrick Desmond's treatment, that he was there
17  during the daytime and he left. So...
18  Q. All right. I think that's all I have for you.
19  I appreciate your time.
20        MR. TANNER: No questions here.
21        MR. HYNES: No questions.
22        MS. MARSCHALK: All right, thank you.
23        THE VIDEOGRAPHER: All right. Going off
24  video record at 3:33 p.m.
25        (Deposition concluded at 3:33 p.m.)

Page 179

1
2        E R R A T A   S H E E T
2        I, the undersigned, LOUIS ADOLPH CASAL, M.D.,
3  do hereby certify that I have read the foregoing
3  deposition and that, to the best of my knowledge, said
4  deposition is true and accurate (with the exception of
4  the following corrections listed below.)
5
6
7  PAGE/LINE    CORRECTION (and reason for correction)
8  _____/_____
9  _____/_____
10  _____/_____
11  _____/_____
12  _____/_____
13  _____/_____
14  _____/_____
15  _____/_____
16  _____/_____
17  _____/_____
18  _____/_____
19  _____/_____
20
21
22
23  Notary Public                    Signature
23  Date_____
24  My Commission Expires:
25

Page 180

1        C E R T I F I C A T E
2  G E O R G I A:
3  FULTON COUNTY:
4        I hereby certify that the foregoing
5  deposition was taken down, as stated in the
6  caption, and the questions and the answers
7  thereto were reduced to printing under my
8  direction; that the preceding pages represent
9  a true and correct transcript, to the best
10  of my ability, of the evidence given by said
11  witness upon said hearing. And I further
12  certify that I am not of kin or counsel to
13  the parties to the case; am not in the regular
14  employ of counsel for any of said parties;
15  nor am I in anywise interested in the result
16  of said case.
17        This, the 3rd day of April, 2012.
18
19
20
21
22
22  Jo Tomoff Fischer, RMR
23  CCR No. B-924
23  Notary Commission Expires 8-25-2012
24
25

Case 2:14-cv-00283-GMN-NJK   Document 1-6   Filed 02/24/14   Page 48 of 67

Desmond, et alCase 1:13-cv-02217-SCJ   Document 1-2   Filed 07/02/13   Page 47 of 73
Narconon, et al.

Louis Adolph Casal, M.D.
March 21, 2012

| | | | |
|---|---|---|---|
| **$** | 46:9 | 118:21;120:22;135:6; | affirmatively (2) | 160:10,11,21;169:2,5,6; |

**$**

academic (1)
15:11

acamprosate (1)
106:15

accept (3)
105:15,24;152:14

access (3)
169:1;170:13,15

accessible (2)
75:6;77:24

accident (1)
9:21

accomplishment (1)
83:25

accordance (2)
6:9,10

according (5)
81:21;82:1;105:13;
107:8;113:6

accurate (13)
37:20;44:18;46:9;
49:16;114:5,8;123:10;
124:23;126:9,9;127:4;
129:2;130:3

across (1)
141:5

Act (2)
6:8,10

action (4)
43:12;156:20,21,22

actively (1)
20:2

actual (5)
26:25;55:9;78:21;
148:3;168:23

Actually (35)
11:5;13:2;16:16;20:13;
21:12;25:11,24;29:7;
38:15;51:16;64:14;
71:21;82:23;85:16;90:1;
94:10;99:8;100:10,24;
101:11;111:17;116:2;
118:10;131:6;139:11,12;
144:23;147:16,19;
157:15;159:14;164:20,
21;168:1;172:4

acute (1)
81:13

Adams (1)
9:12

add (7)
8:11;24:9;28:9;43:25;
63:16;71:17;142:18

addict (2)
138:15

addicted (3)
60:3;73:13;78:22

addiction (26)
26:5;55:22;64:2,5,16,
25;65:3,7,11,14;67:3,7,
14;74:25;80:14;108:15,
21;111:13;117:5,8;

**$18,300 (1)**
75:14

**$500 (1)**
24:12

**$600 (2)**
24:11,12

**[**

[sic] (3)
66:1;107:6;108:10

**A**

Aaron (1)
100:1

abdominal (6)
79:18,20;81:16,22;
82:3,13

abide (1)
106:5

abided (1)
43:20

ability (4)
53:25;84:8,11;160:6

able (9)
37:5;43:16;48:2;50:10;
84:6;86:9;113:23;
154:25;161:2

abnormalities (1)
10:17

absence (2)
169:6;170:24

absolutely (9)
31:25;32:4;37:6;86:18;
109:11,13;135:8;174:6;
175:13

abstained (1)
125:21

abstaining (1)
128:17

abstinence (8)
88:16;94:22;95:12;
107:20,21;125:13,15;
126:21

abstinent (1)
125:23

abstract (8)
26:12,21;29:15,25;
31:18;32:3;34:8,15

abuse (34)
14:17;15:16;26:16;
30:13,15;44:12;51:2;
59:19,25;66:13;73:13;
78:8,9;82:25;87:7;97:22;
100:5,6,19;117:13,15,16,
16,19,25;118:17;148:23,
24;149:2;152:6;155:17,
18;156:12;158:14

ac (1)

137:15,17;141:4

addictions (13)
24:2;55:6,11,22;56:6;
57:3,8;58:10;59:3,14;
78:18;100:23;111:13

addicts (6)
82:21;91:14;108:10;
111:10;112:3;144:6

adding (1)
21:9

addition (3)
80:13;133:2;147:6

additional (2)
36:21,22;68:18

additions (2)
8:6;63:15

address (12)
79:6;81:2;82:5,10,20;
83:5;108:20,21;156:11,
23;161:2;169:9

addressed (7)
82:4;107:6;134:10;
152:22;156:17,19;157:15

addressing (1)
109:12

adequate (8)
26:4;50:9;54:13,16;
88:12;169:1,8,22

administered (1)
68:24

administration (4)
75:3;117:21;178:3,4

administrator (1)
150:22

admit (1)
80:16

admitted (5)
79:16;81:5;107:17

Adolph (4)
6:6,20;7:2;83:18

adult (3)
142:21,24;143:22

advertisement (1)
74:21

advise (1)
93:10

affable (1)
103:18

affects (2)
64:3,7

affirmative (47)
9:3;12:16;13:15;17:16;
21:13;30:21,21;37:19;
40:1;50:20;52:11;56:7,
18;70:3,24;72:5;77:2,4,
20;80:10;86:5,7;92:6,9;
102:4,6,19;105:18;108:8,
13;111:8;113:10;121:24;
122:23;123:13;128:11,
13,15;143:13;154:10;
155:7;157:7;161:15,25;
162:25;164:7,9

132:13;154:4

affluent (1)
149:5

afford (2)
75:2;146:25

affordable (3)
74:22;75:4,6

afraid (1)
172:23

again (12)
32:2;54:2;57:11;81:7;
96:17;111:10;119:22;
122:15;151:7;163:3;
169:19;172:24

agencies (3)
32:8;33:20;167:19

agency (1)
150:14

agent (1)
150:14

ago (8)
9:10;10:13,24;11:2,18;
12:23;36:1;61:19

agree (32)
49:14;61:24;63:12,14;
66:23;67:5;68:15;70:14;
71:13;73:22;74:1;86:12;
87:12,15,23;88:2;95:20;
96:1,2;104:19;110:22;
113:14;125:8;129:24;
130:3;135:6;137:9;
140:9;142:11;144:9;
166:18;178:11

agreed (1)
10:4

agreement (1)
6:16

Ah (3)
30:6;153:1;165:25

aha (1)
22:10

ahead (5)
7:18;26:6;62:25;
135:15;141:15

airport (1)
163:6

al (1)
42:12

Albert (1)
74:9

alcohol (54)
37:13;39:21;41:10;
42:17;43:1;44:8;48:14,
14;53:6,21;54:12;55:16,
22;57:15;60:14;61:22;
65:6;66:13;72:17;77:19;
79:13;82:16,19;91:13;
93:23;94:20;95:21;96:7;
98:9;109:14;119:11,20;
120:5;121:21;125:7;
126:21;132:8;141:4;
148:11,14;156:8;159:24;

170:14,25;172:5,6,13;
176:5

alcohol-related (2)
172:9,10

alive (1)
157:10

allopathic (1)
137:24

allow (2)
94:20;148:19

allowed (4)
6:7;71:1;145:3;175:11

allows (4)
43:18;86:4

alluded (1)
68:19

almost (2)
64:9;89:10

along (6)
33:12;69:23;89:9;93:8;
101:25;115:12

Alpharetta (1)
57:1

although (5)
10:3;83:2,19;84:13;
85:18

altogether (1)
150:15

always (4)
36:24;144:6;146:19;
149:12

amazed (1)
101:6

ambiguity (1)
129:23

ambiguous (1)
110:13

ambulatory (1)
164:8

amount (2)
76:2;149:16

analysis (2)
23:17;33:17

analyzing (1)
29:1

and/or (2)
97:21,25

ans (1)
92:14

answered (1)
167:18

Antabuse (1)
106:15

anx (1)
81:16

anxiety (10)
78:15,23;79:22;80:3,
14;81:13,17;82:6;118:13;
153:21

anxious (1)
79:25

anymore (1)

Case 2:14-cv-00283-GMN-NJK Document 1-6 Filed 02/24/14 Page 49 of 67

Desmond, et al. v.
Narconon, et al.

Case 1:13-cv-02217-SCJ Document 1-2 Filed 07/02/13 Page 48 of 73

Louis Adolph Casal, M.D.
March 21, 2012

81:14

**apart (1)**
164:5

**apartments (1)**
147:12

**apologize (1)**
62:24

**apparently (1)**
109:3

**appear (2)**
20:10;21:18

**appears (1)**
155:1

**apples (2)**
126:23,24

**applicable (4)**
57:16;121:22;132:9,9

**application (3)**
35:9;45:7,17

**applications (3)**
44:18;45:21;46:24

**appreciate (1)**
178:19

**appreciated (1)**
42:4

**approach (3)**
65:15;66:12;70:19

**appropriate (33)**
37:13;39:20;41:9;47:9;
53:1,5,9,16,20;54:4,13;
57:14;61:22;67:21;68:7;
72:25;73:2;83:3;91:2;
106:7,10;121:21;131:21;
132:7;133:12;138:16;
156:7,10;157:24;158:11,
22,24;177:6

**appropriately (3)**
44:9;158:23;168:6

**approval (1)**
97:12

**approximately (5)**
6:3;9:10;24:7,9;145:20

**arbitrarily (1)**
175:18

**area (1)**
17:3

**argue (1)**
115:15

**arguing (1)**
124:7

**argument (2)**
115:15;122:17

**arm (2)**
66:18,21

**around (4)**
8:13;35:10;76:4;93:6

**arrived (1)**
28:7

**article (19)**
25:14,21,24,25;26:6,
11,23;27:2,23;28:1,6;
29:4,15,20,25;32:1,3;
60:17;88:14

**articles (13)**
24:14,18,21;25:1;
27:14,25;28:16,20,25;
29:6;31:23;33:2;56:4

**articles-to (1)**
23:23

**ASAM (8)**
19:1;145:7,19,25;
146:1;178:8,10,11

**ashtray (1)**
99:1

**aside (4)**
32:6;50:23;94:18;
143:2

**aspect (2)**
85:25;108:21

**aspects (1)**
31:22

**assertive (1)**
100:24

**assess (2)**
121:9;165:11

**assign (1)**
79:21

**assigned (2)**
22:21;90:11

**assignment (1)**
16:21;22:2,18

**assignments (1)**
54:23

**assisted (2)**
108:14;138:2

**assume (9)**
14:11;22:25;46:22;
87:16;91:13;93:24,25;
94:22;171:10

**assumed (1)**
127:21

**assumes (1)**
89:23

**assuming (2)**
129:14;131:3

**assumption (5)**
52:16,17;70:21,22;
131:2

**assured (1)**
174:17

**Atlanta (8)**
14:23;84:5,14;161:19,
20;162:1,15,17

**Attached (1)**
7:25

**attempted (1)**
33:13

**attempting (1)**
33:14

**attend (3)**
82:24;84:17;149:22

**attends (1)**
78:7

**attorney (6)**
8:22;9:12,23;11:21;
13:6;174:17

**attorneys (1)**
11:22

**authorities (2)**
29:1;32:18

**authors (1)**
27:4

**authors' (1)**
30:9

**autonomy (1)**
149:13

**available (5)**
74:18,22;77:22;146:22,
25

**average (2)**
100:5,6

**avoid (3)**
60:4;106:24;107:1

**aware (8)**
32:10;33:24;91:18;
106:25;136:14;137:7;
161:1,1

**away (3)**
64:12;100:4;106:20

**awful (1)**
129:18

---

**B**

**back (37)**
13:3;14:12;15:6,8;
24:15;25:4;31:14;39:3,3,
5;40:25;42:14;49:1,5;
51:10;66:24;77:14;
81:15;82:10;84:5,14;
86:14;93:7,14;97:14;
99:22;120:8,25;122:19;
123:22;126:14;130:18;
134:18;147:7;165:12;
173:3;174:14

**backing (1)**
54:9

**backwards (1)**
19:3

**baffled (1)**
20:25

**balcony (3)**
10:15,18;12:3

**ballpark (1)**
118:7

**base (4)**
91:9;147:4;152:3;
153:8

**based (17)**
38:13;52:17;60:5;
78:20;81:12;91:10;
95:20;104:23;112:10;
122:6,7;127:1;129:18;
133:1,1;138:10;144:15

**bases (2)**
85:5;89:12

**basic (4)**
83:7;84:9;121:11;
150:15

**basically (11)**
16:10;47:3;56:21;
66:14;70:2;71:14;74:5;
77:23;102:11;112:16;
174:22

**basics (1)**
109:18

**basing (2)**
103:14;128:24

**basis (12)**
7:13;38:5;41:8;60:6;
91:4;93:4;128:21;
136:17;137:3,8;139:3;
143:6

**bearing (2)**
26:2;137:16

**Beck (1)**
100:1

**become (3)**
52:6;80:18;92:10

**bed (3)**
37:3;129:18;135:1

**began (2)**
21:16;108:21

**begin (1)**
111:10

**beginning (6)**
7:4;21:1;70:2;100:21;
130:19;175:20

**behalf (1)**
7:12

**behar (1)**
98:17

**behavior (4)**
64:4;96:25;99:13;
100:1

**behavioral (15)**
10:17;97:21;98:1,4,5,7,
11,15,17;99:20;100:3,10;
101:14;105:2,7

**behaviors (1)**
98:22

**beings (1)**
155:12

**belief (5)**
59:12;99:16;152:8;
153:2;154:2

**beliefs (3)**
99:15;101:8,11

**believes (1)**
73:6

**believing (2)**
59:7;101:5

**beneficial (1)**
99:11

**benefits (2)**
136:22;139:1

**Bert (1)**
94:7

**best (5)**
9:2;29:4;73:15;74:12;
84:9

**better (6)**

**basically (11)**
58:9;66:5;78:16;81:23,
25;134:10

**betw (1)**
99:21

**beyond (2)**
52:15;107:16

**bias (3)**
127:17;128:5,6

**big (6)**
75:1;84:11;123:15;
124:25;125:1,2

**bill (1)**
24:11

**bipolar (1)**
127:23

**bit (15)**
8:24;11:24;20:25;
22:13;37:16;68:1;69:20;
72:23;77:3;102:18;
127:17;130:13;146:2;
174:21;176:24

**bizarre (1)**
98:25

**blame (1)**
135:12

**blank (2)**
19:6;21:8

**blanket (2)**
87:21,24

**board (4)**
117:4;155:1,2,3

**body (8)**
64:8,11;136:9,13,16;
137:1;165:10,11

**book (13)**
17:22;20:3;21:1,6,15;
68:25,25;69:11,11,18;
72:16;99:22;102:13

**books (15)**
19:17,24;20:13;23:21;
34:19;50:24;68:16,21,23;
71:2,4,15;72:4,10;178:15

**booted (1)**
175:3

**born (1)**
19:22

**boss (1)**
175:19

**both (2)**
60:21;140:9

**bothered (1)**
8:11

**bottom (5)**
47:18;48:12;90:11;
108:2;115:2;119:2

**boutique (1)**
149:4

**boy (1)**
12:18

**Brad (4)**
19:6;84:4,19;93:2

**brain (3)**
12:8;64:3,8,11

Desmond, et al, v.
Narconon, et al.   Case 1:13-cv-02217-SCJ   Document 1-2   Filed 07/02/13   Page 49 of 73   Louis Adolph Casal, M.D.
March 21, 2012

break (5)
21:22;40:10;76:14;
77:6;97:17
breaking (1)
101:4
Breakthrough (9)
75:13,25;76:11;94:8;
147:8;153:13,18;162:2;
176:14
brief (1)
81:15
briefly (1)
176:2
brilliant (1)
129:15
bring (2)
31:24;142:25
bringing (1)
30:2
brought (5)
31:19;34:8;156:20,24;
167:11
bullet (5)
60:22;66:25;72:22;
83:2;131:18
bullets (1)
60:7
bunch (1)
109:24
business (6)
58:11,11;152:1;158:13,
15;176:4
busy (2)
14:20;15:5

**C**

California (6)
29:1,2;32:12;33:10;
34:1,6
call (5)
14:1;65:24;66:1,7;
129:8
called (10)
9:6;13:6;14:11;15:6,8;
76:18,19;78:25;83:9;
154:9
calls (1)
167:17
calorically (1)
137:22
came (8)
8:23;22:14;82:9;84:5;
126:7;129:1;163:6;176:3
can (81)
11:15;15:9;16:24,24;
18:3,12,15;21:20;25:6;
29:11;31:13;33:5;36:8;
39:15;40:17;43:22,22;
44:21;47:23;53:8;54:16;
55:18,19,20;60:3,8,11,19,
21,22;62:6;66:16,19;
69:17;71:21;72:1;73:7;

79:10;83:16;84:1,3;
86:19;94:2;95:17;97:13;
98:16;99:21,21;100:14,
14,15;105:3;106:16,18,
23;109:5,10;110:1;
119:12;126:18;127:9,9,
16;129:22;130:12,12;
135:1,23;137:3;139:6;
141:20;142:10;145:13;
146:25;151:22;158:19;
169:16;170:12;172:20;
175:5;177:8
Canadian (1)
32:18
cancer (2)
66:17,22
capacity (6)
31:4,20;52:7;53:19,23,
23
car (2)
9:11;11:7
care (61)
21:22;56:15,21,24;
57:4,6,16,22,24;59:10,12,
15;65:11,16;66:6,10,13,
15,19;81:11;87:20;88:7;
93:23;94:15,19;105:24;
106:3;109:18,20;110:8,
20;111:25;112:8;115:24;
116:3,7;119:16;121:23;
131:22;132:9;136:6;
141:21,21;142:22;145:1,
2,13;147:23;148:8,21;
149:12,14;150:10,23;
151:11;158:14,15;
161:10;163:5,11;165:2
career (1)
117:14
careful (2)
28:13;71:20
Casal (8)
6:6,16,20;7:2,3;15:7;
83:18;173:8
case (44)
7:7;9:4;10:21;11:6,25,
25;12:2,5,17,22;13:4,10,
14,22;14:2;15:6,22;
21:17;24:5;25:12;36:4;
38:7,14;39:17;44:2;
54:23;71:11;89:1;92:7;
123:5;130:22;131:1;
135:23;144:4;152:9,18;
163:8;167:24;168:2,4;
172:19;175:21,23;176:8
cases (5)
11:2;12:20;13:17,18;
163:7
cash (2)
83:23,25
catastrophic (1)
99:3
categories (1)
166:10

category (1)
167:4
Catholic (1)
86:22
caught (1)
79:23
causation (2)
173:9,23
cause (30)
14:20;19:6;39:4;42:20;
45:24;72:12;80:1;81:12;
82:7;95:2;99:3;106:9;
112:16,18;113:4;119:7,8,
13;120:23;127:25;149:6;
153:21;171:7,19,22,24;
172:17;173:11,15;176:23
caused (1)
172:4
CBT (1)
99:13
center (2)
53:7;144:17
CEO (1)
97:17
certain (10)
28:7;31:22;37:18;
45:18,18;70:6;125:13;
140:12;166:10;176:18
certainly (12)
47:17;48:2;85:7;87:4;
88:8;91:20;115:12;
139:20;142:24;144:2;
150:12;154:10
certification (3)
44:11;48:15,16
certifications (1)
46:7
certified (4)
44:9;48:10;100:2;
117:4
cetera (3)
69:11;72:9;158:12
Chamblee (1)
75:25
chance (3)
9:19;175:4;177:1
change (3)
58:8;77:5;108:16
changed (1)
23:8
changes (1)
161:3
changing (4)
101:4,11,11;107:8
chapters (1)
20:12
characterization (1)
67:14
charge (3)
94:8;166:24;167:20
charged (2)
23:11;76:2
chart (2)

12:13;24:12
charts (2)
10:19;11:6
chase (1)
158:7
cheaper (1)
76:5
check (2)
15:23;18:9
checked (1)
49:10
chemicals (2)
106:20,22
child (6)
9:11,17;10:1,15;11:7,
19
Children (1)
11:21
choice (1)
58:8
choices (1)
73:5
choose (1)
65:23
Chose (1)
35:23
chronic (1)
128:4
cigarette (1)
93:6
circumstance (1)
10:8
circumstances (1)
23:9
city (1)
114:12
Civil (2)
6:7,9
classroom (2)
70:21;120:14
classrooms (1)
43:21
Clay (5)
10:13;11:1,11;12:2;
100:11
Clay's (1)
12:14
cleanse (1)
136:9
cleanses (2)
136:13,16
clear (12)
17:7;32:2;42:7;63:5;
92:18;95:19;114:15;
126:6;136:3,6;152:14;
171:25
cleared (1)
27:23
clearly (5)
31:18;37:7;113:24;
141:9;177:9
click (1)
30:19

clicked (1)
30:14
clientele (1)
149:8
clinic (4)
144:24;152:5;153:12,
14
clinical (10)
120:18;166:19,25;
167:4,12,13;168:8,9,16,
20
clinically (2)
14:20;91:5
clip (1)
33:11
clips (2)
33:6,7
close (3)
10:25;56:23;123:16
closely (1)
151:11
clues (1)
99:7
coach (2)
71:7;93:10
coaches (1)
51:3
coaching (1)
72:13
Cobb (2)
11:18;129:4
coffee (3)
163:17;174:7,8
cognition (1)
99:24
cognitions (4)
99:12,16;101:6,7
cognitive (12)
98:4,6,11,15,17;99:6,
13,19,25;101:14;105:2;
128:3
colleagues (2)
94:4;147:5
colleagues' (1)
91:19
College (1)
117:20
colon (1)
25:16
com (1)
108:11
combination (2)
172:4,6
combined (1)
105:6
comfort (1)
27:24
comfortable (8)
36:12;37:9,11;39:19;
88:6;122:24;127:3;135:2
coming (4)
11:23;36:24;155:13;
177:24

Desmond, et al. v.
Narconon, et al.
Louis Adolph Casal, M.D.
March 21, 2012

commend (1)
88:20
comment (7)
28:9;45:23;53:17;
54:17;55:8,18;142:10
comments (3)
138:11;143:2,3
committed (1)
93:17
committee (1)
155:3
common (1)
97:24
commonly (1)
97:22
communicate (1)
100:24
communication (1)
161:17
community (10)
56:22;59:19;89:11,15;
106:19,20;112:11;
158:17,18;162:13
comorbid (1)
118:12
comorbidities (5)
79:6,14;82:10,14,20
Comorbidity (3)
79:2;80:12;108:12
companies (1)
148:20
comparable (1)
76:7
compare (3)
76:9;126:23;158:19
competent (4)
142:5,21,23;143:22
complaint (1)
143:23
complaints (4)
152:20;154:24;162:12;
169:23
complete (7)
17:19;20:17,21;60:23;
69:10,17;125:15
completely (5)
125:3,6;134:10;135:8;
140:10
complex (1)
64:2
component (20)
68:15;75:15;86:13;
92:12;135:10;142:2,3;
144:12;147:3,10;148:24;
168:25;169:4,7,21;
170:16,18,19,23;171:1
components (1)
161:7
comport (4)
57:21;65:15;101:15;
106:2
comported (1)
115:23

comporting (1)
111:25
comports (10)
59:9,15;65:10;66:14;
88:7;93:22;105:23;110:8,
19;112:8
comprehensive (3)
60:22;81:3;110:10
con (1)
98:10
concentration (1)
57:10
concern (2)
34:5;102:17
concerns (3)
11:24;36:21;155:1
concerted (2)
88:24,25
conclude (2)
47:8;168:3
concluded (7)
25:23;30:1;61:21;
172:21,22;173:4;178:25
conclusions (2)
28:7;29:16
conditions (1)
160:21
conducted (3)
169:4;170:16,23
confidence (2)
83:25;84:5
confirm (1)
113:23
conflict (1)
142:12
conformity (1)
146:6
confusion (1)
53:8
connection (3)
7:16;27:17;39:17
consider (1)
106:21
considerable (1)
95:22
considerably (1)
114:21
considered (1)
62:13
consistent (2)
103:21;127:13
consistently (2)
103:20;104:24
consists (2)
50:21;68:16
constant (1)
155:13
consulted (2)
27:10,16
consulting (3)
10:9;11:3;27:5
consumer (1)
160:6,6

contain (1)
60:15
contend (1)
54:10
contended (2)
46:8,23
contends (3)
123:6;136:22,25
content (1)
84:7
contention (19)
41:8;50:7;54:4;67:6;
73:17,20;74:4;114:4;
123:20;130:9;136:12;
137:4,8;140:3;143:16;
144:22;152:9,12,15
contentions (1)
44:17;141:11
context (1)
148:18
continually (3)
36:24;107:6;108:6
continue (1)
84:12
continued (1)
82:15
continuing (2)
40:5;158:1
continuously (1)
111:2
contract (2)
165:15;166:3
contracted (1)
165:1
contractual (2)
165:23;166:7
contrary (1)
72:1
contribute (1)
23:13
contributed (1)
23:1
control (1)
153:19
controlled (1)
25:17
controlling (1)
152:11
conversation (12)
14:14;15:23;22:22;
31:12;34:20,25;35:2,7;
43:8;62:6,10;134:4
conversations (4)
15:18,24;21:19;72:12
convincing (1)
125:5
cop (1)
147:11
cope (1)
78:16
copies (3)
24:25;25:5,6
copy (5)

17:14;19:10;20:16;
25:11;61:5
core (1)
81:17
Cornell (1)
117:9
corrected (1)
75:18
cost (2)
75:9,13
cost-effective (1)
56:13
costs (4)
75:8,14,20;149:10
counsel (2)
8:8;28:3
counseling (8)
42:17;43:1;44:8;48:8,
14;54:12;72:14;105:6
Counseling-individual (1)
97:20
counselors (2)
44:12;71:16
country (3)
69:3;141:6;149:18
County (8)
9:22,22;11:18,21,22;
12:23;13:7;129:4
couple (6)
36:1;56:23;61:19;
103:15;154:19;163:6
course (16)
23:20;34:23;40:5;44:1;
48:20,23;50:5;52:10,15;
91:8;97:15;98:6;102:9;
117:9,11;133:4
court (23)
9:18;11:16;49:9;88:21;
90:21;91:9;129:4;
140:13;147:18,24;148:9;
149:22;150:7,10,13,14,
22,23;151:16,18,19,21;
163:3
courthouse (1)
12:24
court-mandated (1)
109:10
court-ordered (4)
84:15,17;162:21,23
courts (2)
88:19;141:5
court's (3)
6:10;84:20;91:3
cover (1)
174:20
Covered (3)
121:6,7,15
CPR (1)
51:1
crash (2)
9:12;11:7
cravings (1)
111:20

created (1)
55:19
credentials (1)
15:12
criminal (1)
11:25
crisis (1)
118:14
criteria (5)
23:25,25;141:22;
148:18,19
critical (5)
26:17;28:15;77:25;
88:12;97:20
criticism (3)
64:13,14;107:19
criticisms (2)
36:25;134:12
criticize (1)
158:1
critique (1)
43:24
critiquing (1)
158:16
crystal (1)
171:25
culture (1)
83:24
cup (1)
163:17
cups (1)
77:9
cure (2)
66:17,17
curious (1)
11:2
current (2)
8:3;10:17
curriculum (1)
25:15
custody (3)
12:25;13:14,17
customers' (1)
146:20
cut (9)
58:16;66:17,20;92:2;
120:2;158:5,7;170:4;
177:16
cutting (3)
66:17,18;70:17
CV (6)
8:1,3,8,9,11;117:4

D

dad (1)
103:23
daily (2)
116:11;147:4
danger (2)
95:22;96:3
dangerous (1)
118:14

Louis Adolph Casal, M.D.
March 21, 2012

| | | | | |
|---|---|---|---|---|
| Darvin (2) | 59:2,9;65:22 | 103:18;104:22;119:24; | 172:8,10 | 134:1,20;135:2;154:12 |
| 80:21;105:10 | degree (3) | 121:13;142:20;147:13, | died (8) | discussions (2) |
| data (3) | 10:16;27:24;156:19 | 14;171:7 | 16:15;21:4;51:9; | 15:18;21:21;22:22; |
| 56:10;114:25;115:1 | Delgado (8) | Desmonds (2) | 157:17;168:15;171:15, | 101:19 |
| date (1) | 90:2,7;156:15,17; | 140:14;149:15 | 17;172:1 | disease (17) |
| 108:6 | 158:11,22;159:7,17 | Desmond's (17) | diff (2) | 64:3,6,13,16,20,25; |
| dated (2) | Delgados (1) | 42:18;44:2;81:12; | 68:1;74:7 | 65:3,7,11,14,22,24;66:7, |
| 39:3;99:10 | 92:18 | 88:18;107:9;133:4; | difference (2) | 17;67:4,7,15 |
| day (19) | delineate (1) | 135:23;144:3,14;157:6; | 57:25;96:22 | diseases (3) |
| 15:4;42:6;78:10;81:7; | 166:9 | 163:15,24;164:12,19; | differences (2) | 78:19;121:10,11 |
| 95:8,9,11,17;98:21; | delineated (1) | 166:20;168:2;178:16 | 113:24;115:13 | disk (1) |
| 116:13,13;143:14; | 70:9 | detail (5) | different (16) | 19:11 |
| 144:25;149:7;153:12,12, | delve (2) | 8:25;77:3;83:21;99:24; | 64:23;68:3,3,3,4,4,16; | disorder (4) |
| 14,16;160:16 | 126:4;140:22 | 113:22 | 73:3,5;95:9,11;129:13; | 78:24;87:25;127:23; |
| days (3) | Dempsey (1) | detailed (2) | 132:11;133:17;146:2; | 128:5 |
| 35:23;36:1;61:19 | 119:24 | 100:18;115:11 | 176:24 | disorders (6) |
| daytime (1) | Depakote (1) | details (4) | dig (3) | 78:18;87:22;88:1,1; |
| 178:17 | 127:24 | 84:20;166:3;167:7; | 8:24;116:15;176:8 | 108:11;127:18 |
| deal (3) | Department (1) | 171:20 | direct (1) | dispassionate (1) |
| 84:5;144:20;174:19 | 11:20;45:7 | determine (18) | 144:5 | 155:15 |
| dealing (3) | dependence (2) | 21:15;22:25;23:4;29:8; | Directive (1) | dispense (1) |
| 23:9;111:19;128:10 | 79:14;82:16 | 44:16;46:5;48:9;54:23; | 154:9 | 177:7 |
| deals (1) | depending (4) | 80:11;118:5;123:9; | directly (3) | dispensed (1) |
| 144:18 | 67:24;125:14,20; | 130:2;133:11;142:6; | 23:8;131:18;172:9 | 177:18 |
| dealt (1) | 159:11 | 159:25;160:21,24;161:9 | director (23) | display (1) |
| 67:3 | depends (2) | determined (1) | 120:18,18,18,21; | 119:21 |
| death (24) | 170:18 | 156:15 | 161:18;162:14,17; | dispute (3) |
| 23:2,9,13;42:18; | deposed (2) | determining (2) | 163:13,14,25;164:3,13; | 12:25;148:21;152:18 |
| 144:14;157:6,12;163:15, | 8:18;71:10 | 96:6;120:7 | 165:4,24;166:16,19,25; | dissatisfied (1) |
| 24;164:12,19;166:20; | deposition (31) | detox (10) | 167:4,12;168:8,9,16,21 | 143:21 |
| 167:1,6;171:7,8,8,22,24; | 6:6,8;7:11,19;9:1;10:6, | 44:24;79:16;108:17, | directors (2) | disservice (1) |
| 172:4,18;173:12,24; | 8;12:21;19:1;26:21; | 18;138:1,2;164:3,5,23,25 | 166:10;167:13 | 95:15 |
| 176:23 | 31:19;35:23;42:22; | detoxed (1) | disagree (10) | distinction (3) |
| debate (1) | 75:19;84:7;97:4;105:15; | 105:12 | 67:13;73:19;96:9; | 57:20;145:25;173:17 |
| 122:17 | 144:5;146:10;150:3,9; | detoxification (7) | 103:8;114:18;115:4; | distinctly (2) |
| decades (1) | 152:16;163:19;165:18; | 108:14;138:24;139:1,9, | 170:8;172:5,17;178:13 | 16:16;21:20 |
| 162:13 | 166:3;171:10,17,20; | 22,25;164:10 | disagreement (1) | distribution (1) |
| decide (1) | 173:4;175:20;178:25 | detoxifies (2) | 141:13 | 178:3 |
| 143:7 | depositions (8) | 137:1,7 | disagreements (1) | disturbed (1) |
| deciding (1) | 23:19;24:4,13;71:9,20; | detoxifying (2) | 169:16 | 143:20 |
| 114:3 | 92:5;103:24;151:14 | 137:19;139:17 | disappeared (1) | doc (1) |
| decision (1) | depression (4) | detrimental (1) | 81:23 | 121:12 |
| 100:14 | 78:15,23;80:14;118:13 | 64:10 | discharge (4) | Doctor (31) |
| dedicated (1) | deprivation (3) | develop (5) | 81:7,8;95:10,14 | 6:25;7:23;14:2;38:1; |
| 117:24 | 11:25;12:1,1 | 16:17;17:4,4,8;22:18 | disclosed (5) | 41:4;48:18;58:13;62:18; |
| deemed (2) | Des (3) | developed (2) | 36:3,9;37:11;130:23; | 65:13,21;67:20;71:14; |
| 56:12;95:13 | 119:24;143:17;144:3 | 58:22;74:10 | 173:14 | 77:17;85:13;86:12;89:1; |
| deeper (1) | described (4) | developing (1) | disclosure (12) | 90:22;96:3;98:8;101:19; |
| 126:4 | 14:16;101:15;103:18; | 23:12 | 7:18,25;36:15;41:4; | 110:5;111:24;114:15; |
| default (1) | 122:2 | Development (3) | 121:19;124:3;130:23; | 118:21;121:13,16; |
| 107:10 | describing (3) | 156:15;158:11;159:17 | 132:1,1,6;141:2;178:9 | 130:22;132:3;136:15; |
| defer (3) | 109:19;150:22;176:2 | deviate (1) | disclosures (1) | 137:8;143:9 |
| 80:19,20;172:18 | designated (1) | 71:1 | 152:23 | doctors (2) |
| deficiency (1) | 7:7 | deviation (1) | discovery (3) | 56:23;59:19;79:19 |
| 139:5 | designed (1) | 70:12 | 6:11;124:6,12 | document (20) |
| deficient (1) | 167:22 | devotion-two (1) | discuss (2) | 19:14;59:24;61:2;62:7; |
| 134:17 | desk (2) | 42:5 | 173:8;178:2 | 63:10,13,14;67:1;73:7; |
| define (4) | 13:23;21:23 | DHR (5) | discussed (5) | 74:13;130:24;131:5; |
| 57:19;125:12;159:8,17 | Desmond (28) | 46:23;145:13,15; | 49:25;97:19;105:8; | 147:18,21;150:6,17; |
| definitely (5) | 16:14;18:24;19:2,24; | 146:6;166:9 | 108:12;157:22 | 154:8,22;155:23;157:21 |
| 27:9;90:7;106:21; | 21:4;41:16;42:1,4,8;47:8, | diagnosed (1) | discussing (2) | documents (4) |
| 114:7;154:16 | 13,19;79:8,22;80:5;81:5; | 81:7 | 21:16;59:23 | 19:20;124:4,5;133:3 |
| definition (3) | 82:2;85:10;99:9;101:6; | die (2) | discussion (2) | done (28) |

(5) Darvin - done

8:10;14:5,8;27:5;32:7,
12,15,18;33:20;39:7;
41:13;44:16;46:5,9,19,
20,21;52:1;55:2,15;
72:17;104:16;122:20;
143:17;158:11;161:9,16;
167:23
**door (4)**
106:7;118:8;138:1;
153:22
**dose (1)**
138:12
**doses (3)**
70:6;138:23;139:16
**doubts (7)**
98:24;99:3;100:17,17,
17,17,17
**down (7)**
38:3;39:8;51:18;84:1;
93:21;144:21;150:16
**Dr (45)**
6:6,16;11:9;14:2,23;
15:4,7;19:21,23;74:9;
80:9,21;81:1;97:4,6;
105:10,13;130:22;131:7,
19;135:5;140:7,11;141:1;
162:16;163:16,18,19;
165:1,4,16,18,23;166:15;
168:24;171:11,16,20;
172:3,19,20;173:4,8;
174:19;178:8
**draft (1)**
8:12
**Drew (1)**
14:5
**drink (1)**
76:12
**drinking (2)**
114:19,24
**drivers (2)**
94:5;147:12
**drove (1)**
36:22
**Drs (1)**
15:10
**drug (88)**
25:15;37:13;39:21;
41:10;42:17,25;44:8;
48:14;53:6,21;54:11;
57:2,7,15;59:18,25;
60:14;61:22;64:9,11;
66:13;77:19;78:8,9;
82:18,25;91:12;93:23;
94:20;95:21;96:15;
97:22;98:9;106:1;
108:10;109:14;111:1,1,
14;112:14,15,24;113:6,
25;114:4,9,16,20,22;
115:3,16,19,22;116:3,8,
13;119:3,10,12,19;120:5;
121:21;122:8;125:7;
126:21;132:7;141:4,5;
144:16;148:9,11,14;

149:22;150:10,22,23;
151:18,19;152:6;156:7;
159:24;160:10,10,11,11,
20;169:5;177:4
**drugs (14)**
55:15;60:3;68:3;87:14,
17,21;111:10,15;112:7;
169:2,6;170:13,25;176:5
**drunk (1)**
119:25
**dual (1)**
90:1
**due (1)**
91:8
**dug (1)**
128:25
**duly (1)**
6:21
**Dunwoody (1)**
75:25
**during (8)**
44:1;72:10;95:9;111:1,
3;117:13;120:20;178:17
**duties (6)**
93:3,4;165:23;166:9,
16;167:8
**duty (3)**
169:3;170:15,20

**E**

**earlier (1)**
117:14
**easier (2)**
16:8;19:4
**easily (2)**
47:20;51:23
**eat (1)**
58:9
**Eckl (1)**
14:5
**education (19)**
25:15;37:14;38:10;
39:21;40:5;41:10,19;
44:13;53:6,21;54:5;
57:15;61:22;121:21;
132:8;144:16;152:6;
156:8;164:23
**educational (1)**
68:4
**effect (2)**
138:24;139:17
**effective (37)**
29:2;54:25;55:5,11,21;
56:5,9;57:2,7,19,21,23,
23;58:23;59:2,8,13,20;
60:1,6;66:4,21;77:18;
78:7;82:18,24;98:9;
101:15;109:3,10;115:4,
14;116:9;121:3;133:20;
137:14;149:14
**effectively (1)**
67:8;122:1,3,20,25

**effectiveness (3)**
56:11;58:4;135:9
**effects (1)**
64:10
**efficient (1)**
149:14
**effort (1)**
16:25
**efforts (1)**
43:24
**eight (8)**
20:13,13;34:19;38:2;
68:16,21,23;145:20
**either (7)**
12:21;61:13;89:1;
125:15;149:1;153:24;
166:3
**elaborate (1)**
71:17
**elaborating (1)**
72:9
**elected (1)**
29:14
**element (2)**
105:5;112:5
**elements (12)**
59:17,21;60:14;63:6,
16,21;77:18;110:20;
121:19;122:1;123:1;
134:13
**eliminating (1)**
66:22
**Ellison (1)**
74:9
**else (15)**
22:21;27:12,12;34:16;
67:17;74:4;78:3;106:9;
107:2;108:9;121:2;
123:23;132:14;153:10;
161:16
**else's (1)**
104:10
**emerged (1)**
60:6
**emergency (2)**
138:1;146:16
**emphasize (1)**
64:5
**employed (3)**
44:7;46:6;92:19
**employee (2)**
89:23;90:21
**employees (2)**
119:10;120:5
**employment (3)**
84:12,13;91:19
**enclosing (1)**
19:11
**encounter (1)**
28:25
**encountered (1)**
31:15
**end (2)**

11:10;13:11
**endeavor (1)**
130:1
**energetic (1)**
103:19
**enhances (1)**
176:25
**enough (15)**
8:17;12:10;38:11;
54:15;58:24;74:3;78:1;
85:17;106:11;126:4;
146:16;159:2;171:2,5;
173:17
**enrolls (1)**
80:5
**ensure (1)**
107:7;169:3;170:15
**ensuring (2)**
169:6;170:24
**entailed (1)**
52:19
**enter (1)**
13:8
**entered (2)**
13:9;89:14
**entire (1)**
53:14
**entitled (2)**
38:5;151:24
**environment (3)**
89:19;169:1,22
**epiphanies (1)**
129:15
**equals (1)**
27:22
**erase (1)**
110:14
**Erly (2)**
14:22;15:10
**escape (1)**
166:22
**especially (2)**
72:15;105:6
**essence (2)**
82:5;147:1
**essential (1)**
139:24
**essentially (1)**
173:22
**established (2)**
51:7;150:19
**et (3)**
69:11;72:9;158:12
**ethical (1)**
100:16
**ethics (6)**
47:17,18;72:11,20;
93:16;114:19
**etiology (1)**
79:21
**evaluation (1)**
81:3
**even (13)**

52:18;67:6;69:17;
86:18;88:3;93:19,20;
99:9;100:2,20;103:3;
109:5;115:6
**everyone (7)**
67:22;68:8,10;72:25;
73:3;106:7,10
**evidence (6)**
72:1;101:8;106:17;
107:15;109:5;121:10
**ex (2)**
100:10;112:19
**exactly (12)**
23:3;29:19,19;46:2;
61:25;93:3;98:7;109:23;
114:13;139:19;147:18;
152:24
**EXAMINATION (2)**
6:23;81:5
**examine (3)**
81:7;165:10,10
**examined (1)**
6:21
**example (8)**
74:8;79:9;84:4;94:7;
98:22,22;147:7;158:2
**examples (1)**
167:25
**exceed (1)**
138:6
**Excellent (5)**
57:9;80:15;102:23;
103:4,6
**except (6)**
20:20;73:19;82:15;
85:9;108:4;149:3
**excess (2)**
139:8,16
**excited (1)**
95:11
**exciting (1)**
95:8
**excruciating (1)**
79:18
**excuse (1)**
130:24
**exercise (2)**
58:9;136:9
**Exhibit (18)**
7:19,21;8:1;17:11,14;
20:19;26:8;36:7;60:25;
61:3,15;62:18;131:5,10;
133:18;134:8,14;154:14
**expand (1)**
59:11
**expect (2)**
120:19;168:4
**expectation (5)**
23:15;93:20;114:10;
151:10;165:8
**expectations (1)**
146:20
**expected (1)**

Desmond, et al, v.
Narconon, et al.  Case 1:13-cv-02217-SCJ   Document 1-2   Filed 07/02/13   Page 53 of 73   Louis Adolph Casal, M.D.
March 21, 2012

151:8
expensive (2)
  76:5;149:20
experience (15)
  35:11;41:16,17;43:6;
  73:12;78:20;91:11;
  101:1;117:7;125:8;
  128:8;149:6;162:20;
  167:13;168:10
experienced (2)
  41:21;82:3
experiences (1)
  47:7
experiential (1)
  100:9
experiment (1)
  111:14
expert (16)
  7:7,17;9:15;14:22;
  36:4,10,13,15,20;41:4;
  43:16;60:13;80:19;
  145:4;146:4;158:16
expertise (5)
  17:3;44:21;142:8;
  143:10;171:3
experts (2)
  80:17,18
explain (1)
  79:10
expounding (1)
  72:6
extent (2)
  54:2;67:23
extremely (1)
  99:11
exuberant (2)
  81:21;154:18

**F**

facilities (9)
  65:2;91:11;120:6;
  125:7;141:24;151:24;
  159:5;161:11;162:6
facility (37)
  45:8;9;46:7;84:18;
  93:24;119:11,20;131:21;
  144:12;145:3;146:11;
  147:14;148:12,14,17;
  149:18,23;151:17;
  152:12;153:3,9;154:3;
  159:24;160:1,2,12,15,16,
  18,21,22;162:22,23;
  169:2,7;170:14,25
fact (18)
  9:25;10:2;25:2;32:21;
  38:13;41:19,21,22;42:3;
  46:8,9,24;54:3;87:10,13;
  103:2;137:1;145:25
faculty (1)
  117:10
failed (8)
  62:1;68:6,8;73:1;

168:25;169:7,22;171:1
Fair (22)
  8:17;28:8;9;29:18;
  49:22;58:24;67:9;70:7;
  71:20;74:3;78:1;82:21,
  22;89:24;106:11;108:24;
  111:20;130:4;166:17;
  171:5;173:17;176:7
fairly (3)
  47:19;71:20;76:15
fall (2)
  10:18;156:4
fallen (1)
  10:15
falling (1)
  12:3
familiar (14)
  30:22;32:6,11,14,17;
  34:1;56:14;131:13;
  137:10;138:3;159:7;
  166:12;175:22,25
families (3)
  141:3,5;167:19
Family (3)
  11:20;80:1;142:15
far (15)
  24:6;39:3,5;43:22,22;
  82:12;96:20;100:4,4;
  125:14,20;138:6;139:8,
  16;142:4
fashion (1)
  132:23
father's (1)
  13:6
FDA (3)
  138:6;139:8,16
February (1)
  99:10
feel (7)
  14:19;16:6;35:12;37:8;
  46:21;73:9;142:5
feeling (1)
  174:4
feels (1)
  170:21
feet (1)
  160:7
fellow (1)
  40:4
felt (5)
  16:18;79:18;81:20,23,
  25
few (7)
  14:25;44:11;82:2;
  83:23;100:1,2;162:3
field (6)
  28:14;44:9;65:13;
  100:3;118:21;153:23
figure (2)
  114:8;173:4
file (14)
  16:4;39:16;44:2;62:14,
  15,21;84:21,22,23,25;

85:2,9;104:10;168:23
files (18)
  35:15;37:8,18,22,24;
  38:1,11,15,18,22;39:2;
  42:16,25;43:13,16;51:11,
  24;104:5
filled (1)
  168:5
financially (1)
  77:23
find (20)
  15:14;22:14;24:18;
  27:7;28:18,18;29:23;
  47:17,20;59:18;71:25;
  75:3;81:18;123:23;
  127:16;149:18;155:9;
  157:21;170:2,2
Fine (6)
  6:18;25:7;60:18,24;
  110:17;177:25
fines (1)
  84:11
finger (3)
  66:20,22;172:11
finish (2)
  31:12;134:7
finished (3)
  58:15;85:15;89:4
firm (1)
  14:6
first (27)
  6:21;13:21;14:18;17:2,
  3;19:19;21:3,6,16;22:7,9;
  26:12;59:1;61:4;66:25;
  68:14;69:16,20;79:24;
  82:2;108:15;125:11;
  136:8;144:12;151:13;
  163:9;165:20
firsthand (1)
  41:18
fit (2)
  68:10;75:24
five (3)
  43:7;79:17;89:4
fixed (1)
  157:19
fixing (2)
  155:16;156:25
flexibility (2)
  74:5,6
flexible (1)
  88:18
flippant (1)
  110:5
floating (1)
  8:13
Florida (5)
  148:9;149:22;150:16;
  151:18,19
flux (1)
  155:13
flyers (1)
  176:1

focus (1)
  135:25
focused (1)
  26:16
focusing (1)
  64:7
foggiest (1)
  10:23
folks (12)
  40:3;46:8;49:20;50:9;
  52:5;78:17;79:6;86:4,14;
  91:12;96:6;114:23
follow (2)
  93:10;99:2
following (2)
  98:23;106:3
follows (1)
  6:22
foolish (1)
  103:17
forced (1)
  106:4
forgive (1)
  147:20
forgot (2)
  159:15;175:21
form (21)
  19:7,9;39:1;60:6;
  65:17;73:21;90:23;
  91:15;94:25;97:22,24;
  102:21;104:18;115:25;
  135:11;140:17;141:14;
  159:19;160:23;164:14;
  169:11
formed (1)
  34:14
forward (2)
  12:12;156:24
found (10)
  22:17;28:1,4,17,19;
  29:24;32:1;155:20;
  157:24;163:5
four (9)
  12:19,20;35:18,18;
  89:4,7,14;90:18;149:20
free (3)
  16:6;46:21;73:10
freedom (1)
  149:13
frequency (4)
  113:25;115:19;116:3;
  117:2
fresh (1)
  35:24
friend (3)
  11:9;12:14;14:23
friendly (1)
  103:19
friends (3)
  73:14;94:15;176:14
fulfilling (5)
  165:23;166:7,15
full (2)

6:25;155:12
fully (4)
  96:1;106:2;110:22;
  156:18
function (1)
  64:3
funding (1)
  75:4
further (4)
  15:17;54:17;81:10;
  105:13
future (1)
  129:16

**G**

gain (1)
  83:25
gainful (1)
  84:12
galvanized (1)
  37:5
gave (6)
  10:3;14:21;29:3;39:7;
  48:20;123:17
gen (1)
  159:9
general (14)
  37:23;38:8;97:23;
  117:11;18;133:5;135:22,
  24;138:10;139:1,4,4;
  165:9;170:20
generally (2)
  130:25;168:9
generically (2)
  23:10;50:2
gentleman (2)
  93:2;94:7
Georgia (44)
  6:7,9;10:14;34:3,3,4,9;
  37:12;39:20;41:9,12;
  45:9,25;54:6,8;56:22;
  57:14;61:21;69:9;76:15;
  114:17;115:23;116:9,20;
  117:20;121:20;132:6;
  141:21,25;144:13;
  145:22;147:2;148:17;
  149:2;151:17,24;152:10;
  153:2;163:14;164:12,18;
  166:1,20;167:1
Georgia's (1)
  167:24
gets (1)
  66:4
given (8)
  10:8;12:20;13:19;
  14:25;48:20;83:15;
  121:18;175:4
giving (14)
  15:1;23:12;77:17;
  83:10,22,23,23;97:11;
  118:7;136:2,6;158:25;
  166:14;175:4

Desmond, et al., Case 1:13-cv-02217-SCJ   Document 1-2   Filed 07/02/13   Page 54 of 73
Narconon, et al.
Louis Adolph Casal, M.D.
March 21, 2012

glance (1)
134:23
glancing (1)
44:19
glaring (1)
28:14
glean (1)
71:19
gleaned (2)
171:16,18
glowing (2)
104:7,16
goal (3)
107:20,21;114:11
goes (1)
153:21
going-forward (1)
9:16
good (28)
11:13,13;15:3;16:23;
24:8;38:21;42:7;52:18,
24;55:25;64:7;71:3;77:7;
82:1;90:13;110:2,6;
119:14,23;120:12;
122:16;153:22;155:25;
158:2;159:4;175:15;
177:3,21
good-bye (1)
13:3
Google (1)
32:24
Gowitt (4)
171:11;172:3,19,20
Gowitt's (3)
171:16,20;173:4
grab (1)
43:12
grabbed (1)
38:19
grad (1)
96:4
graduate (9)
70:4;83:22;86:4;91:12;
92:8;93:24;94:20;96:4;
102:9
graduated (5)
86:19;89:7;94:11;
95:15;97:12
graduates (3)
89:13,22;95:21
graduation (1)
95:14
Great (16)
16:5,7;20:18,20;24:25;
44:5,5;45:2;46:4,4;84:5;
88:22;162:15;173:10;
174:19;178:5
greater (1)
88:16
group (6)
52:9;96:16;97:25;
98:11,17;148:19
group-or (1)

97:21
groups (1)
144:24
guess (12)
21:5,25;38:24;42:16;
45:5;78:21;80:4;108:2;
128:5;143:14;149:19;
175:5
guidelines (2)
145:7;148:25
guy (3)
93:6;99:12;128:1
guys (8)
26:18;84:7;100:6,9;
109:5;127:23;163:6;
165:2
Gwi (1)
9:21
Gwinnett (3)
9:22;12:23;13:7

### H

Haldol (1)
127:24
half (2)
39:13;118:19
hand (2)
106:18;166:4
handful (2)
10:13;41:18
handle (1)
177:7
handled (1)
177:25
handles (1)
79:7
handling (2)
78:10,11
happened (1)
29:24
happening (9)
34:6;42:8;43:17;56:22;
101:10;117:3;152:5;
168:1;174:3
happens (2)
64:15;112:11
happy (13)
13:2;14:21;17:23;28:9;
54:17;60:8;109:25;
126:5;134:22;147:20;
148:5;151:14;166:5
hard (8)
30:12;42:5;58:7,10,11;
74:1;98:13;126:23
HARRIS (157)
6:5,18,24;7:22;17:6,12;
18:14,16;19:8,12,15;
20:3,4,18,23;21:19;22:4;
25:7,13;26:9;29:10;
33:23;35:3;39:14;40:9,
14,19;41:2;42:3;44:10,
19;46:1,11;48:24;49:2,4,

13;51:25;52:24;53:11;
54:14;56:3;57:10;58:6;
59:25;60:25;61:1,4,9,12,
16,18,25;62:8,10,17,24;
63:18;64:2;65:18;66:2,
11;69:19;71:3,12,22;
72:21;73:11;74:1,2,25;
75:7;76:24;77:16;80:15;
82:22;83:15;85:2,3,16;
88:14;90:5,25;91:1,3,16,
24;94:2,10;95:3,5;96:9;
97:3,23;102:15,22,24;
103:9;104:1,12,19,25;
106:2;107:18;110:12;
112:10;114:9;115:9,14,
18;116:1,5;123:25;124:7,
14,17,24;126:5;127:16;
129:1,14;130:14,21;
131:11;135:12,14;136:4;
139:13,20;140:18,21;
141:17;142:7,10;143:3,
19;145:18;147:16,19;
148:4;151:22;154:15,22;
156:18;159:21;160:4;
161:5;163:21;164:15;
169:14;173:10,13,16,19,
21;174:16;177:15
hate (1)
170:4
hatting (5)
83:9,9,19,20;86:1
head (5)
47:16,21;100:13;
132:13;154:4
headaches (2)
81:16,16
health (5)
78:13,14;128:4;136:7;
165:11
healthier (1)
129:21
hear (3)
64:1;102:3,12
heard (8)
13:12;33:6,7;56:16;
57:11;162:12;176:19,21
hearing (1)
33:9
heat (1)
136:2
heck (1)
124:11
Hege (4)
80:21;81:1;105:10,13
help (11)
14:2,16,18;15:7;25:25;
60:3;78:16;100:12;
106:6;142:5;158:1
helpful (2)
56:12;96:14;106:24;
108:18;135:22;142:10;
166:5
helping (5)

56:13;58:7;87:8;96:13;
176:4
helps (3)
59:3,14;162:16
hepatitis (1)
121:11
here's (4)
20:2;145:13;146:22;
154:23
heroin (1)
172:5
hesitating (1)
98:23
Hey (17)
44:23;73:8;74:6,15;
75:3;84:1;93:7,11,11;
99:22;129:4;143:23;
145:10;155:4;165:12;
176:15;177:24
high (2)
25:16;129:18
higher (5)
118:10;127:25;138:12;
163:4;178:11
highly (1)
11:11
himself (2)
84:8;142:22
hire (1)
95:3
history (1)
165:10
hit (3)
12:7;30:15;32:1
hitting (1)
12:18
HIV (1)
121:10
hold (2)
84:1;118:20
home (4)
13:3;153:14;159:12;
163:7
homework (1)
41:13
honest (1)
124:24
honestly (2)
94:2;113:21
hope (7)
68:9;73:1;74:6;95:17;
125:4;143:19;153:22
horrible (1)
127:7
hospital (4)
9:11;23:24;81:6;
163:10
hostile (4)
87:10,13;88:5;105:9
hou (1)
170:18
hour (3)
24:11,12,13

hours (12)
18:22,23;24:3,3,5,10;
39:6,25;40:2,6;144:24;
145:20
housing (20)
92:12;94:9;156:14;
159:6,8;168:25;169:2,4,
6,7,21,21;170:14,16,18,
19,20,25;171:3;174:18
huge (2)
106:19,20
Huh-uh (5)
31:1;72:8;145:11;
168:19
human (4)
43:15;45:7;142:21;
155:12
humanly (1)
130:7
humility (1)
158:4
hundred (1)
126:13
hurt (1)
25:25
HYNES (2)
159:19;178:21
hypothetical (2)
95:1;126:11

### I

idea (13)
37:23;45:1;47:12;
48:12;59:12;100:23;
114:16;115:12;119:14;
126:1;128:20;136:6;
141:20
ideas (6)
36:25;73:5;100:12,13,
13
identical (1)
76:15
identification (6)
7:20;17:10;26:7;61:14;
131:9;154:13
identified (4)
156:14;157:3,5,11
identifies (1)
45:17
identify (2)
39:15;49:24
imagine (1)
98:14
immediately (9)
89:23;91:13;92:10;
94:21,22;96:4;97:14;
130:5;137:25
impact (1)
56:3
imperfect (1)
155:12
imperfections (1)

(8) glance - imperfections

Desmond, et al. v.
Narconon, et al.

Louis Adolph Casal, M.D.
March 21, 2012

155:14
implement (2)
 119:12;122:5
implemented (3)
 115:23;122:1,25
important (6)
 33:21;62:19,22;105:5;
 106:12;136:7
imposed (1)
 45:2
impression (1)
 17:7
improve (1)
 158:2
inappropriate (2)
 169:3;170:14
include (7)
 59:17,23;70:18;75:15;
 98:10,15;109:21
included (2)
 59:16;148:25
including (4)
 23:21;80:9;133:3;
 169:5
incompetent (1)
 95:16
inconsistent (2)
 125:3,6
incorrectly (1)
 146:11
increases (1)
 177:1
independent (11)
 16:17;17:5,8;22:2,19;
 23:17;43:12;155:1,2,3;
 158:9
indicated (3)
 22:1;52:4;138:14
indicates (1)
 68:8
indication (1)
 30:3
indicator (1)
 29:21
individual (9)
 39:16;49:11;66:3;
 67:25;68:2;70:19;78:8;
 82:25;97:25
individuals (6)
 26:19;44:6;45:18;
 49:25;50:4;108:10
individual's (1)
 107:5
inebriated (1)
 112:12
ineffective (1)
 101:12
infection (1)
 121:14
inform (1)
 64:10
information (12)
 33:2,4;36:22;59:19;

104:9;109:4;145:17;
 157:16;159:3;167:18;
 171:2,9
informing (1)
 96:24
informs (1)
 97:24
initial (3)
 22:18,22,22
initially (1)
 107:16
injured (1)
 9:11
inpatient (2)
 141:24;149:17
inpatients (2)
 117:15,15
instead (2)
 87:8;100:16
Institute (2)
 59:18,25
instructions (1)
 93:11;98:24;99:3
instructors (1)
 72:3
insufficient (1)
 134:3
insurance (1)
 148:20
insurances (2)
 74:23;141:23
intend (16)
 7:13;25:21;46:22;
 47:23;132:15;140:14,24;
 145:14;146:4;155:23;
 169:9;170:8;171:5;172:5,
 16;173:7
intending (3)
 171:21;175:6,9
intense (1)
 100:3
intensive (5)
 21:22;100:4,10,19;
 145:22
intention (1)
 140:23
interacted (3)
 44:7;48:13;80:9
interactions (1)
 81:13
interest (1)
 126:3
interested (2)
 27:15;170:6
interim (1)
 165:14
International (1)
 69:4
interpret (2)
 83:18,19
interpreting (1)
 72:7
InterQual (4)

141:22;148:18,18,23
Interrupt (2)
 85:13,17
intervening (3)
 93:25;94:22;97:7
intimately (1)
 91:18
into (22)
 8:24;16:25;24:5;28:23;
 32:8;33:20;77:1;86:8,15;
 89:5,14;105:16,24;
 116:15;123:9;126:4;
 128:25;129:3;136:5;
 140:22;151:16;176:8
intoxicated (1)
 119:25
introductory (1)
 16:12
investigate (1)
 54:18
investigation (2)
 33:20;155:2
involved (4)
 13:21;15:5;100:20;
 170:1
IOP (2)
 116:12;145:22
issue (4)
 80:12;144:19;163:12;
 178:8
issues (12)
 6:11;15:16;44:20;68:4,
 4,5;78:12;81:2;152:17;
 156:14,16,17

J

jab (1)
 75:2
jail (2)
 109:5,17
January (1)
 8:9
Jeff (6)
 6:15;15:51:23;62:5;
 76:13;124:2
Jo (1)
 6:12
job (9)
 22:6,25;83:15;84:1,6;
 86:4,17,19;95:18
jobs (2)
 45:18;83:23
journal (7)
 27:20,21;30:5,16,22;
 31:14;139:6
journals (3)
 29:3;30:19;33:3
joy (1)
 127:12
judge (7)
 11:23;13:8;91:4;
 140:19;147:25;148:4;

150:17
judgments (1)
 143:14
jumping (1)
 127:12
June (1)
 21:4
junior (1)
 117:12

K

Kate (3)
 13:23;22:11;54:7
keep (8)
 12:9;21:9;40:11,18;
 103:10;170:22,22,22
Kennison (1)
 19:22
kept (2)
 128:19;177:18
key (1)
 60:5
kick (1)
 174:23
kids (1)
 56:13
kind (31)
 8:7;23:15;27:20;30:12,
 15;44:20;46:25;48:15,16;
 50:3;57:9;60:9;71:7;
 85:20;87:25;88:20;
 93:25;95:16;102:1;
 105:16,25;112:9;132:20;
 139:9;144:12;145:13;
 149:6,8;155:2;166:21;
 172:9
kinds (2)
 51:1;111:14
knew (3)
 9:21;76:2;163:4
knock (1)
 106:7
knowing (3)
 119:24;147:20;151:19
knowledge (6)
 55:8;94:11;140:19;
 158:18;167:25;170:17

L

la (1)
 100:1
lack (1)
 134:10
lacking (1)
 134:3
lag (1)
 92:18
lapses (1)
 111:2
largely (1)
 125:17

last (7)
 20:7,21;25:11;28:4;
 48:25;172:8;178:7
Lastly (1)
 121:9
lasts (1)
 64:21
later (6)
 11:6;18:3;35:23;41:14;
 155:19,20
lawyer-I (1)
 11:9
le (1)
 12:22
learn (1)
 7:12
least (15)
 8:21;35:18;49:20;56:9;
 67:1,3,8,13;68:14;78:22;
 83:18;118:19;131:17;
 149:19;157:22
least-tenured (1)
 39:11
leave (10)
 21:7;95:17,23;142:17;
 144:25;153:15,19,19,20;
 175:9
led (2)
 48:21;138:10
left (1)
 178:17
legal (6)
 10:9;11:4;12:22;13:19;
 68:4;83:1
length (3)
 88:15;97:18;125:21
less (7)
 75:8,13,17,24;149:10,
 11;162:10
letter (1)
 19:11
level (29)
 19:1;54:4;101:22;
 102:7,20;104:8,16,17;
 113:21,22;141:3,21;
 142:22;145:1,2,20;
 147:23;148:8,21;149:12;
 150:10,23;161:9;163:5,
 11;169:8;172:1;178:10,
 11
levels (5)
 52:15;69:14;138:3,6;
 139:12
ll (1)
 45:8
license (11)
 44:18;45:6,17,20;
 46:24;91:23;145:6,12;
 163:23;164:21;167:5
licensed (14)
 34:4;41:12,20;44:12;
 45:8,8,15;53:25;54:3,6,8;
 69:4;144:13;178:10

Desmond, et al., v.
Nar$\overline{cla}$.se 1:13-cv-02217-SCJ   Document 1-2   Filed 07/02/13   Page 56 of 67 Louis Adolph Casal, M.D.
March 21, 2012

licenses (6)
49:11;163:23;164:5,11,
18;166:10
licensing (1)
145:5
licensure (1)
152:5
lie (1)
37:3
life (4)
9:13;58:8;68:3;155:14
likelihood (1)
88:16
likely (2)
10:17;137:16
line (6)
48:12;90:11;91:19;
108:2;115:2;119:2
lines (6)
33:12;69:23;89:9;93:8;
101:25;103:16
lingo (1)
99:9
Lisa (7)
150:2,4,4,9,21;151:5;
166:22
list (13)
12:9;20:21,24;66:25;
77:18;82:18;88:10;
105:3;110:10;124:1;
134:7,8,8
listed (3)
130:24;148:22;168:7
lists (1)
20:12
literature (9)
29:23;30:4;32:25;
125:16;127:2,14;136:18,
21;139:10
little (26)
8:24;11:24;20:25;
22:13;28:19;37:16;
69:20;70:15;72:23;77:3;
79:25;92:16;102:18;
103:17;108:16,16;
110:13;127:17;130:13;
146:2;155:11;169:25;
174:4,7,21;176:24
live (3)
34:3;59:5;162:19
lives (1)
60:5
living (6)
72:12;142:3;147:2;
159:12;169:1,22
local (1)
162:7
locate (1)
32:21
lockdown (5)
141:24;149:17,23;
150:1;163:10
lodged (1)

143:22
log (2)
18:21,23
logged (3)
39:6,25;40:3
logs (7)
38:11;39:4;41:19;
43:17;51:1,6,10
long (14)
10:24;11:2;39:10;43:6,
9;59:16;82:13;88:19;
94:6,9,11;98:21;109:17;
143:15
longer (1)
88:15
longer-term (2)
88:16;146:17
long-term (2)
108:16;148:1
look (21)
16:2;26:17;29:22;34:9;
35:14;38:1;43:13,16;
52:1;57:12;68:11;73:16;
107:18;123:16;133:11;
155:4;157:25;158:6;
161:4;175:11;177:8
looked (23)
19:20;24:14;26:13;
27:12;31:24;37:24;38:2,
10,18;39:24;51:7,12;
76:4;107:11;119:25;
122:14;123:9;124:10;
126:21,25;135:15;
136:21;138:22
looking (17)
14:1;23:10;28:15;30:3;
32:8;40:2,4;43:14;44:22;
57:25;58:1;92:4;117:4;
128:7;146:15,21;163:4
Looks (8)
18:18;43:15;77:8;
112:12,12;113:3;131:13,
17
loose (1)
169:25
loosely (1)
142:1
lose (3)
68:9;73:1;74:6
lost (1)
57:9
lot (15)
8:10;23:19;24:3;41:13;
43:17;71:5;99:6,6;101:1;
106:13;118:18;129:21;
139:13;144:19;162:12
LOUIS (2)
6:20;7:2
love (2)
49:2;124:18
loving (1)
99:12
Lunch (3)

130:17;153:24;162:14

**M**

mail (3)
13:23,25;176:1
main (3)
39:9;74:24;160:5
maintain (1)
84:12
Major (5)
19:23;56:3;68:15;
127:18,19
majority (1)
68:20
making (7)
62:24;70:20;88:21;
167:15,19,20,21
malnourished (1)
137:21;138:16
man (5)
9:13;16:14;93:7,12;
98:19
managing (1)
146:19
mandated (3)
90:21;150:23;163:2
mandates (1)
138:24
manifesting (1)
120:7
manner (2)
142:10;158:12
manualized (1)
99:25
many (18)
8:20;21:24;24:5;42:8;
55:7;75:8;94:3,4;100:22;
106:24,25;108:10;
109:22;118:12;124:13;
125:22;126:20;137:20
map (1)
125:25
March (6)
6:2;25:19;35:4;154:22,
23;157:9
mark (4)
7:19;26:6;61:2;131:4
marked (7)
7:20;17:10,13;26:7;
61:14;131:9;154:13
MARR (1)
176:14
MARSCHALK (58)
6:15,19;14:8;17:17;
18:10,12,15,20;19:3,10,
14,25;20:16,19;25:5,8;
34:23;39:1;40:8,13,16;
51:22;61:6,11;62:3,9,11;
65:17;73:21;77:10;
84:23;90:23;91:15;
94:25;102:4,21;103:5,
12;104:18;115:25;

123:18;124:2,11;129:8;
130:12;135:11;140:16;
141:14;160:23;█████;
169:11;173:7;█████;
174:10;177:11,█████
Mary (7)
~19:1;34:22;36:█████
54:7;113:7;166█████
matches (1)
46:18
material (3)
27:19;47:15;168:2
materials (17)
15:20;23:20,22;26:19;
43:19;47:15;52:2;62:14,
16;64:8;70:10;86:24;
138:22;139:15;144:20;
152:4;153:10
matter (2)
10:10;11:4
matters (1)
21:17
may (27)
12:4;14:25;17:7,7;
22:9;27:11,11;47:14,17;
48:2;62:3;68:18;79:8;
86:8,8;93:17;95:19;
111:13;113:13;118:10,
16;124:14;139:20;143:1;
144:20;165:20,21
Maybe (27)
11:18;18:5;46:15,15;
53:13;72:11;73:3;77:5,9;
81:24;93:1,2;97:17;
101:24;102:17;110:12;
122:8;128:6;129:22,22;
149:4;152:13;158:19;
160:25;162:25;163:16;
165:18
McDonald's (1)
95:18
MD (5)
6:20;7:2;45:2;105:11;
164:25
mean (58)
10:3;17:6;22:3;26:11;
31:11;38:4,21,23;48:18,
21;51:19,24;53:8,23;
58:15,16;59:4;62:6,25;
63:15;74:19;77:22;
83:20;85:13;86:12;92:2;
95:12;96:17;97:1;98:13;
101:7;104:6,13;110:3,7;
111:24;119:15,19;120:2,
16;125:4;134:9;135:15;
143:16;144:19;147:22;
148:13;149:15;151:25;
153:14;156:1;158:7;
170:6;173:6;175:1;177:4,
16,16
meaning (3)
68:25;76:20,23
means (13)

26:4;56:20,21;72:25;
74:13;78:9;83:14;94:15;
96:15;97:2;100:23;
106:12;149:2
means-Is (1)
151:8
meant (3)
146:14;151:6;170:19
█████ed (1)
163:13
medi (1)
137:25
medical (42)
10:9;11:4;12:22;13:19;
32:25;40:5;65:13;79:14,
15,21;81:17;82:4;91:5,9;
117:12,20;120:17,21;
121:13;136:15;137:7;
138:25;139:6,7;140:2;
143:5;162:14,17;163:13,
14,25;164:3,13,24,25;
165:4,5,24;166:9,16;
171:6,25
Medically (2)
108:14;138:1
medication (4)
105:17;177:5;178:2,3
medications (13)
87:25;105:4,9,13;
106:12,16,22,23,25;
107:1;127:20;177:7,7
medicine (10)
76:21;91:7,8;117:5,8;
118:22;120:22;137:24;
165:6,10
medicines (4)
87:8,9;106:18;177:18
meet (2)
35:21;57:24
meeting (10)
10:19;22:11;28:12;
35:21,25;36:23;72:11;
81:4;114:20;170:21
meets (5)
27:23;107:8;109:17,
20;132:9
megadoses (1)
139:15
members (4)
49:19;52:3,6;54:11
memory (3)
29:13;110:15;172:20
mental (7)
78:18;87:22;88:1,1,
12,22;127:18
mention (3)
81:10;142:25;146:1
mentioned (7)
15:4;33:10;49:18;
143:23;159:5;163:13;
178:7
mentioning (1)
159:22

Case 2:14-cv-00283-GMN-NJK   Document 1-6   Filed 02/24/14   Page 58 of 67

Desmond, et al. v.          Case 1:13-cv-02217-SCJ   Document 1-2   Filed 07/02/13   Page 57 of 73          Louis Adolph Casal, M.D.
Narconon, et al.                                                                                                                    March 21, 2012

message (1)
  136:3
messed (1)
  72:15
met (11)
  34:23;37:7,10;57:15;
  60:9;66:5,9;88:17;
  121:22;131:21;151:17
Metro (5)
  161:19,20;162:1,14,17
Michael (1)
  14:23
micronutrients (1)
  137:23
mid (1)
  60:2
might (23)
  12:6,11;25:12;32:21;
  47:16;59:18;72:22;77:8,
  9;90:24;93:19,20;97:1;
  103:16;112:21;113:14;
  120:19,20;134:2;138:15,
  16;139:2;165:19
Mike (1)
  162:16
military (1)
  80:1
Miller (1)
  14:9
mind (7)
  11:23;13:16;17:24;
  57:11;107:19;146:24;
  150:17
mine (3)
  14:24;43:12;129:22
minimally (1)
  149:11
minimum (1)
  149:11
minute (3)
  19:16;57:10;143:24
minutes (2)
  22:11;174:9
mis (1)
  92:23
mispronounced (1)
  7:3
misrepresentations (2)
  140:12;141:2
misrepresented (1)
  141:3
missed (1)
  28:13
missing (1)
  132:19
mistake (2)
  72:18;87:24
mistaken (2)
  89:21;159:15
mistreated (1)
  11:20
misun (1)
  53:13

misunderstood (1)
  53:13
modified (3)
  107:7,16;108:3
mom (1)
  103:22
moment (2)
  113:12;132:18
Monday (1)
  35:5;36:2;61:7;62:12
money (2)
  149:8,16
monitor (2)
  44:24;93:3
monitored (2)
  111:2;151:11
Monitoring (7)
  93:1;94:1,23;96:20,24;
  112:6,9
monitors (6)
  92:10;93:9;94:4;
  158:22;162:18,18
month (4)
  116:18,21;119:3,7
months (20)
  12:23;13:12;64:21,21,
  22;75:14;82:2;88:21,22;
  89:4,7,14;90:12,18,20;
  125:16,23,23,24;148:2
Mooty (5)
  150:4,4,9,22;151:5,21
Mooty's (1)
  150:2
morbidity (1)
  82:15
more (28)
  8:25;23:8;26:13;27:9;
  30:2;37:8;40:7;61:18;
  74:20,21;75:2;76:5;77:3;
  83:1,21;86:11;87:8;89:9,
  16;100:4,18,19;114:8;
  149:20;162:10,10,10;
  168:22
morning (1)
  25:9
morphine (1)
  172:12
most (16)
  8:3;76:14;78:17,17;
  87:4;88:8;97:21,24;
  118:14;120:23;125:7;
  149:13,13;154:10,16;
  171:14
Mostly (1)
  162:2
mother (2)
  11:20;143:1
motivated (1)
  103:19
mouth (1)
  77:23
Move (10)
  48:24;59:6;69:11,13;

101:21;102:5,12;104:8,
  17;106:20
moved (1)
  84:14
moving (2)
  95:10;119:1
mu (1)
  125:14
much (11)
  28:19;34:6;37:8;38:15;
  42:4;75:9,20;100:18,18;
  107:1;149:16
muddle (1)
  63:2
multiple (3)
  78:7;80:1;82:24
must (7)
  11:11;106:8;107:6;
  109:4,4;111:2;165:17
myself (3)
  34:5;37:1;38:16

              N

name (12)
  6:25;9:8,9;10:21;12:5,
  17;25:14;39:15;43:19;
  47:18;71:21;163:17
named (1)
  43:7
names (12)
  13:5;14:21,25;15:1;
  24:20;38:3;39:9;47:14;
  48:4;51:18;162:4;168:23
Nar (2)
  80:5;145:21
Narco (1)
  92:21
Narconon (172)
  16:18;17:5;19:24;
  20:15;22:3,19;23:13,17,
  20,24;25:15;26:4,17;
  27:6;28:17,20,24,24;
  29:2;32:1,7,22;35:17;
  37:12;39:20;41:5,9,12;
  43:18;44:7,11,14,17;
  45:17;46:6,7,13,23;
  49:19,21,22;50:4,5,11,18,
  18,24;52:2,10,15;53:5;
  54:1,11,21,24;55:5,10;
  57:13;58:6,23;59:7;60:9;
  61:21;64:4;67:7,23;
  68:11;69:2,4,9;70:10;
  73:6,8,9,12,19,23;75:5,
  17,21;76:16;79:5;80:5,8,
  16;83:4,8;84:2,23;85:2;
  86:3,6,20,24;88:3,17;
  89:24;90:2,20;92:20,21;
  98:16;102:12;105:8,15;
  114:17;115:23;116:9,20,
  25;121:20,25;122:25;
  123:5,19;124:5;126:1;
  127:17;131:20;132:6,12,

16;133:23;134:9,12,16;
  135:10;136:4,9,21,22,25;
  137:6;138:4,23;139:15,
  23;140:12;141:3;144:13;
  145:12,22;146:5;151:17,
  23;152:10;153:2;156:14,
  16;158:10;163:14,23;
  164:11,18;165:16;166:1,
  19;167:1,5,24;168:25;
  169:3,21;170:14,15,17,
  19,21;173:24;175:22;
  177:5;178:9
Narconon's (12)
  43:20;46:14;50:11;
  58:4;73:17;113:2;
  123:20;128:21;154:2;
  169:2,7;170:25
narrow (1)
  144:21
National (2)
  59:18,25
nature (2)
  35:6;113:16
near (1)
  12:8
necessarily (5)
  64:5;96:19;107:7;
  120:23;137:22
necessary (2)
  12:11;107:7
need (38)
  13:2;14:19;16:1;25:4;
  31:12;40:7,10;44:23;
  66:19;73:9;74:22,23;
  75:3,4;77:8;78:5;81:10;
  105:12;109:2;110:7,24;
  112:14;124:9;125:5;
  144:6;146:22;161:23;
  163:17;164:3;167:14,14,
  16,17;171:22;173:6;
  174:4;175:7,8
needed (6)
  13:10;14:16;15:19;
  105:12;107:10;146:24
needs (7)
  9:16;67:2,25;74:18;
  78:7;79:14;82:5,19,24,
  25;83:5;88:18;91:10;
  107:8;110:20;155:15;
  170:22
negative (10)
  28:15,21;31:1,24;
  32:22;72:8;145:11;
  168:19;176:19,21
negligence (1)
  173:23
nevertheless (1)
  37:10
New (17)
  43:11;74:9;95:8;99:12,
  14,14,15,15,16,16,16;
  100:13,13,13;101:7,8,8
news (4)

23:24;33:6,7,11
next (8)
  15:4;101:22;102:7,13,
  20;104:8;111:1;165:13
Nicely (1)
  110:22
NIDA (1)
  148:25
night (3)
  25:11;28:4;153:14
nine (1)
  145:20
nods (2)
  132:13;154:4
non (2)
  24:1;73:9
none (7)
  32:10;140:4,5,6,20,20;
  141:16
non-effectiveness (1)
  56:11
nonexistent (2)
  113:20;141:25
non-medical (1)
  44:20
non-peer-reviewed (1)
  33:4
nonprofit (2)
  162:15;176:2
non-qualified (1)
  48:22
non-randomized (1)
  25:16
non-spiritual (1)
  74:10
non-threatening (1)
  155:16
Nope (1)
  177:2
norm (1)
  100:25
normal (1)
  155:16
note (3)
  21:15,16;88:20
noted (3)
  60:1;107:19,20
notes (20)
  15:24;16:9,13;17:14;
  18:4;19:19;20:22;21:19,
  20,24;22:1,4;35:19,20;
  75:10,11,12;145:18,19;
  159:11
nothing's (1)
  12:18
notion (1)
  88:5
November (1)
  22:10
now-I'd (1)
  24:8
number (71)
  6:4;18:8,22,25,25;19:1,

Desmond, et al. v.
Narconon, et al.   Case 1:13-cv-02217-SCJ   Document 1-2   Filed 07/02/13   Page 58 of —   Louis Adolph Casal, M.D.
March 21, 2012

5,6,21,22,23,23,24;40:6,
6;41:4;47:6;51:5;53:11,
18;67:18,20;72:22,24;
77:15,21;78:6,21;82:17;
88:9;92:7;97:18;105:2;
107:2,4;110:25;111:4;
124:25;125:1,2,13;126:7,
8,9;129:1,18,24,25;
130:20;131:20,23;
132:15,17;133:1;135:21,
21;140:7,11;141:1,9;
142:4,9;143:4;156:4,6,
16;157:2;158:22;168:24;
171:4;177:9
numbered (1)
18:5
numbers (7)
24:9;53:15;125:17,24;
126:2;138:6;139:8
numerous (2)
101:18;162:14
nurse (1)
93:5
nutrition (1)
139:4

## O

Object (17)
39:1;65:17;73:21;
90:23;91:15;94:25;
102:14,21;104:18;
115:25;135:11;140:17;
141:14;159:19;160:23;
164:14;169:11
objected (1)
103:3
objection (1)
142:23
objective (1)
33:14
Objectives (1)
99:11
obligation (5)
159:25;160:20,20,24;
161:1
obligations (2)
93:9;166:7
obtain (2)
86:4;163:22
obviously (2)
62:15;173:12
occupational (2)
78:12;83:1
occupying (1)
135:24
occur (3)
111:2,3;155:16
occurred (2)
9:21;115:5
o'clock (1)
153:20
October (1)

19:2
off (27)
10:15;12:3;18:9;40:22;
47:16,21;48:20;58:16;
66:18,21;70:17;72:23;
77:11;84:11;87:8;92:2;
108:19,20;120:2,15;
130:13,15;154:12;170:4;
174:10,11;178:23
offer (3)
120:16;140:15;173:8
officer (1)
47:17
often (6)
12:10;45:14;114:23;
115:5,13;116:16
Oklahoma (5)
32:15;33:8,11;34:1,7
ol' (1)
123:15
old (1)
101:5
once (3)
122:15;151:6;163:3
one (67)
8:21,21,22,25;11:5,22;
13:6;18:21;29:21;30:24;
33:8;42:6;43:10,10,25;
51:2;52:25;54:22;57:13,
18;59:2,22;66:6,10;69:3,
7;73:11;75:1;78:3;83:7;
106:4;108:9;111:1,13;
116:18,21;119:2,3,6,6;
120:24;126:10;127:4,12;
128:16;136:17;138:9;
142:18;144:4;147:7,19,
21;148:5,16;149:18;
151:13;152:17;156:9;
157:18;161:12;163:5;
164:6,6;165:20;166:23;
168:3;173:5
ones (4)
71:21;110:1;122:4;
165:20
one-third (1)
127:11
one-time (1)
10:5
ongoing (2)
38:10;161:10
only (17)
8:25;15:1;29:4;30:19;
31:25;69:8;72:10;73:23;
75:12;101:21;103:14,14;
108:15,17;130:4;149:15;
167:25
open (1)
155:15
operate (1)
144:13
operated (1)
114:17
operating (5)

146:5;152:11;154:2;
160:1;178:11
operations (1)
161:10
opiate (5)
171:15,17;172:1,2,7
opiate-naive (1)
176:25
opiate-related (1)
172:11
opine (1)
151:20
opining (2)
88:6;127:3
opinion (97)
9:15;10:14,16;11:8,19;
13:1,19;16:17;17:9;23:8,
12;25:23;26:3;29:16;
33:22,24;34:14,18;37:4,
6,12;38:5,8,12;41:4;44:6;
46:1,22,25;50:10;53:14,
18;55:4,10,21;56:19,24;
58:1,4;60:9,13,19,20;
74:20;75:5;78:20;85:6,8,
22;89:13;91:4,9;97:6;
103:14;109:9;113:24;
115:13;119:15,17;
121:25;124:16,20;
126:18;129:2,7;132:15,
16;135:5,19,21;137:13;
140:11,15;141:1;143:7;
148:15;153:8,8;155:22;
156:13;157:20;158:9;
159:4,23,25;165:22;
166:2,6,14;168:24;171:5,
6,22;173:5,9,23;175:7
opinions (23)
7:13,18;15:15;25:21;
30:1;31:20;36:13,18,21;
47:23;57:13;58:22;
130:25;131:19;140:7;
141:10;158:25;169:10,
13,15;171:4;173:1;
174:21
opportunity (2)
7:11;81:6
opposed (2)
23:10;175:4
options (2)
74:8,11
order (19)
6:11;18:10;21:3;23:16;
34:16;50:4;69:4;102:9,
12,18;104:8;147:24;
150:18;163:4,22;164:5,
10;167:17;175:3
organization (4)
27:16;155:10,12;176:3
organizations (1)
106:13
organized (2)
35:16;132:21
orientation (1)

120:20
orienting (1)
120:17
others (1)
11:15
ought (8)
63:7;22;97:6;111:25;
112:8,21,24;119:11
out (31)
18:10;27:7;28:14;
29:15,23;31:18;40:16;
60:17;74:21;76:22;86:9;
93:11;100:25,25;101:4;
114:8;116:7;118:20;
125:14,20;126:10;127:4;
128:16;145:9;147:1;
153:19,21,23;162:3;
173:4;174:23
outline (1)
7:17
outlined (3)
36:16;133:17;134:13
outlining (1)
110:21
outpatient (21)
24:1;37:13;39:21;
41:10;53:6,20;57:14;
61:22;76:17;121:21;
132:7;144:16;145:3,23;
153:3,9;154:2;156:7;
159:24;160:11;164:6
Outreach (5)
75:25;76:11;94:8;
147:8;162:2
Outreach's (1)
153:18
outside (4)
44:21;72:11;142:8;
167:18
over (14)
11:8;15:8;20:15;21:23;
31:13;33:14;46:6;91:14;
94:23;96:24;125:24,24;
164:17;176:14
overall (1)
54:24
overdose (3)
171:15,17;172:2
overdosing (1)
177:1
overly (2)
97:16;112:13
oversee (1)
44:24
oversight (1)
158:24
overstate (2)
118:11;157:1
overview (4)
22:2;19;23:17;34:17
overwhelmingly (1)
95:25
own (9)

14:19;16:13;23:22;
28:1;35:13;51:3;81:21;
101:5;162:19
owner (1)
161:18
owns (1)
19:22

## P

Page (13)
18:23;20:2,7,11,21;
21:3,6,8,10,12;22:10;
131:7;145:19
pages (6)
18:4,9,18;103:15;
124:4,13
paid (2)
27:9;141:22
pain (5)
79:18,20;81:16,22;
82:13
pamphlets (1)
64:8
pape (1)
104:4
paper (2)
38:12
papers (1)
81:9
paperwork (1)
123:5
paperwork's (1)
167:17
paragraph (2)
169:16;170:10
paraphrasing (1)
81:24
Pardon (1)
81:23
part (26)
16:12;22:25;44:24;
62:14,15,19;85:8;89:10;
93:19,19;96:17,18;98:10;
111:7,17;117:14;124:3,6;
130:23;139:21,22,22,24,
25;160:20;173:23
particular (4)
131:19;138:22;140:14;
156:2
particularly (1)
21:24
pass (1)
102:8
past (1)
33:11
pathologist (1)
172:19
patient (9)
12:24;21:22;65:5;66:4;
105:5;148:21;162:21;
170:22;176:11
patients (18)

Case 2:14-cv-00283-GMN-NJK   Document 1-6   Filed 02/24/14   Page 60 of 67

Desmond, et al. v.  Case 1:13-cv-02217-SCJ   Document 1-2   Filed 07/02/13   Page 59 of 67
Narconon, et al.                                                                Louis Adolph Casal, M.D.
                                                                                        March 21, 2012

60:3;65:15;87:17;
111:19;117:25;118:12,
16;121:10;127:11;128:2,
10;159:6,11;161:21;
162:6;163:8;167:14;
172:10
**Patrick (56)**
18:24;19:24;21:4;
41:15;42:1,3,18;43:1;
44:2,7;47:7,13;48:13;
49:12;51:9,16;79:22;
80:5,9,13;81:5,12;82:1;
85:10;92:24;99:9;101:6;
103:17;104:21;107:9;
119:23;121:13;133:3,8;
135:23;142:20;143:17;
144:3,14;147:13,14,23;
148:8;149:22;150:11,23;
151:11;157:5;163:15,24;
164:12,19;166:20;168:2,
15;178:16
**Patrick's (5)**
23:2,9;48:6;167:1,5
**pattern (1)**
176:17
**patterns (1)**
176:18
**pause (1)**
40:21
**pay (4)**
74:23;84:11;149:9,17
**peaceful (1)**
81:21
**Peachford (6)**
14:24;79:16;105:11;
118:9;153:13,16
**Peachford's (1)**
153:16
**peer-reviewed (11)**
27:19,20,21;28:19,20;
29:3,22;30:4,17,19;33:3
**peers' (1)**
75:8
**pen (1)**
18:8
**people (81)**
15:3;24:2;26:14;37:24;
38:23;41:21;42:5,16,25;
43:7;46:6,13;48:13;
49:11;51:6,8,15;52:9,19;
53:24;55:5,7,11,15,21;
56:6;57:3,8;58:8;59:3,14;
68:6;73:13;74:8;75:1;
76:21;78:22;80:8;87:8;
95:3;96:3,4,14,25;100:1,
2,22;101:2,4;103:23;
104:20;111:9,12;112:6;
114:12;119:21;125:22;
126:13;127:18;128:1,2,
12,17;131:6;137:21;
140:13;142:1;143:8;
146:10,15;147:1;149:5,7;
151:7;155:13;157:25;

162:9,16,19;176:4;
177:17
**people's (1)**
138:11
**per (3)**
118:22;119:3;145:21
**percent (12)**
78:22;118:1,2,11;
123:6,21;124:22;125:18;
127:15;128:21;129:5;
130:2
**percentage (2)**
114:23;117:24
**percentages (1)**
118:6
**perfect (1)**
114:12
**perfectly (4)**
122:3,4;152:13;154:25
**perform (1)**
22:2
**performed (1)**
168:16
**Perhaps (1)**
127:14
**period (7)**
88:12;91:21;93:25;
94:22;95:12;97:7,20
**person (21)**
35:13;37:11;43:10;
48:7,9,22;72:20;94:20;
95:9,11;97:8;99:14;
100:16;103:19;129:16;
136:4;137:19;163:2,5;
166:23;167:20
**personal (3)**
35:12,13;145:19
**personality (1)**
103:21
**personally (1)**
46:17
**personnel (12)**
35:15;37:18,22,24;
38:1,18,22;39:2,16;
41:18;43:13;51:24
**perspectives (1)**
103:22
**pertinence (2)**
29:6,9
**phase (1)**
81:19;118:14,14;163:9,
10
**philosophy (4)**
83:8;106:5,6;169:5
**phone (2)**
11:8;167:17
**PHP (1)**
116:12
**physical (2)**
78:13;81:4;108:20
**physically (1)**
136:1
**physician (3)**

44:24;91:20;143:7
**physicians (3)**
106:14,14;111:18
**physician's (1)**
40:4
**Physiologically (1)**
172:6
**pick (1)**
38:17
**piles (1)**
38:11
**pla (1)**
21:8
**place (4)**
82:20;112:25;161:19;
167:20
**places (8)**
120:23;147:7;149:4,6;
161:12;162:3;163:11;
171:19
**places-but (1)**
162:4
**plaintiffs (2)**
7:12;152:10
**Plaintiffs' (12)**
7:21;17:11,14;26:8;
60:25;61:3,15;62:18;
131:4,10;134:14;154:14
**plan (13)**
9:13;68:2;107:5,6,9,13,
19;108:3;156:2,5,6,21,22
**plans (1)**
167:10
**played (1)**
172:13
**please (2)**
6:13;14:1
**pleased (1)**
101:7
**pleasure (1)**
130:10
**plus (1)**
108:18
**pm (9)**
77:12,15;130:16,19;
153:25;174:12,15;
178:24,25
**point (28)**
23:6;27:15;66:25;
67:18,20;68:5,7;69:24;
71:3;72:1,23;73:7;76:1;
82:23;83:2,2;85:23;90:2,
3,13;94:16;113:15;
119:23;131:19;135:3;
137:4;139:6;160:5
**pointing (1)**
172:11
**points (5)**
60:22;101:10;130:25;
131:18;132:11
**policy (2)**
30:13,15
**pool (2)**

128:1,1
**poorer (1)**
128:4
**population (2)**
128:7;129:21
**position (7)**
89:5,11;95:2,16;96:5;
114:7;120:17
**positive (2)**
29:25;31:22
**possess (1)**
83:14
**possibility (1)**
79:21
**possible (7)**
100:16;106:21;107:1;
130:7;139:4;149:13,14
**posttraumatic (1)**
78:23
**potential (1)**
36:25
**power (3)**
87:7;96:24,25
**practical (1)**
35:9
**Practice (19)**
6:8,9;30:25;34:3;
64:14,19,24;94:19;98:6;
99:5;114:17;116:12;
117:24;120:18;147:4,8;
161:6;165:9;176:17
**practices (2)**
165:6;178:4
**predictor (1)**
126:9
**prefer (1)**
60:18
**prepared (1)**
141:19
**preparing (2)**
9:12;28:12
**prescribe (3)**
87:17,20,24
**prescribed (1)**
70:7
**prescribes (2)**
138:4,23
**present (28)**
118:17;148:2
**presumably (4)**
43:2;52:10;63:12;
173:5
**pretty (9)**
10:25;51:23;62:19,22;
71:5,6;100:3;109:25;
134:19
**prevention (1)**
25:17
**primary (1)**
54:22
**principles (5)**
59:20;60:1,5;86:25;
88:5

**printed (1)**
25:11
**prior (6)**
30:2;95:9;110:14;
127:20,22;157:5
**pro (2)**
32:8;68:6
**probably (9)**
13:20;47:19;80:2;83:6;
85:19;101:1;110:25;
127:19;174:4
**problem (18)**
37:2,3,4;46:12;47:5;
64:6,7,22;65:21,23,24,24;
66:2,8;74:24;79:24;
165:14;172:10
**problems (25)**
28:14,17,17;36:25;
68:3;75:1,1;82:16;
109:16;117:25;118:17;
128:3;155:6,16;156:11,
16,17,23;157:1,3,5,11,15;
161:2,2
**procedure (1)**
137:24
**procedures (2)**
82:20;121:3
**process (5)**
50:23;67:3;70:13;
120:20;146:23;155:20
**processes (1)**
82:19
**produced (2)**
26:20;124:12
**product (1)**
99:18
**professional (2)**
15:12;169:12
**profoundly (1)**
137:21
**program (185)**
14:17;19:23;22:3,19;
23:10,18;29:2;32:7,22,
25;33:20;34:4,9,17,19,
21;37:1,14;39:22;41:11;
43:19;44:14;46:12;47:8,
9;48:22;52:6;53:21;
54:24,25;55:10,15,17,18,
20;57:2,7,15;58:23;59:2,
7,9,13,22;60:7,14;61:23;
63:7,21;64:21;65:6;67:3,
8,24;68:6,9,9,12,14,15,
20;69:17;71:15;73:1,4,8,
9,10,15,19;74:7;75:5,6;
76:9;77:19;79:5;80:6;
82:11,19;83:4;84:15;
86:3,14;88:4,6;89:7,13,
23;91:13;92:8,25;93:16;
94:21;95:15,22,23;96:5,
6,7;97:12,19;98:10,11,14,
17;100:5,7,20;101:16;
104:7,15,21;105:16,24,
25;109:17,20;110:7,8,19;

Case 2:14-cv-00283-GMN-NJK   Document 1-6   Filed 02/24/14   Page 61 of 67

Desmond, et al. vs.
Narconon, et al.

Page 78
Case 1:13-cv-02217-SCJ   Document 1-2   Filed 07/02/13   Page 60 of 78

Adolph Casal, M.D.
March 21, 2012

112:7,21,25;113:2,3,4,17;
114:11,15,16;115:3,22;
116:8,9,13,17;121:4,22;
123:20;126:12;132:8,16;
133:11,12,21;135:5,6,10,
16,22;136:13,16,23,25;
137:6;138:2,4,23;139:22,
25;140:8,13;145:23;
146:5;147:3;152:4,20;
153:10,17,17,18;155:17,
18;156:8,12;160:16;
164:22,23,23,25;170:1,7;
174:23;176:20,22
**programs (21)**
23:25;32:9;57:21,21,
23,24;69:3;73:14,18;
74:22;75:8;76:7,15;
97:25;106:24,25;109:22;
121:9;126:22;159:23;
169:13
**progress (1)**
159:11
**progressed (1)**
168:3
**progressing (1)**
168:5
**proper (2)**
169:5;170:24
**protocol (3)**
111:18;116:8;177:6
**protocols (2)**
121:3;177:5
**protocrol (1)**
111:18
**proud (1)**
84:10
**proven (1)**
95:13
**provide (26)**
10:9;41:12;42:16;
44:13;46:14;54:11;62:1;
76:17;77:19;99:25;
100:3;130:8;136:3;
137:25;139:21;145:3,13;
147:5;151:24;167:18;
168:25;169:8,22;171:1,3;
175:6
**provided (32)**
7:17;8:7;15:20;17:17;
23:20;28:3;42:25;44:8;
48:7,14;49:19,21;50:8;
57:14;61:21;64:20;
68:23;84:7;101:14;
117:19;121:20;123:12,
14,19;124:5;131:21;
132:7,12;141:22;154:8;
156:7;158:10
**providers (1)**
148:20
**provides (3)**
60:14;76:11;98:17
**providing (11)**
38:9;42:10,17;47:12;

53:24;56:24;57:1;139:7;
149:3;158:13,15
**provision (1)**
166:8
**proximate (1)**
173:15
**psychiatric (20)**
9:15;15:16;26:15;
27:13;78:14;80:17,18;
81:3,4,11;87:14,17,21;
105:9,17;106:1;127:19;
128:5;155:17;158:14
**psychiatrist (4)**
83:14,17;104:14;165:6
**psychiatrists (1)**
87:7
**psychiatry (4)**
87:3,11;117:18,18
**Psychometrics (1)**
30:7
**psychopharmacology (1)**
27:14
**psychotherapeutic (1)**
9:16
**published (7)**
26:19;27:20,21;29:22;
30:4,5;33:3
**PubMed (12)**
24:14,15;28:4,23;29:3,
12;30:18;32:1,6,20,23;
123:22
**PubMed-articles (1)**
23:22
**puffing (1)**
102:18
**pull (3)**
29:15;51:23;61:17
**pulled (6)**
25:10;31:18;48:8;
61:18,20,25
**pulling (1)**
145:9
**pure (1)**
165:5
**purely (1)**
153:3
**Purification (1)**
138:21
**purpose (2)**
7:10;38:24
**purposes (8)**
6:7;7:21;17:11;26:8;
29:21;61:15;131:10;
154:14
**purs (1)**
29:20
**pursuant (1)**
147:24
**pursue (1)**
59:1
**push (1)**
149:12
**pushed (1)**

100:25
**put (14)**
8:7;16:25;24:5;28:23;
32:5;77:22;94:18;
107:16;110:22;129:17;
134:10;135:1;144:2;
148:19

## Q

**qualifications (1)**
176:9
**qualifies (1)**
23:25
**quality (1)**
158:16
**quantify (1)**
145:2
**Quebec (1)**
32:18
**question's (1)**
146:1
**quibble (1)**
66:1
**quick (5)**
40:17;63:4;76:12;77:6;
134:23
**quite (14)**
14:20;16:16;39:3,5,10;
42:9;51:5;63:3;83:6;
84:10;87:10,13;88:18;
125:17
**quote (2)**
42:6;88:14
**quote-that (1)**
144:6

## R

**raise (1)**
154:25
**random (7)**
112:17,18,24;113:5;
116:3;119:3,7
**randomly (1)**
116:16,20
**rare (1)**
116:14
**rarely (3)**
116:12,13,14
**rate (13)**
55:9;61:20;123:7,21;
125:8,12;126:21;127:3,
15;128:16,22;129:5;
130:2
**rate's (1)**
127:24
**ratio (1)**
124:23
**ratios (1)**
159:3
**Ratterree (1)**
10:13

**Ratterree's-and (1)**
11:10
**re (1)**
29:12
**read (42)**
6:17;23:19;25:24;
26:24,25;27:22,25;34:14;
42:12,12;44:3;47:7;
48:25;49:5,8;60:8,8,11,
12;71:21;85:7;97:4;
99:22;101:23;104:2;
113:13;139:17,19;
144:15,18;145:15;
147:20;150:2,6;151:1,14;
163:19;165:18,20,21;
169:18;173:3
**readily (3)**
74:18,22;77:21
**reading (13)**
24:3;38:20;63:9;67:2;
71:4;103:16;105:14;
110:9;141:8;144:7;
145:17;168:1;171:20
**real (4)**
40:17;86:9,13;125:1
**realize (1)**
144:19
**really (43)**
15:7;16:22,22;28:19;
29:10,11;30:12;34:5,5;
45:24;47:11;54:16,20;
55:19;56:2;58:7;62:1;
65:25;71:17;76:22;
77:25;80:17,18;95:10;
99:7;100:12,24;101:3,4;
127:15;138:19;142:5;
143:24;146:25;149:2,3;
150:17;162:16;163:11;
164:25;171:2;175:15;
176:8
**realm (1)**
44:21
**reason (9)**
34:5;106:2,3;112:14,
20;131:16;156:9;172:25;
176:13
**reasonable (29)**
26:4;43:15;45:1;56:23;
57:14;59:17,21;60:13;
61:21;71:24;93:18;
96:21;97:10;98:14;
102:8;116:19,24,25;
121:20;126:12;131:21;
132:7;133:20;142:23,24;
143:8,11;156:7,10
**reasonably (2)**
29:25;56:23
**reasons (4)**
59:6;154:6,19;156:9
**reassured (1)**
38:15
**reassuring (2)**
101:10;155:21

**rec (1)**
9:20
**recall (9)**
11:15;22:24;84:13;
113:23;144:7;146:12;
151:9;163:1;168:12
**receive (6)**
89:6;147:24;148:9;
150:11,24;176:1
**received (3)**
13:23;50:4;61:7
**receiving (2)**
142:22;143:21
**recently (1)**
92:19
**Recess (4)**
40:24;77:13;130:17;
174:13
**recognized (1)**
14:22
**recollection (15)**
8:25;9:2;10:23;17:2;
22:5;29:4;44:22;45:25;
84:10,19;115:1,11;
121:12;122:16;148:3
**recommend (2)**
15:10;136:5
**recommendations (1)**
165:12
**recommended (1)**
22:16
**record (21)**
6:2;7:1;41:1;48:9;49:8;
72:2;77:12,15;101:20;
110:18;122:13;130:13,
19;142:12;150:21;
154:12;171:25;174:10,
12,15;178:24
**recording (1)**
8:23
**records (2)**
41:19;48:6
**recover (5)**
59:4,15;60:4;109:6;
176:4
**recovered (1)**
92:19
**recovering (1)**
43:10
**recovery (34)**
43:11;55:6,12,23;56:6;
57:3,8;59:4,14;75:14,25;
76:11;84:8;89:19;94:4,5,
6,8,9;96:13,16,18;
106:19;111:7;147:8;
152:6;153:18;161:19,20;
162:1,2,15,17;164:23
**redo (1)**
29:11
**refer (7)**
60:21;75:10;159:6;
161:7,21,23;162:5
**referral (1)**

Desmond, et al. v.
Narconon, et al.   Case 1:13-cv-02217-SCJ   Document 1-2   Filed 07/02/13   Page 61 of 73   Louis Adolph Casal, M.D.
March 21, 2012

176:18
**referred (2)**
65:5;176:11
**referring (4)**
18:4;42:11;131:5;
160:14
**refers (1)**
131:7
**reflected (3)**
35:19;133:18;138:21
**refresh (2)**
29:13;172:20
**refreshing (5)**
16:25;155:9;156:1;
157:21,24
**reg (1)**
145:9
**regain (1)**
91:22
**regard (5)**
46:10;88:17;113:3;
149:10,11
**regarding (4)**
6:11;70:13;120:6;
140:8
**regardless (1)**
149:10
**regimen (5)**
137:10,11,14;138:20;
140:8
**regs (2)**
145:13,25
**regular (2)**
149:7;161:17
**regularly (2)**
14:24;107:10
**regulations (2)**
145:15;146:6;166:9
**regulatory (2)**
166:16;167:3
**rehab (4)**
97:8;108:18;160:21;
174:23
**rehabilitation (15)**
37:14;39:21;41:10;
53:7,21;54:12;60:15;
65:6;82:19;98:9;121:22;
132:8;144:16;156:8;
160:12
**reintroduce (1)**
86:14
**relapse (5)**
60:4;96:3;111:7,10;
123:4
**relapsed (1)**
72:18
**relapsing (1)**
95:22
**related (3)**
10:18;21:17;156:14
**relates (1)**
41:5
**relationships (2)**

78:11;91:20
**relaxed (1)**
81:20
**release (1)**
95:7
**released (1)**
13:11
**reliance (2)**
28:6;157:21
**relied (1)**
101:18
**relief (1)**
82:3
**rely (5)**
25:20;30:24;33:2;72:2;
86:24
**relying (15)**
34:11;42:15;47:3,6,6;
54:3;60:20;85:4;102:10;
124:15,19,21;130:9;
144:21;156:3
**remain (1)**
84:8
**Remaining (1)**
88:11
**remediating (1)**
156:25
**remem (1)**
90:4
**remember (55)**
9:4,9,9,18;10:21;11:5;
12:4,5,17;15:1;16:11,16;
21:20,25;22:7;29:7,11,
13;33:9,11;39:9;43:22;
44:19,21,22;45:22,24;
71:22;75:13,23,23;79:1;
81:8;90:4,6,6,7;97:9;
101:24;105:22;113:13,
21;115:10;134:4;147:18;
162:4;163:8,11;166:2,23;
167:2,7;171:20;172:8,23
**remembering (2)**
163:20;165:19
**repeat (1)**
36:8
**rephrase (1)**
29:20
**report (4)**
93:16;96:7;101:21;
104:7
**reported (2)**
114:19,24
**reporter (1)**
49:9
**reports (2)**
102:11;104:16
**representations (1)**
142:14
**represents (1)**
151:21
**require (1)**
63:17
**required (10)**

35:17;120:24;147:23;
149:22,24;150:1,10;
163:25;164:13,25
**requirement (1)**
150:5
**requirements (3)**
43:20;151:18;168:8
**requires (3)**
57:7;119:16;167:4
**requiring (1)**
38:9
**re-review (1)**
151:14
**res (1)**
161:23
**research (6)**
23:21,22,23;56:2;60:2,
5
**research-and (1)**
88:13
**reservation (1)**
37:7
**reshaping (1)**
99:8
**residence (18)**
76:12,17;142:3;143:2;
152:22;158:15,17;159:9,
10,13,20;161:19,20,24;
162:1,15,17;169:13
**residency (2)**
117:18,19
**resident (2)**
147:9;160:17
**residential (36)**
75:15;76:9,19,20,22;
84:17;142:1,2;144:11;
146:11,18;147:1,9,10,10,
14;148:11,14,17,22,23,
25;149:1;151:24;152:2,
11;159:13,14,15;160:1,
18,22;161:7,11;162:21,
23
**residential-whatever (1)**
151:6
**resources (2)**
43:16;45:7
**respect (5)**
15:15;67:17;91:4,9;
137:18
**respond (1)**
31:13
**responded (1)**
42:9
**responding (3)**
58:14,20;131:18
**responsibilities (1)**
168:15
**responsibility (7)**
78:11;83:11,22;89:20;
93:15;100:15;167:12
**responsible (1)**
167:21
**restrictive (1)**

149:11
**rests (1)**
88:4
**resulted (1)**
173:24
**results (2)**
139:9;156:22
**results-oriented (1)**
66:14
**resumed (4)**
40:24;77:13;130:17;
174:13
**retained (12)**
9:24;10:3,9;11:3;12:3,
21;13:4,18;22:7;175:23;
176:20,22
**return (3)**
82:12;159:12,13
**returned (1)**
82:11
**review (8)**
11:6;12:13;24:12;
71:20;133:3;147:17;
148:5;169:18
**reviewed (13)**
10:18;23:19,24;34:19;
37:8;39:16;59:24;71:9;
142:11;165:15;171:8,10,
12
**reviewing (1)**
15:21;167:9
**revisiting (1)**
156:22
**rich (1)**
149:5
**rid (1)**
110:1
**Ridgeview (1)**
162:1
**Ridgeview's (2)**
153:17;162:13
**Riepe (4)**
101:25;107:9;108:5;
113:7
**Rieser (22)**
34:20;35:1,12;36:1,10,
13,23;37:18;38:9;39:7;
41:15,25;42:15,24;47:13;
74:14;113:7,16;115:2,10;
166:22,22
**Rieser's (2)**
105:15;114:4
**right (133)**
6:5,17;7:6;8:6;9:2;
10:6;12:2,13,19;13:13,
21;15:5,17;17:22;18:22;
19:16,21;20:24;21:5,14;
22:12,19;23:16;24:8;
26:10;27:11;28:5;29:12,
13;32:4,11,24;34:16;
36:5;38:7;40:15;41:3,5;
42:14;45:16;47:5,10;
48:3;49:25;50:13;51:6,

20;52:12,17,25;53:1,22;
54:9;55:25;58:10;62:11;
65:9;66:24;67:17,23;
69:11,22;74:3;76:1;79:5;
80:24;81:1;85:11;88:9;
90:16,17,17;94:18;98:7;
101:13;105:1;106:11;
109:7,19;110:18;111:6;
112:19;113:2,20;114:13;
116:6,15,20;119:1;
120:25;121:16,18;
123:24;125:22;129:3,9,
17;130:1,4,22;131:14;
132:5,12;135:4;143:16;
147:22;148:7;149:25;
150:18,20;151:23;152:8;
154:1,11;157:8;160:19;
163:12;164:4;166:6,8,22;
167:2;171:19;172:3,23,
25;173:14;177:13,13,14;
178:18,22,23
**risk (1)**
114:21
**Rite (1)**
118:9
**Riverdale (1)**
56:25
**Robbins (8)**
19:23;80:9;163:16,18;
165:1,16,23;166:15
**Robbins' (3)**
163:19;165:4,18
**role (17)**
89:24;90:1;91:14;
92:23;94:1,23,23;96:20,
20;99:1;135:9;137:20,
23;165:4;168:5;172:13;
175:21
**room (2)**
35:14;69:20
**rooms (2)**
98:21;101:10
**roughly (1)**
125:18
**routinely (3)**
30:24;87:16;111:20
**Roy (8)**
19:21,22;97:6;130:22;
131:7;135:5;140:11;
178:8
**Roy's (6)**
97:4;131:19;140:7;
141:1;168:24;174:19
**rug (1)**
155:11
**rule (1)**
87:21
**rules (1)**
93:21
**run (2)**
25:6;167:22
**Rundown (1)**
138:21

Desmond, et al., v.
Narconon, et al.

Case 1:13-cv-02217-SCJ   Document 1-2   Filed 07/02/13   Page 62 of 73

Louis Adolph Casal, M.D.
March 21, 2012

running (3)
164:22;167:21,21

**S**

said-and (1)
144:5
salvage (1)
66:20
same (13)
7:5,5;56:24;60:17;
66:8;68:24;128:7;
137:18;153:16,16,17,17;
154:21
satisfaction (1)
50:12
satisfied (4)
38:12;50:18;107:21;
119:5
sauna (24)
33:9;69:17,21;70:4;
81:19,20;82:8;89:21;
90:8;92:24;93:11;135:5,
5,10,16,22;136:6,12,16,
22,25;137:6;139:24;
140:8
saunas (1)
136:19
sauna's (1)
69:25
Savannah (1)
10:14
saw (7)
26:18;38:15;62:12;
85:9;121:13;147:19;
148:4
saying (21)
39:19;43:14;53:14;
83:11;86:3;97:11;
100:22;114:11,12;
115:18;118:15,16;
120:14;122:7;124:8;
136:5;145:9;146:12;
151:9;169:24;177:24
Scanned (8)
23:21;42:12;45:23;
123:11,15;128:24;
145:17;165:21
scanning (1)
71:5
Scared (3)
55:24;56:8,11
scheduled (1)
165:13
schedules (1)
138:20
scheme (1)
167:3
schizophrenia (1)
127:23
school (1)
25:16
schoolteacher (1)

43:11
scientific (9)
23:23;27:24;28:15;
60:2;128:21;136:12;
137:3,8;140:2
scientifically (1)
136:17
Scientologist (1)
86:21
Scientology (4)
86:25;87:10,13;88:5
Scientology's (1)
87:2
scope (1)
152:4
Scottish (1)
118:9
screens (2)
113:6;116:4
scrutinized (1)
46:17
se (1)
118:22
search (9)
24:16;28:4,23;29:3,12;
32:21,23,24,25
second (14)
21:12;29:24;32:6;42:6;
54:9;68:12;69:18;70:23;
82:9,11;94:19;129:16;
131:7;175:4
seeing (2)
21:22;22:1
seem (2)
29:6;116:18
seemed (2)
84:9;104:22
seems (6)
23:6;71:23;93:19;
102:8;129:18;166:23
selection (3)
127:17;128:5,6
self-run (1)
162:18
semantic (2)
64:13;67:14
Semantically (1)
64:19
sending (1)
160:2
sense (11)
35:13;63:15;82:4;
83:24;96:8;120:9;133:6;
137:22;141:23;142:1;
146:20
sent (1)
65:5
sentenced (3)
147:14;148:8;150:11
sentences (1)
19:5
separate (1)
150:14

sequence (2)
68:24;69:25
seriously (2)
104:21,23
serve (1)
95:16
serves (2)
29:20;121:12
service (2)
41:13;107:5
Services (9)
11:21;14:20;42:17;
43:1;54:12;60:15;107:6;
158:10;176:2
serving (1)
11:22
sessions (1)
72:14
set (1)
20:17
sets (1)
158:2
seven (2)
38:2,17
several (7)
49:18;50:25;51:10;
60:7;131:6;134:2;146:9
severe (2)
78:15;128:1
shape (1)
153:22
sheet (1)
109:4
shot (2)
49:6;174:7
show (4)
17:13;106:17;108:17;
109:5
showing (1)
131:16
shows (2)
60:2;88:14
shy (1)
64:12
side (2)
72:11;88:20
sign (1)
6:17
signal (1)
85:21
significant (1)
41:16
silence (1)
175:18
similar (1)
8:22
Similarly (1)
176:23
Simply (5)
28:24;57:7;60:16;
69:24;99:17
single (10)
55:14,17,18;67:21;

68:7;72:24;73:2;99:23;
106:6,9
sit (5)
75:19;83:13;147:22;
148:7;166:6
site (3)
33:1;46:18;161:12
sitting (5)
35:14;69:20;100:6,7;
120:14
situation (5)
8:22;9:24;11:19;
146:19;167:9
Six (8)
12:23;13:12;88:21,22;
90:11;125:15,23;148:2
six-month (2)
88:24,25
skeptical (2)
27:9,18
smart (1)
127:19
smoke (1)
93:6
smoking (1)
58:9
Smyrna (1)
56:25
sober (5)
59:5;84:12;127:12;
169:1,22
social (1)
83:1
solid (2)
171:3
solidify (1)
100:12
somebody (7)
56:9,25;96:15;112:12;
138:15;154:25;174:22
someday (1)
12:7
somehow (1)
12:25
someone (10)
12:3;48:19;54:7;95:21;
96:19;106:22;112:21;
114:19;142:25;172:8
someone's (1)
120:7
sometime (1)
33:11
sometimes (2)
104:20;146:16
somewhat (2)
134:3;162:9
somewhere (2)
106:9;145:21
soon (3)
83:21;130:7;137:25
sorry (35)
7:3;12:4;20:1;33:25;
41:24;42:3;53:13;62:1,

25;65:12;76:18,18;90:4;
103:7;105:1,20;106:22;
110:12;113:22;115:9;
132:3,4;147:16;148:6;
151:13,21;159:16;160:9;
163:21;165:19;172:15;
173:11;174:3;177:4,10
sorry-that (1)
88:14
sort (13)
17:3;33:14;53:15;
54:23;76:4;87:20;97:8;
102:18;130:25;145:5;
158:25;177:8,21
sought (1)
142:21
sounds (4)
62:18;66:25;112:19,19
space (4)
83:12,13,14;100:15
speak (3)
13:8;79:8;135:23
speaking (1)
125:18
specializes (1)
118:21
specific (19)
18:4;39:15;44:8,11;
48:9;49:24;60:10;67:24;
71:1,5,6;76:20,23;81:11;
116:8;119:18;124:9;
167:8,25
specifically (12)
15:11;34:9;38:8;59:7;
70:10;79:8;81:10;
115:22;131:7;133:8;
144:18;169:10
speed (1)
170:11
speeds (1)
175:13
spend (2)
43:14;149:16
spending (1)
144:23
spent (4)
18:22,23;22:11;24:10
spoke (2)
16:9;133:2
sporadic (3)
113:9,14,20
stabbing (1)
79:19
stack (2)
38:19;123:15
staff (14)
41:15;43:24;44:11;
46:17;47:12;49:19;52:3,
6;53:5;54:11;89:5,10;
167:15;169:9
staffing (11)
37:12;39:20;41:5,9;
47:8;53:5,15,18;156:6;

Desmond, et al. v.
Narconon, et al.

Louis Adolph Casal, M.D.
March 21, 2012

158:23;159:3
staff's (1)
    38:10
stage (1)
    108:15
stamp (1)
    97:12
stand (1)
    75:18
standard (40)
    56:14,21;57:4,6,16,22,
    24;59:10,12,15;60:10;
    65:10,16;66:5,9,12,15,19;
    87:20;88:7;93:23;94:14,
    19;105:24;106:3;109:18,
    20;110:8,19;111:25;
    112:8;115:24;116:2,6;
    119:16;121:23;131:22;
    132:9;137:24;141:20
standing (1)
    6:11
standpoint (1)
    138:25
start (9)
    15:21;19:19;20:25;
    68:25;69:18;83:22;
    97:13;119:21;164:17
started (7)
    38:19;79:22;93:6;94:6,
    12;120:8;175:20
state (18)
    6:25;32:8,12,15;33:19;
    34:4;41:20;44:13;45:25;
    46:23;54:6,8;81:13;
    139:11,15;141:25;
    148:17;149:2
statement (12)
    49:17;53:11;71:22;
    74:1;97:11,23;105:22;
    113:23;114:18;144:7;
    148:4;178:13
statements (2)
    156:5;170:8
states (2)
    137:6;145:7
state-Utah (1)
    162:3
statistics (3)
    55:9;95:25;123:4
statutory (1)
    166:16
stay (4)
    88:19,20,21;106:20
steps (1)
    74:10
stick (1)
    110:13
sticking (1)
    97:8
still (3)
    88:6;125:23;157:9
stimulate (1)
    83:24

stop (6)
    56:13;58:8;60:3;91:6,
    7;136:11
stories (3)
    42:11;101:19;104:2
story (2)
    99:10;101:22
Straight (3)
    55:24;56:8,12
straightforward (1)
    63:3
strange (2)
    83:11;103:25
stream (1)
    12:6
street (1)
    48:20
strength (1)
    64:4
strengths (1)
    83:7
strenuous (1)
    136:1
stress (2)
    78:24;155:13
stressful (1)
    97:16
strike (3)
    48:24;52:3;126:19
strong (4)
    82:1;86:3;101:8;
    160:25
structure (2)
    76:16;99:17
student (5)
    44:2;68:2,24;104:7;
    105:25
students (39)
    25:16;50:24;64:10;
    67:25;70:12;71:10,13;
    83:5;92:8,19;93:17,24;
    94:24;101:21;102:11,18;
    104:3,15;113:11,19;
    115:4,11;116:21;117:12;
    122:8;137:7;138:25;
    139:7;141:2,5;144:4;
    158:3,24;160:2,14;161:7,
    22;169:24;170:23
student's (2)
    170:13,15
students' (2)
    104:5;169:1
studied (4)
    54:14;83:20;136:18;
    139:12
studies (16)
    32:7,21;34:2;108:17;
    123:11,13,19;124:6,9,16,
    19;126:5,20;127:1;
    128:24;155:20
study (4)
    32:12,14,17;139:7
studying (1)

44:1
stuff (6)
    43:17;70:20;122:14;
    164:24;171:8;177:21
submitted (1)
    45:6
substance (26)
    14:17;15:16;26:16;
    30:13,15;44:12;51:1;
    73:13;100:5,6,19;117:12,
    15,16,19,19,25;118:17;
    148:23,24;149:2;152:6;
    155:17,18;156:12;158:14
substances (1)
    170:2
substantive (1)
    21:16
succeed (1)
    83:17
succeeded (1)
    97:13
success (18)
    42:11;55:9;99:10;
    101:18,22;104:2;123:6,
    21;124:23;125:8,11,12;
    127:15,24;128:16,22;
    129:5;130:2
successful (1)
    23:25
successfully (1)
    60:4
sued (1)
    178:5
suffer (3)
    78:17,18,23
suffered (1)
    80:13
suffering (7)
    24:2;78:14;79:13,17;
    80:2;82:14;118:12
sufficient (3)
    51:15;101:14;122:9
suggests (1)
    72:3
sum (4)
    28:5;43:23;63:21;
    157:20
summary (2)
    18:25;67:9
SunTrust (1)
    95:18
superficially (1)
    171:14
supervised (1)
    151:12
supervising (1)
    96:23
supervision (3)
    91:22;165:1;169:8
supervisory (5)
    91:14;92:22;94:1,23;
    96:19
supplementing (1)

137:23
support (27)
    26:3;31:20;56:10;
    76:12,17;78:12;83:16;
    95:25;132:16;136:12;
    137:4;140:2;142:4;
    155:23;158:15,17;
    159:10,10,13,13,14,15,
    20;160:1,18;161:24;
    169:13
supported (3)
    123:20;142:3;147:2
supportive (2)
    159:6,8
supports (5)
    28:6;29:16;127:14;
    169:4;170:24
suppose (1)
    129:7
supposed (4)
    37:25;53:20;71:7;
    133:11
Sure (61)
    9:5,7;10:11;13:15;
    15:9;16:1,11;18:1,16;
    19:18;28:11;30:14;36:14,
    17;38:11;40:12,19;52:18;
    56:17;58:5,13,20;60:24;
    61:25;62:25;66:19,21;
    75:11;81:19;83:17;
    85:14;90:5;92:17,17,22;
    96:12;97:7;112:6;128:6;
    130:14;132:18,20;134:7,
    16,24;139:19;142:8;
    145:16;152:19;154:21;
    156:24;165:2;167:13,15,
    19,20,21;169:20;170:20;
    174:6,20
surely (1)
    27:15
surprise (2)
    104:13,15;112:15
suspect (2)
    112:13,20
swear (1)
    6:12
sweat (1)
    136:9
sweep (1)
    155:10
sworn (1)
    6:14,21
symptoms (6)
    51:2;81:17;82:3;
    119:12,21;120:8
system (1)
    140:14
systematic (1)
    28:17

T

ta (2)

21:23;134:22
tabbed (1)
    128:19
table (1)
    100:7
talk (28)
    14:24;37:16;50:2;
    54:19;70:22;72:14;78:5,
    9,10;84:4;111:5;123:4;
    134:17;141:19,20;
    144:11;147:13;148:20;
    154:11;169:16;170:12;
    171:23;172:17;175:9;
    176:24;177:6;178:1,8
talked (7)
    11:8;36:10,13;121:19;
    131:20;152:21;157:23
talking (23)
    11:23;31:13;41:25;
    61:3;67:11;72:19,22;
    99:1;100:8,8,8,9;112:5;
    114:14;120:13;133:5;
    144:24;145:8;154:21;
    174:1,18;175:21;177:17
talks (1)
    178:8
tall (1)
    73:25
tally (1)
    24:8
tangible (1)
    101:3
TANNER (1)
    178:20
tape (3)
    6:3;77:15;130:20
tapes (1)
    77:5
Target (2)
    95:18;97:14
taught (2)
    49:11;117:9
Taylor (5)
    19:6;84:4,19;85:4;93:2
teach (4)
    48:22;50:4,11;54:1
teacher (2)
    39:11;71:7
teachers (11)
    35:10;39:9;43:21;
    47:17,20;48:5;51:2;
    53:19;54:21;70:25;71:16
teacher's (2)
    70:19;100:8
teaching (3)
    51:5;52:21;70:20
teachings (1)
    86:25
techniques (4)
    35:9;44:15;46:14;66:3
Technologies (3)
    30:7;50:11;54:1
telling (14)

Desmond, et al. v.
Narconon, et al.

Case 1:13-cv-02217-SCJ   Document 1-2   Filed 07/02/13   Page 64 of 67

Denis Adolph Casal, M.D.
March 21, 2012

20:9;46:11,13;47:3,4,
13;50:17;60:16;63:6;
96:15;101:2;110:11;
122:6;142:6
**ten (1)**
9:10
**tend (5)**
27:25;33:2;87:7;98:1;
106:14
**tends (1)**
129:21
**Tennessee (1)**
84:11
**tenure (1)**
35:11
**term (7)**
56:14;59:4;146:11;
148:11,12;151:25;166:21
**terminology (1)**
116:10
**terms (13)**
28:23;53:15;86:17;
115:4;119:3;125:8,20;
126:19;128:17;132:14;
147:24;149:23;150:10
**terrible (1)**
135:13
**test (10)**
56:5,8;81:17;112:14,
21;114:20,22;116:13,16,
21
**testified (5)**
6:22;10:20;12:20;
103:23;113:19
**testifies (1)**
113:16
**testify (4)**
9:25;13:9,19;47:24
**testimony (14)**
12:9;17:8;24:13;26:2;
85:4;101:20;113:8;
114:5;133:10;150:21;
151:1,3;171:19;177:23
**testing (21)**
112:16,17,18,18,25;
113:4,5,17,25;114:4,16;
115:3,16,19,22;116:8;
119:4,13;120:25;121:2;
177:4
**tests (5)**
112:15;114:9,24;
121:14;122:8
**Thanks (1)**
49:7
**therapeutic (3)**
89:10,14;158:17
**therapies (3)**
97:21;98:5;105:7
**therapist (1)**
99:19
**therapy (9)**
98:11,12,18;99:14,20;
100:1;101:14;105:2;

168:3
**therefore (2)**
83:12;96:2
**Thereupon (8)**
6:14;7:20;17:10;26:7;
49:8;61:14;131:9;154:13
**thing-is (1)**
145:5
**thinking (10)**
9:21;24:3;99:2,4;
101:5,12;127:8,10,11;
163:16
**third (1)**
117:13
**thorough (1)**
134:19
**though (9)**
67:6;75:23;88:3;103:3,
3;113:24;115:7;171:12;
176:7
**thought (16)**
12:6,11;15:8;16:24;
19:4;33:25;35:24;54:22;
58:3,19;74:11;110:9;
111:3;133:12;134:2;
158:21
**thoughts (1)**
98:25;99:13,15,16,17;
101:8;135:20
**three (9)**
75:14;89:7;116:18,21;
119:2,3,6;149:19;162:6
**throughout (1)**
69:3;146:9
**throw (3)**
76:21;116:6;147:1
**thumbing (1)**
38:19
**thus (1)**
24:6
**times (12)**
8:20;49:18;101:18;
116:18,21;119:6,7;146:9;
149:20;162:14;169:24;
170:2
**tired (2)**
112:13;174:4
**title (1)**
83:10
**titles (1)**
166:21
**today (7)**
7:11;25:22;28:12;35:3;
74:25;75:19;101:19
**together (5)**
72:13;100:11;107:16;
148:19;155:3
**told (14)**
10:7;11:12;16:11,13;
29:15;33:14;38:13;43:8;
51:4;54:7;116:23;122:8,
12;154:5
**tomorrow (1)**

153:22
**tonight (1)**
159:12
**took (6)**
16:9;21:18,22;70:19;
163:6,6
**top (3)**
30:6;47:16,21
**torture (2)**
40:20;47:11
**total (5)**
24:10;28:5;43:24;
63:21;157:20
**totally (1)**
129:12
**touch (1)**
100:22
**tougher (1)**
128:2
**town (2)**
94:16;162:15
**toxic (1)**
172:1
**toxicologist (1)**
172:7
**toxins (3)**
136:10,13,16
**track (3)**
72:23;128:19;170:23
**train (1)**
52:2;54:20;93:9
**trained (5)**
44:14;46:13;119:11;
158:23;169:8
**training (43)**
35:16,17;37:25;39:6;
41:19;43:20;49:19,21;
50:3,8,9,14,19,21;51:1,3,
15;52:2,19;53:11,12,24;
54:5,10,15,15,17;68:18;
86:13;98:15,21;99:6;
117:7,17,17,19;119:18;
120:4,6,14,22;143:6,11
**transition (1)**
146:23
**transitioned (1)**
89:5
**translate (1)**
86:8
**travels (1)**
80:1
**treat (12)**
55:15;64:20,22;66:7;
67:8;82:8;106:4,5;118:8;
135:6;149:7;156:5
**treatable (1)**
64:3
**treated (5)**
9:25;81:9;117:14,14;
162:20
**treating (16)**
26:5;55:21;65:15,21,
22,23;66:3;73:13;74:25;

112:3;117:25;127:25;
128:2,14;137:14;138:15
**treatment (81)**
16:14;24:2;30:13;42:9;
47:12;59:20;60:1,3,7;
64:21;66:13;67:21,24;
68:2,7;72:25;73:2;74:18;
77:19;78:7;82:23,24;
85:5;87:21,25;88:11,24;
89:1,6;90:12,18;91:13;
93:23;94:21;95:21;97:22,
25;101:16;105:5,25;
106:6,9;107:5,9,11,18;
108:3,15;109:2,10;
110:24;111:1,3,17;
117:13;119:11,20;120:5;
121:9;125:7;126:22;
136:4;137:17;141:4;
146:15,16,17;148:1,12,
14,17;149:25;152:2;
156:5,6;159:24;163:9;
167:10,16;169:5;178:16
**treatments (1)**
91:5
**trial (3)**
12:21;25:17;47:24
**tried (1)**
27:7
**triggered (1)**
115:20
**trouble (2)**
163:20;165:19
**TRs (4)**
69:20;98:22;100:21;
101:13
**truck/bus (1)**
94:5
**true (22)**
22:3;42:19;46:24;47:4;
48:18,19;51:19;55:14,16;
68:16,17;87:14;90:22,25;
115:5,6;125:4;129:19,20;
137:1,2;170:1
**truly (2)**
16:17;95:3
**trust (2)**
162:10,11
**truth (2)**
37:6;142:6
**try (16)**
29:13;32:21;41:3;
44:21;47:22;58:15;66:20,
20;73:3,10;85:11;88:22;
105:3;106:24,25;158:1
**trying (17)**
21:14;23:3;26:17;
31:17;40:20;47:10,11;
57:20;86:14;110:3;
118:2;132:20;140:1;
144:20;152:25;155:10;
172:25
**turn (2)**
135:4;163:12

**twice (1)**
162:25
**twins (2)**
71:7;100:21
**Two (21)**
11:5,18;15:1,3;19:5;
29:20;35:23;45:6,13;
56:16;57:25;77:9;90:20;
112:10;143:2;163:7,7,23;
164:5,10;174:9
**two-minute (1)**
174:5
**type (6)**
41:17,21;68:6;89:11;
111:14;147:2
**types (1)**
24:1
**typical (5)**
138:12;167:9,12;168:8,
15
**typically (4)**
33:3;79:20;118:13;
168:9

---

**U**

**ul (1)**
82:8
**ulcer (1)**
82:7
**ultimately (1)**
52:6
**Um (2)**
92:13,13
**un (2)**
101:12;139:14
**unanswerable (1)**
65:20
**uncomfortable (1)**
143:20
**uncommon (2)**
111:9,12
**under (9)**
67:1;79:15;91:22;
93:15;130:3;145:12;
155:10;156:4;177:9
**understanding-and (1)**
145:4
**Understood (3)**
8:12;92:23;133:10
**Unhook (1)**
77:10
**unit (2)**
21:22;117:16
**universe (1)**
63:20
**unknowns (1)**
139:13
**Unless (2)**
97:15;175:7
**unlicensed (1)**
152:11
**unreasonable (1)**

Desmond, et al. v.
Narconon, et al.  Case 1:13-cv-02217-SCJ  Document 1-2  Filed 07/02/13  Page 65 of 78  L. Adolph Casal, M.D.
March 21, 2012

165:7
unresponsive (1)
   48:25
unstaple (2)
   18:12,15
unsure (1)
   92:16
untrue (1)
   46:12
up (30)
   24:15;25:11;26:13;
   36:25;42:14;46:18;54:9;
   58:3;65:25;72:15;83:12;
   101:21;102:5,20;104:8;
   108:5,6;126:14;129:7;
   135:2;142:25;153:21;
   156:11,20,24;167:11;
   170:11;174:22;175:13;
   177:18
up-but (1)
   24:9
updated (4)
   8:9,15;107:10,15
upon (5)
   45:2;67:24;72:6;86:24;
   125:20
Urgent (1)
   154:9
use (21)
   17:7;20:15;43:19;
   53:22;64:22;87:14;
   88:16;91:3;96:15;111:1;
   119:12;137:21;142:1;
   145:7;146:10,17;149:23;
   155:23;159:9,10,14
used (10)
   11:1;31:2;52:2;90:20;
   96:17;97:22;99:10;
   115:22;116:8;136:2
useful (2)
   106:16,18
using (19)
   20:2;31:20;56:5,8;
   60:4;64:12;79:23,23;
   96:7;105:16,25;111:10;
   112:7,21;116:9;119:21;
   120:8;126:2;156:2
utilizing (1)
   149:15

**V**

vague (1)
   88:13
vaguely (1)
   101:24
value (1)
   58:6
Vans (1)
   147:12
variability (2)
   69:2;73:4
variation (3)

70:15,16,18
variety (4)
   26:15;18;27:13;126:24
various (6)
   32:8;38:10;137:25;
   140:13;141:5;177:17
vary (2)
   67:24;125:17
vast (1)
   68:19
Vaughn (4)
   14:23;15:4,11;162:16
verified (1)
   41:14
versus (1)
   24:1
veterans (1)
   52:20;117:20
video (10)
   6:1;40:22,25;77:11,14;
   130:15,18;174:11,14;
   178:24
VIDEOGRAPHER (5)
   6:1;40:22,25;76:13;
   77:11,14;130:15,18;
   174:11,14;178:23
view (9)
   17:5;64:24;65:6,11,13,
   15;67:7;87:2;153:23
viewed (1)
   65:3
violations (1)
   93:16
virtually (2)
   136:7;141:25
visit (1)
   161:12
visited (1)
   143:1
vitamin (5)
   137:10,11,14;138:20;
   140:8
vitamins (11)
   33:7,8;70:6,9;81:19;
   137:25;138:13,17;139:8,
   16,24
vocational (4)
   68:5;83:5;85:23;86:13
voice (2)
   13:23,25
voluntary (1)
   109:3
volunteer (1)
   14:19
vote (1)
   160:7

**W**

walt (1)
   143:23
walk (2)
   138:1;160:6

walked (2)
   21:23;48:20
walking (1)
   99:23;153:21
walks (1)
   118:8
wall (1)
   100:22
Walmart (1)
   95:18;97:14
wander (1)
   93:6
water (5)
   40:7,10,17;77:7,8
way (49)
   16:1;25:20;31:8;41:4;
   48:10;54:10;56:13;
   57:13;66:8;67:9;69:5,7,
   13;71:1,6,14;73:11,16,23,
   23;74:10,14;83:11;85:5;
   99:8;101:21;102:17;
   103:20;112:12;114:11,
   12;126:16;134:10,17;
   136:1,17;138:9;145:2;
   155:16;157:18;161:4;
   167:22;169:4;170:16,24;
   172:17;173:5;176:25;
   177:24
ways (7)
   42:9;75:4;101:3,5,12;
   135:22;162:24
web (2)
   33:1,4
Wednesday (1)
   35:3
weed (2)
   79:23,23
week (1)
   145:21
weeks (7)
   81:20,20;82:2;95:9;
   135:24,24,25
weird (1)
   99:4
welcome (3)
   103:1;121:17;134:18
weren't (1)
   34:1
What's (26)
   9:8;17:13;21:3;25:14;
   29:23;34:6;55:4;56:21;
   67:20;78:6;88:9;96:22;
   99:19;122:12;126:25;
   139:3;141:22,22;143:5,5;
   146:24;152:5;155:4;
   158:18;170:18;174:3
whatsoever (4)
   31:6;48:15,17;137:17
Where's (1)
   58:12
wherever (1)
   149:9
Whig (1)

15:18
Whitlock (8)
   13:24;14:3;15:6,19;
   16:10;21:21;22:13,23
whole (3)
   64:20;66:18,21
Who's (5)
   41:23;111:25;114:8;
   142:6,6
whose (1)
   39:16
willing (10)
   38:14;69:6;71:23;
   88:19;113:14;115:6,12;
   156:11;157:25;158:3
wish (1)
   24:24
wit (1)
   155:22
withdrawal (2)
   51:2;81:9
within (3)
   57:4;86:6;87:19
without (8)
   8:23;37:7;76:22;93:25;
   94:21;98:13;99:16;
   129:23
witness (40)
   6:12,14;7:7;9:25;10:2;
   18:11,13,17,21;19:5;
   20:1,20;25:10;39:2;49:2,
   10;60:13;65:18;73:22;
   76:14;85:1;90:24;91:16;
   95:1;102:22;103:7,13;
   104:19;116:1;124:14;
   132:13;140:18;141:16;
   146:5;154:4;159:20;
   160:24;169:12;173:18;
   177:13
wondering (1)
   37:2
word (12)
   53:22;64:12;76:21;
   92:22;142:1;144:2;
   146:17;147:1;159:9,10,
   14;160:25
words (7)
   27:22;64:23;77:22;
   95:17;101:6;147:11;
   176:17
work (20)
   11:1,3;14:5,8;24:10;
   27:6;41:17,22;42:5;
   47:18;55:24;56:1;58:7;
   65:2;69:13;71:15;73:9,
   18;133:4;176:8
worked (6)
   49:21;51:16;90:2,5;
   91:12;128:3
working (14)
   18:24;38:23;40:11;
   41:22;51:8;68:16,20;
   90:7,8;94:12;97:14;

15:18
100:11;119:19;154:25
works (6)
   26:15;66:14;70:13;
   71:15;94:7;150:16
world (3)
   74:21;86:9,17
worried (1)
   155:11
worries (1)
   99:4
worrying (1)
   19:19
worth (1)
   30:1
worthwhile (1)
   30:3
worthy (1)
   95:13
write (7)
   27:10;33:5;38:3;39:8;
   51:18;72:17;159:11
writes (1)
   104:7
writing (2)
   72:16,19
writings (3)
   81:12,22;103:20
writings-made (1)
   42:7
written (6)
   26:14,15;27:13;28:25;
   47:18;93:20
wrong (5)
   23:1;64:18,19;75:17;
   81:18
wrote (10)
   15:24;27:12;42:4,13;
   101:22;103:15;104:15,
   24;145:21,22

**Y**

year (6)
   39:13;117:13;126:10;
   127:4,12;128:16
year-I (1)
   45:5
years (13)
   9:10;10:13;11:5,18;
   41:16;45:14;51:5,10;
   73:13;79:17;119:24;
   125:13;128:4
years-Narconon (1)
   45:6
yell (2)
   31:8;175:16
yelling (1)
   101:2
Yep (3)
   17:18;18:25;105:4
yesterday (1)
   35:4
York (2)

Desmond, et al, v.                   Case 1:13-cv-02217-SCJ   Document 1-2   Filed 07/02/13   Page 66 of 78
Narconon, et al.                                                                                          Louis Adolph Casal, M.D.
March 21, 2012

43:11;74:9
young (4)
 9:13;10:15;16:14;
 39:11

**Z**

zero (2)
 162:18,18

**1**

1 (22)
 6:4;7:19,21;18:11,20,
 22;22:10;36:7;67:18;
 68:25;69:11;88:11;
 122:24;131:20,23;
 132:15,17;133:1;145:20;
 156:6;177:9;178:10
1:33 (2)
 130:16,17
10 (3)
 18:17;19:23;110:23
10,000 (1)
 124:13
11 (8)
 18:17;19:23;21:4;
 22:10;168:24;169:16;
 170:10;171:4
11:05 (1)
 6:3
11:42 (2)
 40:23,24
11:43 (2)
 40:24;41:1
12 (9)
 18:17,18;19:24;20:11;
 110:25;111:4;125:15,23;
 130:24
12:26 (2)
 77:12,13
12:37 (2)
 77:13,15
12-Step (3)
 73:1;74:9;106:19
12th (1)
 154:22
13 (7)
 122:25;130:25;132:11;
 133:2,17;134:8,13
14 (2)
 79:24;119:24
18 (1)
 145:20
19 (1)
 145:20
1970s (1)
 60:2
19th (1)
 35:4

**2**

2 (13)
 17:11,14;18:11,23;
 20:19;67:20;69:11;72:22,
 24;74:4;77:15;88:11;
 157:9
2:29 (2)
 130:17,19
20 (3)
 73:13;74:25;125:18
2004 (1)
 10:25
2008 (4)
 21:4;25:19;99:10;
 154:23
2011 (1)
 22:10
2012 (1)
 6:2
20th (1)
 35:4
21st (2)
 6:2;35:3
24 (2)
 125:15,23
24-hour (1)
 151:10
26 (1)
 8:9
27- (1)
 142:20
28-year-old (2)
 142:21;143:22

**3**

3 (16)
 18:11,25;26:6,8;77:21;
 88:11;104:16;130:20;
 140:11;141:1,9;142:4,9;
 143:4;153:20;156:4
3:00 (1)
 153:25
3:21 (2)
 174:12,13
3:28 (2)
 174:13,15
3:33 (2)
 178:24,25
33 (1)
 127:15

**4**

4 (18)
 18:11,25;41:4;47:6;
 53:11,18;60:25;61:3,15;
 62:18;78:6;82:17;88:11;
 104:17;133:18;134:8,14;
 145:19

**5**

5 (9)

18:11;19:1,2;88:9,11;
 97:18;131:5,10;140:7
50 (4)
 78:22;118:1,2,11

**6**

6 (5)
 18:13;19:5;105:2;
 140:7;154:14
60 (1)
 22:11
6th (1)
 99:10

**7**

7 (3)
 18:17;19:6;107:2
70 (1)
 126:7
70-something (1)
 126:7
76 (6)
 123:6,21;124:22;
 128:21;129:5;130:2

**8**

8 (4)
 18:17;19:21;68:25;
 107:4
8,000 (1)
 124:13
8,000-plus (2)
 124:4,4
80 (2)
 24:9;125:18
80-ish (1)
 24:7

**9**

9 (2)
 18:17;19:22